**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **VIRGINIA NESTER and** | § | |
| **ROBERT SCOTT NESTER,** | § | |
| **INDIVIDUALLY and AS NEXT** | § | |
| **FRIENDS OF C.N. and S.N., MINORS** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Case No. 1:13-CV-00920-LY** |
| **vs.** | § | |
| | § | **JURY DEMANDED** |
| **TEXTRON INC. d/b/a E-Z-GO** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs VIRGINIA ("GINI") NESTER and ROBERT ("SCOTT") NESTER, INDIVIDUALLY and AS NEXT FRIENDS OF C.N. and S.N., MINORS ("Plaintiffs" or "the Nesters") file this their First Amended Original Complaint and Jury Demand, complaining of defendants TEXTRON INC. d/b/a E-Z-GO and for cause of action respectfully show as follows:

### I. PARTIES

1.     Plaintiffs VIRGINIA (GINI) NESTER, ROBERT SCOTT NESTER, C.N. and S.N. are individuals residing in Buda, Hays County, Texas, and are citizens of the State of Texas.

2.     Defendant TEXTRON INC. d/b/a E-Z-GO is a Delaware corporation that maintains its principal place of business (nerve center) in Providence, Rhode Island.  It has been served and made an appearance.  At times herein, it may be referred to as Textron or E-Z-GO.

-1-

## II. JURISDICTION AND VENUE

3.      This Court has federal diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states.  Among other things, and without limitation, the amount in controversy in this case involving a plaintiff who became a quadriplegic as a result of the matters set forth herein far exceeds the minimal jurisdictional threshold of $75,000, exclusive of interest and costs.  Plaintiff Gini Nester's past medical bills alone far surpass this jurisdictional amount.

4.      This Court has both general and specific personal jurisdiction over the defendant because (without limitation) it conducts and purposefully does business in Texas and directs business toward Texas; it has regular and continuing contacts with Texas; has sold and/or shipped products to Plaintiffs and other persons in Texas; has placed products in the stream of commerce to Texas; own or lease real property in Texas; and are amenable to service in Texas.

5.      Venue is proper in the Austin Division of the Western District of Texas because all or a substantial part of the events or omissions giving rise to the claims and causes of action occurred in Hays County, Texas.

## III. STATEMENT OF FACTS

6.      Textron Inc. is a $12.1 billion multi-industry company with approximately 32,000 employees. The company claims to leverage its global network of aircraft, defense and intelligence, industrial and finance businesses to provide customers with innovative solutions and services. Textron claims it is known around the world for its powerful brands such as Bell Helicopter,

Cessna Aircraft Company, E-Z-GO, Greenlee, Jacobsen, Kautex, Lycoming, Textron Systems and Textron Financial Corporation. Textron Inc. consists of numerous subsidiaries and operating divisions. It touts that it provides provide customers with groundbreaking technologies, innovative solutions and first-class service. Yet in 2001, it designed and marketed a utility vehicle that was equipped with an outdated and unreasonably dangerous "kickoff" brake system that was in use in the mid 1960's back before man went to the moon and has not changed any since, despite advances in safety technology. In 2011, that 50 plus year old brake system caused an E-Z-GO Workhorse utility vehicle to take off without an operator and it struck and paralyzed Gini Nester.

7.     E-Z-GO is a division of Textron. In 1954, in Grovetown, Georgia, two brothers founded E-Z-GO from a claim that they could build a golf car better than any other golf vehicle then on the market.  The kickoff brake system was a part of that claim, back in the day. E-Z-GO became part of Textron in 1960. The kickoff brake system hasn't changed any since then. Today, E-Z-GO builds dozens of vehicle models under the E-Z-GO, Cushman and Bad Boy Buggies brands. Besides the golf cars with which it is so often identified, E-Z-GO also manufactures utility vehicles for work and recreation, personnel shuttles and material-handling machines. Many still use the outdated and unreasonably dangerous kick off brake system. Virginia Nester was struck and paralyzed by a runaway E-Z-GO utility vehicle that had a kickoff brake system. The vehicle in question is a model year 2001, gas powered, E-Z-GO ST 350 Workhorse Utility Vehicle (Workhorse) (serial # 1369608) manufactured by Textron Inc. in 2000.

**Gini Nester is struck and paralyzed by a runaway Textron vehicle**

8.     Plaintiffs Virginia ("Gini") and Robert ("Scott") Nester are a husband and wife who live in Buda, Hays County, Texas with their daughters, C.N. and S.N.  The Nesters purchased an

E-Z-GO Workhorse cart (Serial #1369608) in 2005.  The cart, described as a utility vehicle, was designed, manufactured, marketed and placed into the stream of commerce by Textron Inc. d/b/a E-Z-GO, and sold to the Nesters by Rental Service Corporation (Rental Service) in San Marcos, Hays County, Texas. The vehicle has a maximum speed rating of 15 mph. The weight of the vehicle is approximately 1050 pounds and it has a load capacity for passengers, cargo and accessories of 800 pounds.  On the afternoon of December 5, 2011, Gini Nester was using the utility vehicle cart at the Nesters' ranch near Buda, Hays County, Texas, to assist with feeding and moving their small group of livestock.  No other person was with Gini but her daughter was waiting in the car back at the barn.  Gini was using the Workhorse utility vehicle to move cattle from one section of the ranch to another and then feed them.  Gini was going to feed the cattle a supplemental feed consisting of cattle cubes. The supplement feed came in 50 pound bags. The Nesters stored the bags of cattle cubes in a barn located on the property.  To get the supplemental feed out to the feeding area and because the bag was too heavy for her to lift into the cargo area, Gini placed a bag of cattle cubes on the passenger side floor board of the E-Z-GO Workhorse utility vehicle leaning against the seat.   While traveling across the ranch on the E-Z-GO Workhorse, Gini approached a manual gate leading to the pasture where she was going to move and feed the cows.  Once she reached the gate, Gini stopped the utility vehicle a few feet from the gate, applied the parking brake, left the selector level in the "F" (forward) position, and climbed out to open the gate.  The engine had stopped when she took her foot of the accelerator per design.  Gini then walked to the gate and opened it.  As Gini was opening the gate, with her back to the vehicle, the bag of cattle cubes fell on the accelerator pedal, kicking-off the parking brake, starting the engine, and causing the vehicle to inadvertently and unintentionally accelerate forward,

suddenly and without warning, from a complete stop.  Gini never saw or heard the vehicle coming from behind with enough time to avoid it.  She turned and saw it as it struck her.  The Workhorse struck Gini, knocked her to the ground and ran over her, at least in part. Paralyzed with a broken neck and unable to move or call for help, Gini was trapped there hoping someone would find and help her before she died.

9.       An hour or more later, Gini was found in this position by her husband, who had come looking as he was worried to have not heard from her.  Fearing severe injury, including a broken neck, he called emergency medical personnel, who transported her to Brackenridge Hospital in Austin.  There she was diagnosed with fractures of the C5, C6 and C7 vertebrae, with dislocation between the C6 and C7 with displacement of C6 up and forward of the C7 – resulting in pinching and stretching of the spinal cord.

10.     Gini Nester is now a quadriplegic as a result of the incident, requiring round-the-clock care from others.  Her life is clouded in fear, uncertainty and pain.  Everything about her life has drastically changed forever, just as she thought it would as she lie waiting for help at the ranch.  This accident should never have happened.  Gini Nester didn't have to be one of the victims of this unreasonably dangerous product; not a single person should.  Her damages were caused by the unreasonably dangerous and defective vehicle and the negligence and gross negligence of Textron/E-Z-GO and its employees, agents, servants, and/or divisions.   The Nesters bring this action to hold Textron accountable and to try to prevent any other person from being hurt or killed by this product.

**Workhorse vehicle description**

11.     Textron initially sold the E-Z-GO Workhorse vehicle in question to Rental Services

Corporation USA/RSC Equipment Rental (RSC) in October 2000. It came with an operator's manual, and E-Z-GO knew it was likely to be re-sold, but gave no instruction to pass the manual along if it was. RSC rented/leased the incident utility vehicle to different organizations and corporations but never made any substantial changes to the vehicle pertinent to this action. RSC (later merged with United Rentals, Inc.), sold the vehicle to the Nesters in 2005. The Nesters were not given an operator's manual when they bought the vehicle.

12. Textron began the product design and development of the Workhorse utility vehicle in about 1995 or 96. Textron designed the ST 350 Workhorse utility vehicle "for hauling material and up to two passengers in the performance of non-recreational off-road utility vehicle activities." Textron was aware that the ST 350 Workhorse would be used in a ranch or farm environment with livestock. That's where the Nesters were going to use it.

13. Textron began selling E-Z-GO ST 350 Workhorse Utility Vehicles in 1998. The ST 350 Workhorse Utility Vehicle is leveraged from and based on the design of the Textron E-Z-GO TXT golf car. Compared to the typical golf car, the ST 350 Workhorse possesses larger knobby wheels for off road use and an extended cargo bed. The operator/passenger compartment and controls of the ST 350 Workhorse are similar to those of the typical E-Z-GO golf car, including a single bench seat and an open floor board area. The vehicle looks a lot like a golf cart with a dump bed added, and even includes a golf ballholder, cupholders and teeholders on the dash.

14. Also similar to Textron's golf cars, the controls of the E-Z-GO ST 350 Workhorse included:

- A key/light switch

- A direction selector

-6-

- A steering wheel

- A combination service brake and parking brake pedal

- An accelerator pedal

15.    The key/light switch is mounted to the approximate center of the dash. The switch has three positions: OFF, ON, and Lights (designated by a "light icon").  (See manual excerpt below) The key/light switch enables/energizes the basic electrical system of the utility vehicle when switched to ON or Lights.



**Fig. 12  Key/Light Switch and Fuel Gauge**

When the vehicle is left unattended, the key should be removed to prevent inadvertent operation of the vehicle.

**NOTE**   If the vehicle is equipped with E-Z-GO installed custom accessories, some accessories may remain operational with the key switch in the 'OFF' position.

16.    The direction selector is located on the seat support panel (i.e., behind the operators legs when seated in the vehicle). The direction selector consists of a three position lever: forward, neutral, and reverse. Textron instructs users to leave the vehicle in the "F" (forward) position when unattended.  Thus, if the key is in the "on" position and the accelerator is pressed, the vehicle will

accelerate forward.  The steering wheel and pedals are on the left side of the vehicle, like a passenger vehicle. The steering wheel allows the operator to steer the vehicle laterally much like other passenger vehicles and golf cars.

**Textron's kick-off brake system**

17.     Not long after E-Z-GO started, and perhaps even at the time it started in 1954, it utilized a design in its golf cars that it refers to as the "kick-off brake system."  Part of the reason was to allow the vehicle to take off quickly and easily.   While perhaps convenient, this characteristic is also dangerous.  In this system, the accelerator pedal is physically linked to the parking brake.  When the accelerator pedal is pressed, it releases or "kicks off" the parking brake. The Workhorse utility vehicle in question was designed and marketed by Textron with a kick off brake system.

18.     The Workhorse is designed so that the engine only runs when the accelerator is depressed. When the accelerator is depressed it engages a micro switch that controls the ignition and starts the engine.  When the accelerator pedal is released the micro switch shuts the engine off. There is a "Key/Light Switch" located on the dash panel.  The 2001 Owner's Manual & Service Guide explains that "this switch enables the basic electrical system of the vehicle to be turned on and off by turning the key.  The lights will illuminate only when the key is moved to the light icon." The Workhorse uses a "Combination Brake and Parking (PARK) Brake Pedal."  The brake pedal is split into two sections with the lower portion controlling the service brake and the upper section controlling the parking brake.  The parking brake is engaged by pushing the upper parking brake section of the pedal down until it locks.  The configuration of the pedals is shown in Figure below.



**Figure: Diagram from the "2001 Owner's Manual & Service Guide" for the E-Z-GO Workhorse ST 350 showing the configuration of the accelerator pedal and combination parking brake/service brake pedal.**

19.     The accelerator pedal in the Workhorse is multi-functional and works in the same manner as the accelerator pedal of other E-Z-GO golf cars with a kickoff system.  Because the pedal has a micro switch ignition design used to serve as the ignition mechanism, pressing the accelerator is analogous to turning on an ignition key in a car and starts the vehicle's engine assuming the key is in the "on" position.  When the accelerator pedal is released, the vehicle engine stops, analogous to turning the ignition key in a car to the "off" position.  The accelerator pedal is also used to adjust the travel speed of the Workhorse similar to the accelerator pedal of a passenger vehicle.  Textron also considers this accelerator pedal design to be an operator present switch or what some refer to as a dead-man switch – a safety device intended to prevent the vehicle from operating without an operator physically in the vehicle.  In reality, it is far from a safety device and

actually allows the vehicle to operate without an operator present in an unreasonably dangerous way.

20.     To engage the parking brake the top section of the brake pedal is pressed down until it locks in place. Once it is set, the parking brake is released by depressing the bottom (i.e., service) section of the brake pedal.  That is the preferred method of releasing the parking brake instructed by EZGO to assure the longest service life of the brake components.

21.     The parking brake can also be released or "kicked off" by depressing the accelerator. Textron does not recommend this method of releasing the parking brake.  The design of the parking brake is such that, if the parking brake and accelerator were both engaged at the same time, and the brakes are properly adjusted to the recommended setting, the parking brake will prevent movement of the vehicle, even if the accelerator is depressed.  Thus, if the parking brake was not linked to the accelerator and the accelerator was depressed, the brake would not allow the vehicle to move.

**Linkage of the Accelerator to the Parking Brake**

22.     There is a mechanical linkage between the accelerator pedal and the parking brake latch that uses a kick-off cam to disengage the parking brake any time that the accelerator pedal is depressed.   If the parking brake is set, pressing the accelerator pedal will kick-off the parking brake and allow the vehicle to move.  This is why Textron refers to the linkage of the accelerator pedal and parking brake as their "kick- off" brake system.  The "kick-off" feature of the parking brake system incorporates a series of linkages between the accelerator pedal and the latching mechanism for the parking brake. These various components can be seen in Figure A which is from the Technician's Service and Repair Manual. Pressing the accelerator pedal rotates the Kick-

Off Cam Pivot through the movement of the Kick-Off Link. This rotates the Kick-Off Cam which

forces the parking brake pedal latch arm off of the catch bracket. When the latch is released the

spring loaded brake pedal fully releases the parking brake. This all happens in the snap of a finger.



**Figure A: Diagram from the "Technician's Service and Repair Manual" showing the Kick-Off Linkage between the accelerator and brake pedals. Notes were added to demonstrate how mechanism works. Steps #1 through #5 show the order of how the brake is release but all five happen almost simultaneously.**

23. If the key/light switch is in the ON position and the accelerator is pressed, the parking

brake will kick off, the engine will start, and the vehicle will accelerate either forward or in reverse

depending on the position of the direction selector (i.e., "F" or "R"). Even if the key/light switch is

OFF and the accelerator is pressed, the parking brake will kick off and the vehicle can roll

downhill when parked on a slope. The accelerator pedal can be de-linked from the parking brake

by the removal of a single pin.  The de-linking of the accelerator pedal from the parking brake does not affect the accelerator or braking performance.  Notably, delinking the pin does not diminish the utility of the vehicle in any way.  The basic design of the kick off system has not evolved since 1965.

### Before the design of the Workhorse, Textron knew of the dangerous risk of Unintended Acceleration with the kickoff system – a hazard that can kill or seriously injure

24.     One of the known hazards and risks associated with the kick off system in general is the danger of unintended acceleration (UA).  This danger has been known by Textron since 1965. Unintended acceleration is inherently dangerous because once the vehicle is moving without an operator it can result in property damage, severe injury and death.  The Workhorse weighs over a thousand pounds and even if it is only traveling at slow speeds, it is still capable of inflicting severe damage to property and/or persons.

25.     James Fisher is the manager of reliability engineering for Textron E-Z-GO and was part of the E- Z-GO ST Series Workhorse utility vehicle design team.  Fisher is not, however, an engineer.  Fisher provided 30(b)(6) deposition testimony as Textron's Corporate Designee as well as factual deposition testimony.  Fisher defined "unintended acceleration" as acceleration that users of the vehicle did not intend to have happen (i.e., inadvertent, accidental). Textron recognizes that one of their vehicles moving without an operator present creates a hazard with a risk of serious bodily injury.  Textron designed their E-Z-GO Workhorse utility vehicle with a kick-off brake system that links the accelerator pedal to the parking brake. A parking brake is intended to keep a vehicle from moving.  But in the kick off system, if the parking brake is engaged, pressing on the

accelerator pedal will automatically kick-off and release the parking brake, whether intended or not. Because pressing the accelerator pedal also starts the vehicle's engine and accelerates the vehicle, any object or person that applies a low level of pressure to the accelerate pedal will cause the vehicle to move regardless of the prior state of the parking brake (assuming the key is on).

26.     Textron also designed their E-Z-GO Workhorse with a key/light switch. The key/light switch enables the basic electrical system of the vehicle, including the lights. When the key is turned to ON or Lights, pressing the accelerator will kick off the parking brake, start the engine and accelerate the vehicle. When the key is turned OFF, pressing the accelerator will not start the engine. However, because the parking brake is linked to the accelerator, even with the key off the vehicle could still inadvertently move or accelerate downhill if the accelerator pedal is inadvertently or accidently pressed.

27.     Before the design of the Workhorse, Textron was aware that a consequence of the design of their kick-off brake system was the potential for the inadvertent operation and/or unintended acceleration of the vehicle. For example, in the section describing the Key/Light Switch of its Owner's Manual and Service Guide for the incident E-Z-GO Workhorse, Textron states:

When the vehicle is left unattended, the key should be removed to prevent inadvertent operation of the vehicle.



**Fig. 12 Key/Light Switch and Fuel Gauge**

When the vehicle is left unattended, the key should be removed to prevent inadvertent operation of the vehicle.

NOTE *If the vehicle is equipped with E-Z-GO installed custom accessories, some accessories may remain operational with the key switch in the 'OFF' position.*

28.     Textron was also aware that the design of their kick-off brake system created a hazardous condition that could lead to severe personal injury or death when the vehicle key/light switch is ON.  For example, in their Owner's Manual and Service Guide for the incident E-Z-GO Workhorse, Textron states:

WARNING

If key switch is "ON" and parking brake is set, depressing the accelerator will release the parking brake and cause the vehicle to move which could result in severe personal injury or death.

## Accelerator Pedal

Depressing the accelerator pedal starts the engine. When the pedal is released, the engine will stop (Ref Fig. 14 on page 3-12).

 **WARNING** *If key switch is 'ON' and parking brake is set, depressing the accelerator will release the parking brake and cause the vehicle to move which could result in severe personal injury or death.*

Depressing the accelerator pedal will release the parking (PARK) brake if it is engaged. This is a feature to assure the vehicle is not driven with the parking (PARK) brake engaged. **Depressing the accelerator pedal is NOT the preferred method of releasing the parking brake.**

3-11

29.     Consistent with the information in the E-Z-GO Workhorse manual, Textron has known for more than some 40 odd years of the potential that somebody or something may depress the accelerator causing the vehicle to move without an operator in the driver's seat (i.e., unintended movement of the vehicle). Textron knew that personal injury could occur if the key was left on and something or someone inadvertently pressed the accelerator causing the vehicle to move Textron has been aware of the hazard associated with the unintended acceleration of the vehicle since at least 1975. Textron has known since the early 1980s that unintended acceleration was an issue that needed to be addressed in the design of their vehicles.

30.     Nick Moore is the senior Product Manager at Textron Specialized Vehicles.  Moore

-15-

also provided 30(b)(6) deposition testimony as Textron's Corporate Designee as well as factual deposition testimony. Moore testified that unintended acceleration is a hazardous condition associated with their vehicles that could result in severe injury or death and that Textron has known about the hazard since at least 1989. Nevertheless, the basic design of the kick-off brake system has not changed or evolved since 1965, some 50 years ago.

**Golf cart use begins to expand in the early 1990's**

31.     In the late 80's and early 1990's, golf cart use in the Unites States began to increase dramatically. The use began spreading from what was previously almost exclusively golf related use to much more non-golf related use. People began using the vehicles for use at the farm, ranch, business, neighborhoods, retirement communities and many more non-golf utilities. And with that increase in potential use, injuries from golf cart accidents also began to climb dramatically. This was before Textron designed the Workhorse.

**Textron seeks to leverage the increased use of golf carts in non-golf settings and moves into the utility vehicle market**

32.     On or before 1995, Textron sought to leverage the increasing use of golf carts by consumers that were not golfers. One of those targets for Textron was to enter the utility vehicle market. Before then, Textron was primarily engaged in business to business design and sale of golf carts. Textron customers and consumers were primarily golf course and golf maintenance related customers (golf courses or resorts) as opposed to individual consumers. Moreover, the use of the cart was primarily golf related. So, Textron attempted to expand the sales and profits relating to golf cars by leveraging the design of its golf car and directly target individual consumers, such as utility vehicle purchasers like the Nesters. These Textron efforts to increase

profits spawned the concept of the Workhorse in 1995.

**The safety design hierarchy: what the product design process should be**

33.    It is beyond dispute that in 1995, when the design of the Workhorse began, there were established and accepted fundamental principles to be used in the design of a vehicle such as the Workhorse.  Those fundamental and accepted engineering principles are reflected in the safety design hierarchy, principles that Textron agrees apply to it and to which it should adhere. The prerequisite step to the safety design hierarchy is to identify the hazards associated with a product. When a specific hazard has been identified, the first step is to change the design of the product to eliminate the hazard. Safety of people, even one person, is paramount.  If it is not feasible to eliminate the hazard, the next step is to utilize a guard to separate the user from the hazard. If it is not feasible to redesign or guard, it is imperative to adequately warn the user of the hazard.

34.    Textron recognizes it should abide by this safety hierarchy and should design the hazard out, guard against it or if those are not possible, provide adequate warning of the foreseeable hazards associated with the use of their product.   At the time it designed the Workhorse, Textron knew it had a responsibility to identify and mitigate the inadvertent operation/unintended acceleration hazard associated with the kick-off brake system of their E-Z-GO Workhorse utility vehicle. Textron also knew it had a responsibility to identify and mitigate the increased risk of inadvertent operation/unintended acceleration created by carrying cargo in the passenger compartment of their E-Z-GO Workhorse utility vehicle.  Textron did neither.

**1995 – 1998: in the Textron "design process" for the Workhorse, Textron ignores the safety design hierarchy and the increased risk of Unintended Acceleration in a utility vehicle with a kickoff system**

-17-

35.     The E-Z-GO Workhorse utility vehicle is based upon the E-Z-GO TXT Golf car. However, there are significant differences in the body design, users and intended use of the Workhorse compared to the typical E-Z-GO golf car.  For example, the use is for utility, not golfing, and the Workhorse is designed with a cargo body instead of a golf bag carrier.  The Workhorse user was not going to be a golfer on a golf course.  Unlike its typical golf car, Textron intended the Workhorse for carrying all different types of cargo, equipment, and tools and to be used in work related activities, in off road environments, and in farm and ranch environments around animals. Textron's marketing materials even depict this.  By contrast, the typical golf car is used to transport one or two golfers without cargo and with their golf clubs stored on the bag rack located on the back of the vehicle.  Also, while the typical golfer may get in and out of the cart over a hundred times in four hours, Textron knows of no farm or ranch activity, for example, that requires such use in a utility vehicle.

36.     Given the different intended users and use of the E-Z-GO Workhorse compared to their typical golf car, Textron had a responsibility to evaluate the product and determine the hazards associated with its foreseeable uses and misuses, including those associated with: 1) carrying and transporting different types of cargo both in the bed of the vehicle and the passenger compartment; 2) exposure to a wide age range of users, passengers, and bystanders (e.g., children, teenagers, and older adults); 3) use by people unfamiliar with the operation of the typical golf car; 4) use in an off-road environment; and 5) use in farming and ranching environments with exposure to farm animals and pets.  Textron failed to do so.

37.     Textron also had a responsibility to identify the potential types of users of their Workhorse and determine the knowledge and understanding of those user groups with respect to

how the product works and the hazards or risks associated with its use and misuse. Textron also had a responsibility to determine what warnings and instructions were needed to safely use their Workhorse product within its intended applications and environments.  Textron failed to do so.

38.     A significant hazard  associated with the use of the E-Z-GO Workhorse utility vehicle is the unexpected unintended acceleration of the vehicle due to the inadvertent contact of the accelerator pedal by a person, object, or other thing (e.g., pet).  The risk of unintended acceleration is increased when carrying or storing cargo in the passenger area of the E-Z-GO Workhorse vs. the cargo bed. Cargo stored or carried in the passenger area can more easily come in contact with the accelerator pedal than cargo carried or stored in the cargo bed.  Textron performed no analysis of these hazards.

39.     The testing and design documents produced by Textron regarding the design of the Workhorse ST 350 and any analysis of hazards associated with the vehicle, (and testimony in the case), shows E-Z-GO made no legitimate attempt to perform a hazard analysis to identify the danger associated with unintended acceleration that can occur when an object contacts the accelerator pedal of a parked vehicle.   E-Z-GO performed no testing to consider or evaluate the effectiveness of alternative design safety features such as separate parking brake and service brake systems, accelerator pedals without kick-off linkages, pedal guards, and/or operator present sensors for the Workhorse ST 350. Before the design of the Workhorse, Textron was aware that a consequence of the design of their kick-off brake system was the potential for the inadvertent operation and/or unintended acceleration of the vehicle.  Consistent with the information in the E-Z-GO Workhorse manual, Textron knew for more than 40 years before the design of the Workhorse of the potential that somebody or something may depress the accelerator causing the

vehicle to move without an operator in the driver's seat (i.e., unintended movement of the vehicle). Textron knew that personal injury could occur if the key was left on and something or someone inadvertently pressed the accelerator causing the vehicle to move. Despite knowing unintended acceleration was dangerous and severe and extreme personal injury was possible because of it, despite a stated goal to completely eliminate the ability of the product to experience unintended acceleration, despite knowing what a Design Failure Mode and Effect Analysis (DFMEA) was and doing it on other subsystems, Textron performed no DFMEA regarding unintended acceleration for the Workhorse. Textron never even considered the safeguards the auto manufacturers or other competitors were using to prevent unintended acceleration. Unintended acceleration was not discussed or analyzed in any way by Textron before the Workhorse was designed, marketed and sold.

**Textron ignored safer design alternatives that should have been used on a Workhorse**

40.    By ignoring and skipping the fundamental design safety hierarchy, Textron ignored safer alternative designs to the kickoff system that in reasonable probability - - (i) would have prevented or significantly reduced the risk of the injuries in question without substantially impairing the product's utility and (ii) were economically and technologically feasible at the time the product left the control of Textron Inc., by the application of existing or reasonably achievable scientific knowledge.

**Safer alternative design - remove the linkage pin**

41.    The first and by far most basic such alternative design is simple, less expensive, more reliable and safer – take out the linkage pin that connects or links the accelerator to the parking brake so the parking brake does not automatically kick off. With the linkage removed, and the

parking brake on, the risk of unintended acceleration is eliminated as the vehicle would not move even if something or somebody pressed the accelerator.  With the pin removed, the parking brake will not kick off, instead actually performing its function to keep the vehicle from moving.  Using this design is actually less expensive than using the kickoff system as it requires less parts, and it does not impair the product's utility.  As indicated below, following a tragic accident and government action, it appears Textron has actually implemented this alternative design to prevent unintended acceleration in similar vehicles in the United Kingdom.  But Textron failed to and refuses to do so voluntarily in the United States.

**Removing the linkage is easy and lowers the cost of the vehicle**

42.     Removing the parking brake "kick-off" linkage is easy and simple and actually lowers the manufacturing cost of the product.  This linkage system consists of the sixteen components shown in Figure B.



**Figure B:  Diagram from the "Service Parts Manual" showing the parts of the Kick-Off Linkage between the accelerator and brake pedals. Part numbers underlined in red are all of the parts that could be removed from this system when the linkage is removed.**

43.     The total cost for all of the parts associated with the parking brake "kick-off" linkage system is over $75.00.  Records provided by E-Z-GO for the ST 350 vehicles show that between the years of 1998 and 2008 almost 20,000 vehicles were manufactured; the cost saving of the parts for the parking brake "kick-off" linkage system for this many vehicles would be over 1.5 million dollars. The removal of the parking brake "kick-off" linkage system is economically feasible since it would actually lower the cost of the vehicle.

**Textron removes the linkage pin by design and through recall or bulletin**

44.     Documents recently produced by Textron indicate that it addressed the hazard of unintended acceleration in similar vehicles with a kickoff system, at least in the United Kingdom, through design by unlinking the accelerator and the park brake pedal.  Textron also provided post sale warnings and recall information.  Textron admitted in this matter that removing the linkage pin functions like turning the key off.  However, for reasons that have not been articulated, Textron indicates it has not considered or implemented the unlinked parking brake– accelerator pedal design for similar vehicles sold in the United States and that it has no such intention of redesigning the kickoff system or its use in the United States.  This is even after Textron has notice of fatalities and serious injuries related to the kick-off system and notice that the warnings or instructions it provides regarding turning the key/light switch off when exiting the vehicle are not followed and ineffective.

45.     Evidence indicates that Textron retained some significant amount of control over the product in question after manufacture.  Evidence shows Textron also actually had or voluntarily assumed a duty for curing the defect in question through recall and/or a duty to warn after the sale.

This duty to recall and warn was prompted by Textron's own volition and recognition of the duty, or by governmental directive, or alternatively both.  Without question, by 2005, Textron was aware of serious incidents, the defect and the need for a cure.  Textron also knew of the need and feasibility of changing the kickoff design and assumed the duty of changing the design of the vehicle in units already sold by removing the parking brake "kick-off" linkage through a recall or technical service bulletin after it was manufactured and distributed to customers.  Textron also recognized the duty to warn post sale.  Textron proposed to and apparently implemented those actions in the United Kingdom.  Curing the defect is simple – disconnect the linkage.  To disconnect the linkage between the pedals requires only the removal of two cotter pins. This could be done in a matter of minutes with only a pair of pliers.  To completely remove all of the components associated with the parking brake "kick-off" linkage system you only need to remove one cotter pin and loosen two set screws.  This could still be done in a matter of minutes with simple tools.  In a letter dated November 28, 2005 and addressed to Dr. Swan (a British Health & Safety Executive Engineer) in response to what appears to be a fatal unintended acceleration incident in England, a Textron representative writes, "…E-Z-GO has determined that it is feasible, and is working on field service instructions for disconnecting the accelerator from the brake release mechanism…" E-Z-GO indicated it was sending an advisory letter to all first time purchasers (data from Warranty registrations), providing information on the circumstances of the accident that occurred and requesting owners to risk assess their applications of vehicles, and to provide information to enable owners to have their products adapted to disconnect the accelerator from the brake release mechanism.  Textron indicated a similar advisory letter was to be sent to all dealers in the United Kingdom, to locate units in second or third ownership, which Textron admitted it had the means and

method to do.   Textron also indicated these actions would provide the *best* protection for users to prevent *future* occurrences of accidental brake release and vehicle runaway.   As of November of 2005, E-Z-GO knew of and had approved these post sale recall and warning solutions that would have prevented Mrs. Nester's injuries had it been implemented in the United States.   For no good reason, through neglect and gross neglect, Textron failed and refused to fulfill its obligations to people in the United States, like Gini Nester.

46.   In fact just days after indicating post sale recall intentions above, E-Z-GO issued a Field Service Bulletin (FSB) on November 30, 2005 in the United States for the inspection and replacement of the park brake catch bracket, part of the kickoff brake system.   But Textron never mentioned in that FSB the danger of which it was aware, and never mentioned what it knew was the "best protection" from future unintended acceleration occurrences.   It would have been very simple for E-Z-GO to have included in this service bulletin the information above relating to the removal of the "kick-off" linkage, since their service technicians were already going to have to be working on the parking brake latch area of vehicles. Removing the "kick-off" linkage is a less involved process than the replacement of the park brake catch bracket and it would not require any replacement parts so it would be a less expensive service bulletin to implement than the service bulletin that was issued.   Textron had in place a system to communicate with the owners and second and third purchasers of their vehicles to initiate a program to remove the "kick-off" linkage. Textron knew that it was needed and feasible to remove the linkage but Textron did not to take any action.   If Textron had issued a service bulletin in the U.S. and removed the linkage and stopped manufacturing vehicles with the linkage in November of 2005, many of the incidents and associated injuries and deaths after 2005, including Ms. Nester's, would have been avoided.   The removal of

the "kick-off" linkage in the workhorse would not have substantially impaired the product's utility and would have prevented the incident that injured Mrs. Nester.

**Safer Alternative design – separate parking brake**

47.     Second, Textron ignored using a separate parking brake. The vehicle could have been designed with a separate service brake and parking brake engagement/release mechanism such as a separate foot operated pedal or a hand operated parking brake lever, as Textron did in other vehicles it designed and sold at the time.  These parking brake systems were and are very common in most automobiles and also in other utility vehicles.  These systems were and are clearly technologically feasible and do not increase significantly the cost of the manufacturer.

48.     Prior to the design and release of the 2001 E-Z-GO Workhorse, many other manufactures produced utility vehicles, personnel/burden carriers and automobiles that incorporated parking brake systems that minimized the inherent risks associated with unintended acceleration. These other models clearly show utility vehicle designs that incorporate safer parking brake systems that are technologically feasible and do not diminish the product's utility. These designs would have probably prevented or significantly reduced the risk of unintended acceleration in the foreseeable event of an object contacting the accelerator pedal.

49.     Textron itself had alternative parking brake designs it should have evaluated and used. Textron incorporates a hand operated parking brakes on numerous vehicles.  These vehicles, though somewhat different from the Workhorse ST 350, show that Textron did design and manufacture numerous vehicles with parking brake systems that would have been a safer alternative to the one used on the subject vehicle.  Ironically, a Textron vehicle that does not use the parking brake "kick-off" mechanism is the E-Z-GO Workhorse ST 480.  This vehicle is very similar to the ST 350 and

would have almost identical utility. The ST 480 uses the exact same accelerator pedal assembly as the ST 350 but has a service brake pedal for the hydraulic drum brakes and a hand operated mechanical parking brake.  There is no linkage or mechanism that releases the parking brake when the accelerator is pressed.  The E-Z-GO Workhorse ST 480 demonstrates an economically and technologically feasible alternative design that would have probably prevented or significantly reduced the risk of unintended acceleration in the foreseeable event of an object contacting the accelerator pedal.

### Safer alternative design - operator present switch

50.    Third, Textron could have utilized a safer alternative design with an operator present switch in the seat of the vehicle, as it did in other vehicles it designed, manufactured and sold at the time. An operator present switch or a "dead man's switch" is in the seat of the vehicle that makes it so that the vehicle could only be operated if someone is sitting in the operator's seat.  While Textron claims the accelerator in the Workhorse serves as an operator present switch, such a claim is patently absurd, as there are numerous instances Textron knows of (or should know of) where something besides an operator has put pressure on the accelerator and vehicle has moved and killed or seriously injured people without any operator present.  The accelerator pedal on the E-Z-GO Workhorse is not an effective operator present switch or a "dead man's switch" as alleged by E-Z-GO since it has been shown through testing and the numerous other incidents that it can easily be overcome by any number of objects that cause the vehicle to move without an operator being present (see list of incidents below).  The fact that E-Z-GO lists this ineffective "'deadman' accelerator control" as a safety feature shows Textron's fundamental misunderstanding of vehicle design safety.

-26-

**Safer alternative design – pedal guard**

51.     Fourth, Textron could have utilized a safer alternative design of placing a pedal guard around the accelerator, as it did at the request of several customers who specifically requested that protection and were given it by Textron for the small additional charge of fifty dollars ($50.00).  A pedal guard is a device that would make it so that the accelerator pedal can only be depressed by specific shaped objects applying force on the pedal in a specific direction.

**Instead of designing out or guarding against the danger, Textron continued to use inadequate warnings and instructions**

52.     Textron insists that the kickoff system is not unreasonably dangerous because if the key is turned off then the engine cannot start and the vehicle will not accelerate.  Textron has repeated this mantra since the time the kickoff design came into use 50 plus years ago.  Textron blindly relied on this concept in the design of the Workhorse failing or refusing to consider safe guards other than the key switch.  Textron continues to repeat it today.  The "turn the key off" instruction is the linchpin of the safety chain for Textron.  But the glaring problem there is that the instruction to turn the key off does not work and Textron knows it. For a number of reasons, users don't turn the key off.  Textron's own employees, representatives and experts don't turn the key off.  Textron has admitted that removing the linkage pin performs the same safety function as turning the key off.  In fact, it is actually even safer than turning the key off, doesn't affect the utility of the product and is less expensive.  Textron knew of the hazard.  While Textron now claims its warning and instructions are sufficient, the reality is that it gave no analysis to them at the time of the design, they didn't work then and they don't work now.

53.     Since Textron has deliberately departed from the safety hierarchy set out above and

chose to attempt to address the hazard through instructions/warnings instead of design, at a minimum, Textron should have ensured it provided adequate warnings and instructions for the proper use and reasonable foreseeable misuses.  However, Textron failed to provide users with an adequate warning and instruction regarding the unintended acceleration hazard associated with their kick-off brake system and carrying cargo in the passenger compartment of the E-Z-GO Workhorse utility vehicle.

**Textron failed to give adequate warnings and instructions**

54.     To be effective warnings need to provide sufficient information for the user to recognize the hazard, its consequences and severity, and how to avoid it.  Textron knew that a product safety sign or label should alert persons to a specific hazard, the degree or level of hazard seriousness, the probable consequences of involvement with that hazard and how the hazard can be avoided.  Effective warnings also provide explicit information to motivate behavior, are conspicuous and attention getting, and understandable to the user audience.  Warnings also need to be constructed so that users can use the product safely.

55.     Textron classifies the potential inadvertent operation/unintended acceleration of the vehicle related to the kick-off brake system as a hazard that requires a warning safety sign.  Textron relies on the use of the key/light switch being turned to OFF as the primary means to prevent unanticipated and unintentional acceleration of the vehicle. To prevent people from exiting the vehicle without turning off the key, Textron put an instruction as a bullet point with other instructions on a label located on the dash of their E-Z- GO Workhorse utility vehicle (see Picture 1 below) and information within its Owner's Manual.

56.     Textron's dash label is about 2-1/8" high by 13-7/8" wide and placed above the cup

holders and below the key/light switch and fuel gauge/golf tee holders. The label is black in color with an orange border and orange text. The label is titled "Safety and Operating Instructions." The label also states WARNING and possessed 7 bullet points. Bullet point number 5 stated:

- Before leaving vehicle, turn key 'OFF" move the direction selector to forward 'F' position and engage parking (PARK) brake.



**Picture 1: - Workhorse dash label**

57.    Textron contends it places the most important warnings regarding the operation of their vehicle on the product because they are aware that users will not have access to or read the manual.  Textron is also aware that often the user of their vehicle is not the owner and that they have to make sure that anyone who gets on the vehicle has clarification of what the safe operation of

the vehicle will be. Textron knows the vehicle will likely be re-sold but does not require or request that their owner's manual is provided to the new owners when one of their vehicles is re-sold.   The vehicle owner's manual are not readily available on the E-Z-GO website; a consumer would have to call customer care hotline to request one. Consistent with Textron's policy and practices the Nesters were not provided with an Owner's Manual when they purchased the used E-Z-GO Workhorse Utility Vehicle. The only vehicle operation instructions and warnings the Nesters were provided that related to turning the key/light switch off when exiting the vehicle where those on the Textron dash label.

58.     Contrary to the requirements of an effective warning, Textron's dash label (Picture 1) failed to explicitly identify the inadvertent operation/unintended acceleration hazard associated with the kick-off brake system of their E-Z-GO Workhorse utility vehicle and the increased risk of inadvertent operation associated with storing cargo in the passenger compartment.  Textron also concedes that there is nothing in the E-Z-GO Workhorse manual that specifically warns about unintended acceleration. Also, there is nothing in the E-Z-GO Workhorse manual that states or warns that cargo should not be carried on the seat or floorboard of the vehicle. The warning related to inadvertent operation/unintended acceleration was buried within other non-relevant information where it was likely to go unnoticed and presented in a manner which did not identify it as important safety information versus general operating instructions.  Textron's failure to provide sufficient information to identify the inadvertent operation/ unintended acceleration hazard and how to avoid it deprived users like Gini of critical information they needed to recognize the potential danger of carrying cargo in the passenger vehicle and/or leaving the key/light switch on.

59.     Textron was aware of that users of their vehicles were either unaware of and/or

-30-

disregarded their instruction to turn off the key/light switch before exiting the vehicle. When Textron was developing the Workhorse vehicle in the mid-1990s, Textron was aware that users were not following the label instruction to turn off the key when exiting the vehicle.

60.     Textron's failure to provide an adequate warning regarding the inadvertent operation/ unintended acceleration hazard associated with the design of their kick-off brake system is also apparent in the actions of the owners of similar functioning E-Z-GO vehicles with similar dash labels.  For example, after an employee was struck and injured by an E-Z-GO golf car that was inadvertently accelerated, his employer (Glatfelter) placed supplemental warning signs on their fleet of golf cars to remind employees of the need to remove the key from the key/light switch to prevent similar incidents.  Yet another example where E-Z-GO warning and instruction did not work.

61.     Textron's failure to provide adequate warning regarding the inadvertent operation/unintended acceleration hazard was unreasonably dangerous, rendered the E-Z-GO Workhorse Utility Vehicle car defective and unreasonably dangerous, and was a producing cause of Gini Nester's incident and injury.

**During design of the Workhorse or after, Textron did nothing to investigate why the key instruction was not working.**

62.     When designing the Workhorse, although Textron was aware that users were not turning the key/light switch off before exiting the vehicle, Textron took no steps to study or identify how prevalent the practice was; why users were not turning the key off before exiting; the efficacy of the label instruction; or how to improve/revise the dash label to ensure that users were aware of the hazards associated with not turning the key off before exiting and to motivate users to follow the instruction.  Textron relied on their instruction for the key/light switch being turned to OFF as the

primary means to prevent unanticipated and unintentional acceleration of the vehicle. To alert users of the need to turn off the key before exiting the vehicle, Textron primarily relied on their dash label. Given their reliance on the dash label to safe guard users from the inadvertent operation hazard associated with their kick-off brake system, Textron had a responsibility to ensure their warnings were effective at alerting users to the hazard and motivating them to comply with the instruction. However, Textron did not employee or consult with a human factors and/or warning design expert to address the warnings and instructions needed for the new category of workhorse/utility type vehicle. Rather Textron depended on the warnings and instructions they used for their golf car vehicles. The instruction and warnings Textron re-used were not intended to deal with the differences in how the vehicle categories would be used, who they would be used by, and where they would be used.  Textron's failure to assess the efficacy of their label and instructions used to safe guard users from the inadvertent operation/unintended acceleration hazard associated with their brake kick-off system was unreasonably dangerous, rendered the E-Z-GO Workhorse Utility Vehicle car defective and unreasonably dangerous, and was a producing cause of Gini Nester's incident and injury.

**Textron failed to meet the ANSI Z535.4 standard**

63.    Textron admits it should have complied with the ANSI Z535.4 standard.  Textron relied upon the ANSI Z535.4 standard for the construction of their manuals and warning labels. ANSI Z535.4 is the American National Standard for Product Safety Signs and Labels (5). The ANSI Z535.4 standard (5):

> … sets forth performance requirements for the design, application, use, and placement of safety signs and labels intended to identify potential hazards for persons using, operating, servicing, or in proximity to, a wide variety of products.

64.     The ANSI Z535.4 standard was first published in 1991 and since that time there have been several revisions and updates to the standard (5).  The incident E-Z-GO Workhorse vehicle was manufactured by Textron in 2000. The relevant ANSI Z535.4 standard to the incident E-Z-GO Workhorse vehicle is the 1998 revision (5).

65.     Contrary to Textron's dash label and the information they provided in their manual, ANSI Z535.4 notes (5):

> A product safety sign or label **should alert persons to a specific hazard** [emphasis added], the degree or level of hazard seriousness, the probable consequences of involvement with the hazard, and how the hazard can be avoided.

66.     ANSI Z535.4 defines a safety sign as (5):

> A visual alerting device in the form of a decal, label, placard, or other marking such as an embossing, stamping etching, or other process **which advises the operator of the nature and degree of the potential hazard(s)** [emphasis added]. It can also describe safety precautions or evasive actions to take, or provide other directions to eliminate or reduce the hazard.

67.     Under the ANSI Z535.4 standard a product safety sign consists of a signal word panel plus a message panel (5).  The signal word panel presents the signal word, such as WARNING, corresponding to the level of hazard and risk (5). ANSI Z535.4 defines the message panel as (5):

> Area of the safety sign **that contains the word message which identify the hazard** [emphasis added], indicate how to avoid the hazard, and advise of the probable consequences of not avoid the hazard.

68.     By failing to explicitly identify the inadvertent operation/unintended acceleration hazard associated with the kick-off brake system of their E-Z-GO Workhorse utility vehicle and the increased risk of inadvertent operation associated with carrying cargo in the passenger

compartment, Textron's dash label and manual failed to meet the requirements of the ANSI Z535.4 standard for design and development of product warnings (5).  Textron failed to provide adequate warning consistent with contemporary industry standards and their own internal policies as to the inadvertent operation/unintended acceleration hazard associated with the kick-off brake design of the E-Z-GO Workhorse Utility Vehicle and carrying cargo in the passenger area of the vehicle. Textron's failure to comply with the American National Standard Z535.4 and their own internal policies deprived consumers of their E-Z-GO Workhorse Utility Vehicle, such as Gini Nester, of the protection afforded to the public by those guidelines, standards, and policies.  These and other failures were a producing cause of the incident and damages.

**Textron should have provided adequate warnings and instructions**

69.     An adequate warning and instruction are defined as warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.  In order to provide adequate warning and instruction, the warnings and instructions that Textron should have provided should have specifically and explicitly informed users:

- The accelerator pedal can be accidentally contacted or pressed causing brake to kick-off and vehicle to move unexpectedly.
- The key should be turned off each time they exit vehicle to avoid inadvertent operation of the vehicle.
- Not to store cargo in the passenger area of the car because cargo can shift and contact the accelerator pedal and/or brake causing the vehicle to move unexpectedly.
- Inadvertent operation of the vehicle can cause severe injury or death.

-34-

70.     Textron should have provided a conspicuous, specific, and explicit warning on the steering wheel or the dash of their E-Z-GO Workhorse Utility Vehicle related to the inadvertent operation/unintended acceleration hazard associated with their kick-off brake system and carrying cargo in the passenger compartment of the vehicle.  The cost in terms of money, effort, and time to do so would have been minimal and insignificant.  Textron develops and sells warnings labels for the steering wheel of their E-Z-GO golf cars.

71.     Had a conspicuous, explicit, and specific warning been provided on the steering wheel of their E-Z-GO Workhorse utility vehicle, Textron would have ensured that Gini Nester was provided with the information she needed to recognize the inadvertent operation/unintended acceleration hazard associated with the kick-off brake system and carrying cargo in the passenger compartment and make an informed decision as to her use of the vehicle and avoided injury.  This and other failures was a producing cause of the occurrence and injury.

**Gini made an anticipated and foreseeable use of the Workhorse**

72.     Textron alleges that Gini Nester's incident and injury could have been prevented had she turned the key/light switch off before dismounting the vehicle to open the gate.  However, leaving the key/light switch on when exiting the vehicle is consistent with the anticipated and foreseeable use of E-Z-GO vehicles and is a practice followed by a large percentage of vehicle users, Textron employees, and Textron corporate representatives themselves.   It was not unreasonable or negligent conduct for Gini to dismount without turning the key off.  That was a foreseeable and anticipated use of which Textron knew or should have known at the time design.

73.     At design, Textron was aware that users of their E-Z-GO vehicles do not turn the key/light switch off before exiting the vehicle.   The majority of users do not.   E-Z-GO representatives do not. Textron corporate representatives do not.  Both Fisher and Moore testified that they exit an E-Z-GO vehicle without turning the key/light switch off even though the instructions are on the vehicle.  Videos posted on YouTube by Textron (both marketing a specific product or line of products or for charity events) depict Textron employees, spokespersons, and customers exiting a Textron vehicle without turning the key switch off or entering a Textron vehicle without having to turn the key/light switch on. Textron's own expert left the incident Workhorse Vehicle unoccupied with the key/light switch in the ON position during his inspection of the vehicle in this matter.

74.     Textron knew or should have known that exiting an E-Z-GO vehicle without turning the key off is an expected consequence of the design of the vehicle. Textron designed the vehicle so that the accelerator pedal starts and stops the vehicle's engine not the key.  Textron designates the key as a "key/light" switch that turns on the electrical system of the vehicle including the lights, not a kill switch.  The presence of the key is not needed for the engine to start (assuming the switch was turned on before the key was removed). The functions of the key and accelerator pedal are contrary to the experience of entering and exiting a passenger vehicle (or most other vehicles) where the engine is turned on and off by the ignition key and the accelerator is used to modulate speed.

75.     Considering the severe personal injury hazard involved with the design of their kick-off brake system, Textron's continued reliance on warnings and instructions it knows do not work is a conscious disregard of the safety hierarchy.  Moreover, repeatedly blaming the user for not following an instruction that Textron knows is inadequate and does not even follow itself instead of

-36-

addressing the hazard through the design of the product and its warnings and instructions is improper, unreasonably dangerous, and an egregious disregard for its responsibility as a product manufacturer.

**The hazards associated with the kick-off brake system of the E-Z-GO Workhorse would not be contemplated by the ordinary user of the vehicle and were not by Gini Nester.**

76.     Textron is critical of Gini Nester for not perceiving that, if the key was on, cargo in the passenger area could fall over, strike the accelerator, release the brake and cause unintended acceleration.  While Textron knew this could happen at the time it designed the vehicle, this risk was not contemplated by either the ordinary user or Gini Nester.

77.     As shown above, while Textron knew the importance of turning the key off, it also knew ordinary users did not.  Likewise, while Textron knew the importance of not carrying cargo in the passenger area, it knew or should have known ordinary consumers did not.

78.     The E-Z-GO Workhorse is intended for carrying various types of cargo, equipment, tools, and other objects.  The Workhorse is designed and sold with a flat bench style seat and a flat floorboard. The flat surfaces afford the perception and ability to stack or place objects on for temporary storage or transport during use of the vehicle.   The design and operation of the accelerator pedal affords the perception that the vehicle is off when pedal is released. Given the design of the vehicle there was no reason for a user to think that the cargo should not be stored or placed in the passenger compartment or that the vehicle would start or move on its own after the engine was off and the parking brake set.  Textron's own print and video marketing material depicts cargo being carried and/or stored in the passenger compartment of their utility vehicles, including on the bench seat and on the floor board.

79.     Other incidents involving inadvertent operation/unintended acceleration of the vehicle demonstrate that the practice of placing cargo in the passenger area is a foreseeable use and that the hazard of the presence of cargo placed in the passenger compartment was not contemplated by the ordinary user.  These incidents also show the risk and that users do not turn the key off.  For example, from 1999 to 2012 there have been numerous other incidents where people have been injured or killed by a Textron vehicle due to inadvertent operation/unintended operation of the vehicle.  In many of these, cargo that was placed in the passenger compartment of a Textron vehicle inadvertently contacted the accelerator pedal resulting in the vehicle moving without an operator and then striking the victim.  In one or more of the incidents, a young child inadvertently hit the accelerator pedal causing the parking brake to kick-off and the vehicle to move. In some, an employee inadvertently contacted the accelerator pedal while entering the Textron vehicle causing the parking brake to kick-off and the vehicle to accelerator forward striking the victim.

80.     Virginia Nester's lack of appreciation of the inadvertent operation hazard associated with the kick-off brake system and carrying cargo in the passenger compartment of the vehicle is consistent with the anticipation and expectation of Textron.  Textron admitted it does not think it is easy for the average consumer to detect and know that unanticipated acceleration could occur with their kick-off system.

81.     Textron's design of their E-Z-GO vehicles results in the user depending upon and associating the engine stopping and starting with the accelerator pedal and not the key. The key then becomes a secondary function that is not directly related to the starting and stopping of the vehicle and likely not thought about in the ordinary use of the vehicle.  The lack of importance and need for the key in the ordinary use of an E-Z-GO vehicle is identified in the testimony of both James Fisher

and Nick Moore. For example, Moore testified that he unconsciously leaves the key/light switch on when he exits the vehicle. Unconscious is defined as without awareness or below conscious thought which can be due to forgetting and/or distraction. James Fisher also testified that he has inadvertently exited a golf car without turning off the key because he did not think about turning off the key before getting out of car.

**Blaming the victims**

82.     Considering the severe personal injury hazard involved with the design of their kick-off brake system, Textron's deviation from safe design principles and continued reliance on warnings and instructions it knows do not work is a conscious disregard of the design safety hierarchy. Moreover, repeatedly blaming the user for not following an instruction that Textron knows is inadequate and does not even follow itself instead of addressing the hazard through the design of the product and its warnings and instructions is improper, unreasonably dangerous, and an egregious disregard for its responsibility as a product manufacturer.

**Textron's attempts to characterize Unanticipated Acceleration accidents as "freak" should be rejected.**

83.     Textron knew the kickoff system could cause unanticipated acceleration and personal injury or death.  It has known that for 30 or more years.  Textron has warned about it for 30 or more years.  The numerous incidents involving the dangerous unintended acceleration of their vehicles validates the existence of that known danger.  But instead of acting to try and mitigate it (at least in the United States) Textron claims now that these incidents are "freak accidents" that cannot be foreseen or anticipated or prevented.  Textron is just flat wrong. First, Textron appreciated and warned of the risk for 30 years before the Nester incident.  Textron does not warn of freak accident

danger.  Textron has a policy to not issue a warning unless merited by incidents, as is apparent from testimony in the *Lesho* case.  Thus, the warning itself is an admission by Textron that the risk and danger is present and real.  Second, Textron relies on its lack of records regarding incidents or claims to contend there is no real or meaningful risk of injury due to unintended acceleration in vehicles with a kick off system.  But Textron cannot bury its head in the sand and then escape responsibility by claiming lack of notice.  By design or neglect, Textron has no meaningful or effective process established to monitor the safety of its products through reports of accidents or injuries.  Textron had a duty to exercise reasonable care to learn of post-sale problems with their products. The failure of Textron to set up a system to gather post-sale information and then claim a lack of knowledge is unreasonable, especially when one could be set up with little effort and expense.  Textron should have put into place an appropriate post-sale monitoring system and establish appropriate committees or trained personnel who can analyze the gathered information to determine whether post-sale actions might be appropriate.  Moreover, Textron does not keep records of incidents or lawsuits past three years.  Incredibly when it did keep records before 2005, Textron kept records in what it refers to as "Wally's file cabinet" and those have since been destroyed.  So relying on Textron's claimed lack of recorded incidents is neither reliable nor reasonable support for an analysis of whether the product is unreasonably dangerous or whether Textron had notice of incidents.

84.     Textron originally claimed in this matter it is only aware of three or four incidents of unintended acceleration, including the Nester incident.  In fact, there are substantially more such similar/substantially similar incidents of which Textron knew or should have known.   Some of those are as follows:

**4/25/1999 Robert Hallenbeck** On April 25, 1999, Robert Hallenbeck, a golf course starter, was in the golf car barn of a PGA West Golf Course in California when he was struck by an unoccupied E-Z-GO golf car. The golf car accelerated when another employee dropped a tent bag into the vehicle. The bag struck the vehicle's accelerator and remained on the accelerator, causing the vehicle to travel in the golf car barn without any driver. Hallenbeck was pinned between the golf car and a wall of the building.  Hallenbeck filed suit against Textron on 4/24/2000.

**1/31/2000. Brian Oliver** was working as carpenter at manufacturing faculty in Louisiana when a Textron (Cushman) light industrial vehicle which was not occupied struck Oliver from behind, and Oliver sustained personal injuries. Oliver filed suit in Louisiana state court, and Textron removed the lawsuit to federal court on 3/5/2001.

**8/11/2001. Daniel Lesho** was working as a electrician at a Pontiac Plant in Oakland County, Michigan. Lesho was working in an area near where a ladder was stacked up against parts. The ladder fell and hit the accelerator pedal of the E-Z-GO workhorse golf car.  The kick off brake system permitted the golf car to accelerate forward causing injuries to Lesho's right knee and leg. Lesho brought suit against E-Z-GO / Textron on June 10, 2004.

**1/31/2004 Melissa Dunham Roberts,** a Kentucky horse farm owner, died from injuries sustained in an incident involving a golf car believed to be an E-Z-GO vehicle when she was pinned under the cart. Roberts had driven the gas-powered golf cart from her house on the farm to the horse barn to muck stalls and put horses in the barn. After driving the golf cart into the barn, Roberts placed two bales of hay on the golf cart; one on the back and one on the passenger side of the front seat. The ignition key was left in the "on" position. She left the golf cart in the aisle at the end of the barn and then walked the length of the barn, entered a stall, mucked it out, exited the stall into the barn aisle, and leaned the pitch fork against the wall next to the stall door. Unknown to Roberts, the bale of hay on the passenger seat had slipped off the seat and fallen onto the gas pedal of the golf cart with a kick off brake system. With the pedal depressed by the hay bale and the key in the "on" position, the golf cart proceeded down the barn aisle, striking the victim and pinning her underneath. She was found dead of trauma and exposure by her minor daughter several hours later.

**7/2005 Devon Cliffs Holiday Park Incident, United Kingdom.** A child climbed on an E-Z-GO Shuttle Carrier (TXT 6) with a kick off brake system with the key in the off position and depressed the accelerator kicking off the parking brake. As a result, the vehicle rolled down a hill running into a crowd of people with injuries to multiple individuals, including an apparent fatality.

**4/20/2006 Zaida Bedell** On April 20, 2006, Zaida Bedell was playing in a charity golf event in California. Bedell was walking from her car to the location where she was working at a tournament volunteer at which time she was struck by an unoccupied E-Z-GO golf car with a kick off brake system. Bedell sustained injuries due to the impact from the golf car. The golf car had been under the control of a man hired by the event to entertain guests. This man was using the golf car to transport some boxes of product that he intended to sell at the event, and he had placed the boxes in the front seat of the cart. While loading the boxes onto the seat of the cart and with the key

in the on position, the boxes contacted the accelerator, the kick off brake system released the parking brake and the car accelerated forward and struck Bedell.

**10/2008 Kenneth Brooks** In Springfield, Oregon, Kenneth Brooks, a football official, was hit by a golf car before the start of a high school football game. Employees of the high school left the golf cart with a kick off brake system unattended on the sidelines with the key in the ignition in the on position. A two-year-old boy got into the cart and the child's hands or body depressed the cart's accelerator pedal, kicking off the brake and causing the cart to travel uncontrolled across the field and strike Mr. Brooks. Brooks suffered a back injury, a concussion and other head injuries.

**4/15/2009 Linda Cassidy** Linda Cassidy, was feeding horses in Hidden Lake Farms in Ocala, Florida. Cassidy was using an E-Z-GO golf car with a kick off brake system in her work with the chores on the horse farm. Cassidy's body was found under the E-Z-GO vehicle. At the time the body was found, five empty feed buckets were found on the floor board of the vehicle resting on the accelerator pedal. The police investigation concluded the feed buckets fell over and contacted the accelerator, the accelerator was depressed enough to activate the kick off brake system and release the parking brake and accelerate forward, running her over and killing her.

**10/23/2010. Helicopter Incident**. At Essex, United Kingdom, a young child inadvertently hit accelerator in cart with a kick off brake system. The cart went out of control, travelled a considerable distance, and made contact with a nearby helicopter as the cart passed under the tail rotor.

**12/5/2011. Gini Nester**. Gini Nester was paralyzed when she was hit by an E-Z-GO Workhorse with a kick off brake system.

**12/17/2011 AT&T "Cowboy Stadium" Incident**. An E-Z-GO 2010 Shuttle 2 Electric unit with a kick off brake system was being used at a high school championship game at AT&T (Cowboy) Stadium in Arlington, Texas. After the game, orange end zone pylons were being collected and tossed towards the vehicle in a loading procedure. One or more pylons fell to the floorboard, contacted the accelerator, thus, with the kick off brake system, releasing the parking brake and causing the vehicle to accelerate forward and continue forward in a runaway fashion injuring seven people before being brought under control. The incident was captured on live TV and video and can now be found extensively on YouTube.

**5/12/12 Terry Miller** Terry Miller was working at an Electric Shop in Pennsylvania. A 2005 E-Z-GO Model TXTPDS golf car with a kick off brake system was close to the work bench where Miller was standing. Another employee entered the passenger side of the vehicle since the driver's side of the vehicle was blocked by materials in the plant. The parking brake was on and the key was in the on position. As the employee slid across the seat, the employee unintentionally contacted the accelerator pedal and the car lunged forward striking Miller from behind causing serious injuries to Miller's legs. After the accident, the employer created and uses its own warnings for use in vehicles with kickoff system.

**NEISS Database**

85.     Additionally, Textron was or should have been aware of incidents and injuries due to unintended acceleration through review of other sources, such as the NEISS Database, operated by the Consumer Product Safety Commission and relied upon by responsible manufacturers as one source to monitor product safety and performance.  That database shows at least 31 actual patients, an estimated number of 1,645 patients, were treated in US emergency departments for a golf-cart related injury that occurred as a result of an unintentional acceleration of a golf cart between 1990 and 2013.  In fact, NEISS is only collecting injuries treated in the emergency department setting, and is thus, only looking at one slice of a much larger pie.  Injuries treated outside that setting, for example, injuries treated by other health care providers in a primary care setting, are not included in the NEISS estimates.  Therefore, the total numbers of injuries from unanticipated acceleration are underestimated in NEISS.  Textron was aware of NEISS but never monitored it in a meaningful fashion, probably so it could deny notice or knowledge of incidents and injuries.

86.     Textron's claim of no notice or lack of foreseeability is also contrary to what Textron has communicated internally.  In addition to the correspondence to Dr. Swan cited above, Textron employees were aware of and acknowledged this danger and expressed it in writing among themselves in 2005.  In an email sent from Tim Lansdell to Jim Fisher on November 4, 2005, Mr. Lansdell, referencing the unintended acceleration that caused the fatal accident in England wrote, "Obviously, I am concerned that development of future products should consider *foreseeable misuse* in the control design and *learn from this incident*." (emphasis added)  But Textron didn't learn and did nothing to prevent the Nester accident in the United States, despite the recognized

-43-

duty to do so.  Given the knowledge that unintended acceleration was foreseeable for this vehicle within its intended use and the inherent dangers associated with unintended acceleration at the time of its design, E-Z-GO designed and produced a vehicle that was unreasonably dangerous because it was not equipped with a parking brake or system that could reliably prevent unintended acceleration, and it knew it.

87.     It is probable that there are more similar, unanticipated acceleration incidents that only resulted in property damage or inconvenience to the customer that have never been documented or reported.  The fact that an incident of unintended acceleration was a narrow miss or not a serious injury does not mean it is not significant from a design perspective.  Product design should be proactive to avoid injuries, not reactive, as is the policy at Textron.  The Textron philosophy, that not enough injury incidents have occurred yet to merit a design change, is contrary to accepted, reasonable design principals and a conscious disregard for safety.  Gini Nester and her family were victims of that disregard and the devastation it brings.

## IV.  CAUSES OF ACTION

### Strict Product Liability (Design and Marketing Defects)

88.     The statement of facts set out above are incorporated here by reference in full. Plaintiffs' injuries were due to an unreasonably dangerous E-Z-GO Workhorse cart designed, manufactured, marketed, distributed and placed into the stream of commerce by Textron, and marketed and sold to Plaintiffs without relevant substantial change from its original design, manufacture and sale by Textron.

**Design Defect**

89.     There was a design defect in the E-Z-Go WorkHorse utility cart at the time it left the possession of Textron Inc., that was a producing cause of the occurrence and injuries to Virginia Nester.  The design defect was a condition of the product that rendered it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. There was one or more safer alternative designs, meaning a product design other than the one actually used that in reasonable probability - -

(i)     would have prevented or significantly reduced the risk of the injuries in question without substantially impairing the product's utility and

(ii)    was economically and technologically feasible at the time the product left the control of Textron Inc., by the application of existing or reasonably achievable scientific knowledge.

The unreasonably dangerous is risk utility analysis indicates the Workhorse was unreasonably dangerous. There are five factors or considerations to be considered in the risk utility analysis and all five factors merit liability against Textron:

1.      the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use;
2.      the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;
3.      Textron's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;
4.      the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and
5.      the expectations of  the ordinary consumer.

Textron's breaches were a producing cause of the occurrence and injuries in question.

**<u>Marketing Defect</u>**

90.     The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative, if necessary, there was a defect in the marketing of the E-Z-Go Workhorse utility cart at the time it left the possession of Textron Inc. that was a producing cause of the occurrence and injuries in question.  The "marketing defect" with respect to the product means Textron's failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known to Textron or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

91.     "Adequate warnings" and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

92.     An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

93.     "Producing cause" means a cause that was a substantial factor in bringing about the occurrence in question, and without which the occurrence would not have occurred.  There may be more than one producing cause.

94.     The duty to warn and instruct for safe use in connection with marketing a product is determined by the dangers inherent in the product or associated with its foreseeable use.  Textron breached this duty.

95.     This duty extends beyond the purchaser to the ultimate user.  Textron breached its duty.

96.     The duty is limited to dangers that are either known or by the application of reasonably developed human skill and foresight should have been known by the defendant when the product was marketed and to uses that are either intended or reasonably foreseeable.  Textron knew or should have known of these dangers.

97.     Implicit in the duty to warn and to instruct for proper and safe use is the obligation to keep abreast of scientific knowledge and advances and to provide an adequate warning of dangers that were known or should have been known, based on the latest knowledge and available information. Textron breached this obligation and duty.

98.     Textron's breaches were a producing cause of the occurrence and injuries.

99.     These design and marketing defects were a producing cause of the December 5, 2011 occurrence and the severe injuries suffered by these Plaintiffs as a result of that occurrence.  Textron is strictly liable in tort, and Plaintiffs hereby invoke the doctrine of strict product liability.

## Negligence

100.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative, if necessary, Plaintiffs would show that Textron owed Plaintiffs and other consumers a duty to design and market the E-Z-GO cart in question in such a manner that is was safe for ordinary use.

101.    Textron negligently placed the product in the channels of trade and sold it in a manner that these defendants foresaw, or in the exercise of reasonable care ought to have foreseen, would probably carry the defective and unreasonably dangerous product into contact with persons such as the Plaintiffs, and failed to use reasonable care in the design and marketing of the product to prevent injury to persons, including Plaintiffs.  These defendants also negligently *(i)* failed to design it without a defect; *(ii)* failed to warn Plaintiffs and others using the cart of its defective and unsafe condition; *(iii)* failed to recall the product; *(iv)* failed to correct the product through a technical bulletin; *(iv)* Textron had a duty to exercise reasonable care to learn of post-sale problems with their products.  The failure of Textron to set up a system to gather post-sale information and then claim a lack of knowledge is unreasonable, especially when one could be set up with little effort and expense. Textron should have put into place an appropriate post-sale monitoring system and establish appropriate committees or trained personnel who can analyze the gathered information to determine whether post-sale actions might be appropriate.

102.    Textron's negligence was a proximate cause of the injuries suffered by these Plaintiffs.

## Breach of Warranty

103.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative, if necessary, Textron expressly and impliedly warranted to the general public, including Plaintiffs, that the E-Z-GO cart was safe, merchantable, and fit for its intended uses and purposes.  The public, including Plaintiffs, relied upon the warranties made by these defendants.  The product was not fit for the ordinary purposes for which said goods were to be used, as contemplated by the parties, but instead was defective and unreasonably dangerous.  The

product failed to meet the justifiable expectation of its user as an average consumer as to the reasonable safety of equipment furnished by the defendant for its intended use.

104.    Plaintiffs suffered injuries as a direct and proximate result of their reliance upon the defendant's warranties, and as the direct and proximate result of breaches of the warranties by Textron.

## **Duty to Recall**

105.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative if necessary, Textron owed the duty to recall the product after sale/distribution and did not use reasonable means to discharge that duty and such was a proximate cause of damages to the plaintiffs.  Textron owed the duty because it retained some significant amount of control over the product after manufacture and sale.  With that control came a duty to recall, which Textron recognized.  Textron initiated safety recall measures.  Textron initiated a program to improve upon safety of the kickoff brake system in vehicles that it had already designed and sold.  Textron owed the duty to improve the safety of vehicles with the kick off system by, among other things, a recall to disconnect the linkage between the accelerator and the brake. Textron had an obligation to complete the remedy by using reasonable means available to it to cause the remedy to be implemented.  It failed to do so and this was a proximate cause of damages to the Plaintiffs.

106.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative if necessary, Textron assumed the duty to recall the product after sale/distribution then did not use reasonable means to discharge that duty and such was a proximate cause of damages to the plaintiffs.  Textron actually or apparently assumed a duty to

recall.  Textron initiated a program to improve upon safety of the kickoff brake system in vehicles that it had already designed and sold.  Textron assumed the duty to improve the safety of vehicles with the kick off system by, among other things, disconnecting the linkage between the accelerator and the brake through recall and/or notice.  Once it assumed the duty, Textron had an obligation to complete the recall and remedy by using reasonable means available to it to cause the recall and remedy to be implemented.  It failed to do so and this was a proximate cause of damages to the Plaintiffs.

107.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative if necessary, Textron owed a duty to recall the product after the time of its sale and /or distribution and breached that duty, which was a proximate cause of damages to the plaintiffs.  Textron received a governmental directive issued pursuant to a statute or administrative regulation requiring it to recall the product; or alternatively, if Textron did not issue the recall action as a result of a governmental directive, undertook on its own to recall the product, including recall through technical service bulletin, and Textron failed to act as a reasonable person in recalling the product.

108.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative if necessary, Textron owed a duty to provide a post- sale warning and breached that duty, which was a proximate cause of damages to the plaintiffs.  A reasonable person in Textron's position would have provided a warning after the time of sale or distribution of the product.  Textron failed to do so and this was a proximate cause of damage to Plaintiffs.

109.    The statement of facts set out above are incorporated here by reference in full.

Pleading further and in the alternative if necessary, Textron voluntarily assumed a duty to provide a post- sale warning and breached that duty, which was a proximate cause of damages to the plaintiffs.  A reasonable person in Textron's position would have provided a warning after the time of sale or distribution of the product.  Textron failed to do so and this was a proximate cause of damage to Plaintiffs.

## **Gross Negligence**

110.    The facts set out above are incorporated here by reference in full.  Textron put profits ahead of safety and acted consciously and knowingly with indifference to the rights, welfare and safety of Plaintiffs and the public by placing the defective cart into the stream of commerce when they had notice or should have known it was unreasonably dangerous.

111.    The acts and/or omissions set out, when viewed objectively from Textron's standpoint at the time of act or omission, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  There was a likelihood of a serious injury to someone like Gini Nester.  Plaintiff may rely on circumstantial evidence, in whole or in part, for proof.

112.    Textron is liable for exemplary damages for its acts and omissions.  Textron is liable for its agent's non-criminal acts and omissions because it authorized the manner and doing of the acts and omissions; the agent was employed in a managerial capacity and was acting in the scope of employment and/or the principal or a manager of the principal ratified the acts or omissions.  Textron is also liable for a vice principal's acts or omissions where the vice principal acted with gross negligence.

## **Res Ipsa Loquitor**

113.    Pleading additionally and alternatively, if necessary, Plaintiffs cannot more

specifically allege the acts of negligent manufacture or design on the part of Textron because facts or evidence in that regard are peculiarly within the knowledge of Textron, including but not limited to information that has been destroyed or never produced. In the alternative, in the event Plaintiffs are unable to prove specific acts of negligent design or manufacture, Plaintiffs rely on the doctrine of *res ipsa loquitur*. In this connection, Plaintiffs will show that the character of the occurrence giving rise to this litigation – the sudden unexpected acceleration of the cart and ensuing collision and injuries – is such that it would not have happened in the absence of the negligence of Textron and that the design and manufacture of the products in question were within Textron's exclusive control at the time the negligence probably occurred.  Plaintiffs had no or restricted means of ascertaining the method or manner in which these products were designed and manufactured, and they came into Plaintiffs' possession in the same condition they were in when they left the control of the defendant, in pertinent part.  Thus, the defendant was negligent in the design and/or manufacture of the products, which negligence was a proximate cause of the injuries and damages sustained by Plaintiffs.

114.    Plaintiffs hereby give notice that they intend to rely on evidence of specific acts and on evidence that permits the jury to infer negligence on *res ipsa* grounds.

## V. DAMAGES

115.    Plaintiff Gini Nester, who is now a quadriplegic, sustained severe and permanent injuries as a result of the defects and/or acts and/or omissions set out above.  She seeks damages under all categories allowed by Texas law – including but not limited to damages for physical pain and suffering, mental anguish, disability, loss of earnings and earning capacity, physical impairment, physical disfigurement, and medical care and expenses – both in the past and in the

future.

116.    Plaintiff Scott Nester has also suffered damages, including mental anguish, lost earnings and earing capacity, loss of household services, and loss of consortium, both in the past and in the future.

117.    Plaintiffs C.N. and S.N., who are both minors, have suffered damages, including mental anguish, loss of household services, and loss of consortium.  The physical injury to Gini Nester was and is a serious, permanent, and disabling injury.  The children are entitled for a jury to consider and award damages due to the loss of parental consortium that resulted from the physical injury to Gini and such is requested.  "Parental consortium" means the positive benefits flowing from the parent's love, affection, protection, emotional support, services, companionship, care, and society.  They ask the jury to consider at least the following factors: the severity of the injury to the parent and its actual effect on the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium-giving relationships are available to the child.

118.    Plaintiffs would show that they have been caused to incur doctor bills, hospital bills and other reasonable and necessary medical expenses in the past, and will be forced to incur such medical care and costs in the future, and seek recovery for those damages.

## VI. EXEMPLARY DAMAGES

119.    Defendants also are liable for exemplary damages caused by gross neglect and/or gross negligence, which were a proximate cause of the injuries and the resulting damages to Plaintiffs.

## VII. INTEREST

120.    Plaintiffs would show that they are entitled to recover interest for all elements of damages recovered for which the law provides for prejudgment interest.  Plaintiffs are also entitled to post-judgment interest at the lawful and legal rate.

## VIII. CONDITIONS PRECEDENT

121.    All conditions precedent to Plaintiffs' right to recover have occurred, have been fully performed, or have been waived by Defendants.

## IX. DISCOVERY RULE

122.    Plaintiffs specifically plead and invoke the discovery rule as a bar to any claim by any defendant that the Plaintiffs' claims or causes of action are barred by any statute of limitations.

## X. JURY DEMAND

123.    Plaintiffs have demanded trial by jury and have tendered the proper fee for same to the Court's Clerk.

## XI. TO THE COURT ONLY

124.    Plaintiffs hereby plead to the Court only that they have reached a settlement of their claims with former Defendant United Rentals only.

## XII. NOTICE OF INTENT TO USE EVIDENCE OF SIMILAR INCIDENTS OR OCCURRENCES

125.    The statement of facts set out above are incorporated here by reference in full. Pleading further and in the alternative if necessary, in addition to any reasons set out in the body of the complaint, Plaintiffs hereby give notice of their intent to use evidence of other similar incidents, post or pre-design, for one or more of the following purposes in this matter: to rebut Textron's

claim of no knowledge of incidents by Textron; to rebut industry standard or state of the art claims; to rebut Textron's claim that the accelerator is an Operator Present Switch; to show lack of claimed notice of incidents or defect comes from intentional or negligent policy of not looking; to show Textron's monitoring or failure to monitor incidents is unreasonable and renders its claim of "freak accident" unreliable; to rebut or demonstrate the unreliability of Textron's proclaimed statistical likelihood of injury; to rebut Textron claims that warnings and instructions are adequate and heeded; to rebut Textron claim of lack of foreseeability; to rebut claims of no foreseeable misuse; to show user's anticipated awareness of dangers inherent in product; to show the general public knowledge of the alleged obvious condition of the product; to show the existence of the design defect; to show the existence of the marketing defect; to show the existence of the unreasonably dangerous condition; to show knowledge of the defect or dangerous condition or risk; to show awareness of the defect,  to show dangerous condition or risk; to show ease of which incidents occur; to show to show magnitude of the danger; to show Textron control over product and ability to correct the defect, either pre-sale or post-sale; to show mechanism of injury; to show producing cause; to show foreseeability; to show expectation of consumer; relating to post design and sale duty to war; and re to post design and sale duty to recall or provide service bulletin; whether a warning should be given; the location of the warning; and to support Textron was consciously indifferent toward accidents and the claim for gross negligence/exemplary damages.

## XIII.  CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Gini Nester and Scott Nester, Individually and as Next Friends of C.N. and S.N., Minors, request that the Defendant Textron be cited to appear and answer at trial, and that on final trial the Nesters have judgment against Textron

for actual damages, together with prejudgment and post-judgment interest as provided by law, costs of court, reasonable attorney's fees, exemplary damages, and such other and further relief, at law or in equity, to which these Plaintiffs are justly entitled and for which they now ask.

Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

/s/ Sean E. Breen

_____

Sean E. Breen
State Bar No. 00783715
1900 Pearl Street
Austin, Texas 78705-5408
E-mail: sbreen@howrybreen.com
Phone: (512) 474-7300
Fax: (512) 474-8557

WRIGHT & GREENHILL, P.C.

/s/ Craig A. Nevelow

_____

Craig A. Nevelow
State Bar No. 14933580
221 West 6th Street, Suite 1800
Austin, Texas  78701
E-mail:  CNevelow@w-g.com
512-476-4600
512-476-5382 (Fax)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was electronically filed on January 16, 2015, through this Court's Case Management/Electronic Case Files system, in accordance with Rule 5 of the Federal Rules of Civil Procedure, to all counsel of record, to wit:

Dale Gene Markland
dmarkland@marklandhanley.com
Tara E. Hanley
thanley@marklandhanley.com
Delwin Eugene Hervey
dhervey@marklandhanley.com
MARKLAND HANLEY LLP
2200 Ross Avenue Suite 4100W
Dallas, TX 75201
Tel. (469) 341-3633
Fax (469) 341-3640

*Attorneys for Defendant Textron Inc., d/b/a E-Z-GO*

Paul Clark Aspy
aspy@namanhowell.com
NAMAN HOWELL SMITH & LEE, PLLC
8310 Capital of Texas Highway, Suite 490 Austin, TX 78731
Tel. (512) 479-0300
Fax (512) 474-1901

Brittan L. Buchanan
bbuchanan@vbllp.com
VAN OSSELAER & BUCHANAN, LLP
9600 Great Hills Trail Suite 300 West
Austin, TX 78759
Tel. (512) 225-2822
Fax (512) 225-2801

*Attorneys for Defendant United Rentals, Inc., f/k/a RSC Holdings, Inc., and RSC Equipment Rental*

_____
Sean E. Breen