IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| VIRGINIA NESTER and ROBERT SCOTT NESTER, Individually and as Next Friend of C.N. and S.N., minors, | § § § § | |
| *Plaintiffs*, | § § | Cause No. 1:13-CV-00920-DAE |
| vs. | § § | |
| TEXTRON, INC., d/b/a E-Z-GO, | § § | JURY DEMANDED |
| *Defendants*. | § § § | |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
TEXTRON'S MOTION FOR SUMMARY JUDGMENT**

---

Sean E. Breen
sbreen@howrybreen.com
State Bar No. 00783715
HOWRY BREEN & HERMAN, L.L.P.
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

Craig A. Nevelow
cneleow@w-g.com
State Bar No. 14933580
WRIGHT & GREENHILL, P.C.
221 West 6th Street, Suite 1800
Austin, Texas 78701
Tel. (512) 476-4600
Fax (512) 476-5382

*Attorneys for Plaintiffs Virginia Nester and
Robert Scott Nester, Individually and as Next
Friend of C.N. and S.N., minors*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.     INTRODUCTION .......................................................................................................... 1

II.    BACKGROUND FACTS ............................................................................................... 1

    A.    E-Z-GO golf carts have long featured a kick-off brake system that creates a danger of severe personal injury or death due to inadvertent operation and/or unintended acceleration. .......................................... 1

    B.    In an attempt to expand into new markets with new potential customers, Textron leverages and converts its E-Z-GO golf carts into utility vehicles. ........................................................................... 4

    C.    During the "design process," Textron made no effort to analyze and address the risks and utility presented by its design choices for the new farming-and-ranching application of the Workhorse utility vehicle. ......................................................................................................... 5

    D.    Textron ignored safer alternative designs that existed at the time the E-Z-GO Workhorse ST350 was designed and would have been apparent to Textron if it had followed the safety design hierarchy. ...................... 7

        1.    Removing the linkage between the accelerator pedal and the parking brake. ............................................................................ 8

        2.    Separate parking brake .................................................................. 9

        3.    Operator-present switch (or OPS) ............................................... 9

        4.    Pedal guard ................................................................................. 10

    E.    Instead of designing out or guarding against the danger posed by the kick-off brake system, Textron continued to use warnings and instructions it knew were inadequate, ineffective, and not being followed. ......................................................................................................... 11

    F.    Mrs. Nester made an anticipated and foreseeable use of the E-Z-GO Workhorse ST350. ........................................................................ 14

    G.    The hazards posed by the kick-off brake system would not be contemplated by ordinary users of the vehicle and were not contemplated by Mrs. Nester. ......................................................... 16

    H.    Textron has repeatedly and unreasonably chosen to ignore safety problems with the kick-off brake system by burying its head in the sand. ............................................................................................................. 18

    I.    Textron knew of a safer alternative design fix for the dangers of the kick-off brake system before Mrs. Nester was paralyzed, said it would implement it, but then put profits over safety and left the design in place. ......................................................................................... 22

|      | J.   | Gini Nester is struck and paralyzed by the unreasonably dangerous runaway Utility Vehicle. | 24 |
| III. | | SUMMARY JUDGMENT EVIDENCE | 25 |
| IV.  | | ARGUMENTS AND AUTHORITIES | 26 |
|      | A. | Legal standards | 26 |
|      | B. | Organization of the Nesters' responses | 27 |
|      | C. | Design defect | 28 |
|      |    | 1.  Matter-of-law arguments | 28 |
|      |    | 2.  No-evidence arguments | 30 |
|      | D. | Marketing defect | 37 |
|      |    | 1.  Matter-of-law arguments | 37 |
|      |    | 2.  No-evidence arguments | 43 |
|      | E. | Negligence | 47 |
|      |    | 1.  Design | 47 |
|      |    | 2.  Marketing | 50 |
|      | F. | Breach of warranty | 53 |
|      |    | 1.  Matter-of-law arguments | 53 |
|      |    | 2.  No-evidence arguments | 53 |
| V.   | | CONCLUSION | 56 |
|      | | CERTIFICATE OF SERVICE | 58 |

# TABLE OF AUTHORITIES

**Federal Cases**

*Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175 (5th Cir. 2015) ..................... 26, 49

*Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006) .......................... 22

*Garcia v. Penske Logistics, LLC*, No. 5:13-CV-85, 2014 U.S. Dist. LEXIS
   174533 (S.D. Tex. Dec. 18, 2014) ................................................. 26, 49

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832-RF, 2005 U.S.
   Dist. LEXIS 32213 (W.D. Tex. Nov. 1, 2005) ................................. passim

*Kitchen v. Dallas County*, 759 F.3d 468, 476 (5th Cir. 2014) .................................... 26

*Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220 (5th Cir.
   1991)................................................................................ passim

*Scott v. Dorel Juvenile Grp., Inc.*, 456 F. App'x 450 (5th Cir. 2012) ......................... 31

*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912 (5th Cir. Tex. 1992)................................ 26, 49

*Willis v. Roche Biomedical Labs., Inc.*, 21 F.3d 1368, 1371 (5th Cir. 1994) .............................. 26


**Texas Cases**

*Allen v. W. A. Virnau & Sons, Inc.*, 28 S.W.3d 226 (Tex. App.—Beaumont 2000,
   pet. denied) ...................................................................... 50

*Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997)................................... 30, 31

*Bowser v. Craig Ranch Emergency Hosp., L.L.C.*, No. 05-14-00501-CV, 2015
   Tex. App. LEXIS 6631 (Tex. App.—Dallas June 29, 2015, no pet. h.) ................................. 40

*Caterpillar, Inc. v. Shears*, 911 S.W.2d 379 (Tex. 1995) ............................... 37, 47

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) ........................................... 31

*Genie Indus., Inc. v. Matak*, 58 Tex. Sup. Ct. J. 832, 2015 Tex. LEXIS 437 (Tex.
   May 8, 2015) ...................................................................... 30

*Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex. 1978) ............................. 47

*Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661 (Tex. 1999) ................................ 53

*Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654 (Tex. 1999).......................................... 40

*Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989)........................... 53

*Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331 (Tex. App.—Tyler 2003, no
   pet.)............................................................................... 53

*Seifried v. Hygenic Corp.*, 410 S.W.3d 427 (Tex. App.—Houston [1st Dist.] 2013,
   no pet.)........................................................................... 50

*Sims v. Washex Mach. Corp.*, 932 S.W.2d 559 (Tex. App.—Houston [1st Dist.]
   1995, no writ) ..................................................................... 43

*Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306 (Tex. 2009) ............................................................. 30

*Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9 (Tex. 2008) .................................. 40

*U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118 (Tex. 2012)........................................................ 40

*Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886 (Tex. Civ. App.—El Paso
    1979, no writ) ...................................................................................................................... 54

## Texas Statutes

Tex. Bus. & Comm. Code § 2.314............................................................................................. 53

Tex. Civ. Prac. & Rem. Code § 82.005 .................................................................................... 31

## Federal Rules

Fed. R. Civ. P. 56..................................................................................................................... 26

Plaintiffs Virginia (Gini) Nester and Robert Scott Nester, individually and as next friends of C.N. and S.N., minors, file this response in opposition to Defendant Textron, Inc. d/b/a E-Z-GO's (Textron) Motion for Summary Judgment (Doc. No. 70), and in support thereof would respectfully show as follows:

## I.    INTRODUCTION

Textron's motion for summary judgment is meritless and should be denied in all things. As Textron well knows, the Nesters are entitled to a jury trial after marshaling at least some evidence for every essential element of the claims they have asserted in this lawsuit, which is set forth below.

Because Textron has failed to demonstrate any of the Nesters claims are barred as a matter of law or lack legally sufficient evidence, the Nesters respectfully request an order denying Textron's motion for summary judgment, and for such other and further relief to which the Nesters may be justly entitled.

## II.    BACKGROUND FACTS

**A.    E-Z-GO golf carts have long featured a kick-off brake system that creates a danger of severe personal injury or death due to inadvertent operation and/or unintended acceleration.**

E-Z-GO was founded in Augusta, Georgia, in 1954 as a golf cart-manufacturing company, and was acquired by Textron in 1960.[1]  One of the features of E-Z-GO's early golf carts was a kick-off brake system, the design of which has not been altered since approximately 1965.[2]  The accelerator pedal is physically connected or linked to the golf cart's parking brake by screws and

---

[1] *See, e.g.*, Deposition of Jim Fisher (Sept. 11, 2014), at 274:14–19, attached as Exhibit 1.

[2] Deposition of Nick Moore (Dec. 17, 2014), at 35:2–9, attached as Exhibit 2.

rods.[3]  Anything that simply depresses the cart's accelerator pedal will disengage, or "kick off," the cart's parking brake.[4]  Diagrams of the system are shown below:[5]

 

The kick-off brake system allowed a user to quickly hop in the vehicle and drive by simply pressing the accelerator pedal, without the necessity of separately disengaging the vehicle's parking brake.[6]

But the design of the kick-off brake system posed dangers as well: allowing the vehicle to move without a separate action to disengage the parking brake could lead to inadvertent operation or unintended acceleration of the vehicle when anyone or anything simply pressed the accelerator pedal.[7]  A user could move the vehicle unintentionally, or worse, the vehicle could take off without an operator in control.[8]  Since 1975, and likely earlier, Textron has indisputably been aware that

---

[3] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 62:24–63:1, 63:4–7.

[4] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 63:8–13.

[5] Excerpt from E-Z-GO Workhorse ST Series 2001 Owner's Manual (Textron000344), attached as Exhibit 3; Excerpt from Technician's Repair and Service Manual for E-Z-GO Gasoline Powered Utility Vehicles, Starting Model Year: 2000 (Textron000278), attached as Exhibit 4.

[6] *See, e.g.*, Ex. 2 (Moore deposition), at 37:19–23.

[7] *See, e.g.*, Deposition of Timothy O'Byrne (May 27, 2015), at 5:6–18, 11:22–12:7, attached as Exhibit 5.

[8] *See* Ex. 5 (O'Byrne deposition), at 11:22–12:7.

aspect of its kick-off brake system could cause severe personal injury or death: it has included in its owner's manuals a notice of the danger posed.[9]

---

### Accelerator Pedal

Depressing the accelerator pedal starts the engine. When the pedal is released, the engine will stop (Ref Fig. 14 on page 3-12).

 **If key switch is 'ON' and parking brake is set, depressing the accelerator will release the parking brake and cause the vehicle to move which could result in severe personal injury or death.**

Depressing the accelerator pedal will release the parking (PARK) brake if it is engaged. This is a feature to assure the vehicle is not driven with the parking (PARK) brake engaged. **Depressing the accelerator pedal is NOT the preferred method of releasing the parking brake**.

**3-11**

---

In addition to the notices in its owner's manuals, representatives of Textron in this lawsuit have specifically testified Textron was aware of the dangers of such unintended acceleration no later than 1989,[10] nine years before the E-Z-GO Workhorse ST350 hit the market. A member of Textron's design team for the Workhorse ST350 has testified he was aware of the dangers of unintended acceleration decades ago,[11] and that such unintended acceleration could cause severe personal injury.[12]

---

[9] Excerpt from representative service manual for E-Z-GO golf cart (Textron003078), attached as Exhibit 6; *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

[10] *See, e.g.*, Ex. 2 (Moore deposition), at 104:2–15, 104:17.

[11] Ex. 1 (Fisher deposition Sept. 2014), at 38:7–39:1.

[12] Ex. 1 (Fisher deposition Sept. 2014), at 39:10–13.

**B.**     **In an attempt to expand into new markets with new potential customers, Textron leverages and converts its E-Z-GO golf carts into utility vehicles.**

Prior to 1995, Textron's E-Z-GO division focused primarily on sales of carts to golf courses and golf cart maintenance-related customers.[13]  In or around that time, Textron made a strategic corporate decision to expand their product offerings and enter new consumer markets to sell to more potential customers.[14]  This was initially done by adapting Textron's existing E-Z-GO TXT golf cart design to other, non-golf applications, including farming and ranching.[15]

Product design and development of the E-Z-GO Workhorse ST350 utility vehicle began in or around 1995 or 1996,[16] and it debuted in 1998.[17]  Though Textron added several design changes for its new farming and ranching market (for example, larger, knobby tires and a cargo bed), many of the same design elements from Textron's golf-cart design remained.  The absence of significant design changes from Textron's TXT golf cart to the farming-and-ranching Workhorse ST350 utility vehicle is underscored by other design features carried over to the Workhorse: as shown in the picture below, the same cup-holders, tee-holders, and golf ball-holders from Textron's TXT golf carts were simply left on the Workhorse's dash.

---

[13] *See* Ex. 2 (Moore deposition), at 39:13–18.

[14] *See* Ex. 2 (Moore deposition), at 39:6–9.

[15] Ex. 1 (Fisher deposition Sept. 2014), at 27:13–28:1.

[16] Ex. 1 (Fisher deposition Sept. 2014), at 27:3–7.

[17] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 105:21–106:9.



**C.     During the "design process," Textron made no effort to analyze and address the risks and utility presented by its design choices for the new farming-and-ranching application of the Workhorse utility vehicle.**

The safety design hierarchy is a universally recognized design process to address dangers and potential dangers posed by a product: (i) when a specific hazard has been identified, a design should be changed to eliminate the hazard; (ii) if it is not feasible to eliminate the hazard, a design should instead guard potential users against the hazard; and (iii) if re-design or guarding potential users is not feasible, the potential users must be adequately warned of the hazard.[18]  While the Nesters' expert witnesses recognized and explained the applicability of the safety design

_____

[18] Deposition of Jim Fisher (Dec. 12, 2014), at 139:8–16, 139:18–140:1, 140:3–8, 140:20–23. 140:25–141:8, attached as Exhibit 7.

hierarchy,[19] as discussed in more detail below, three of Textron's witnesses in this case also whole-heartedly accept the safety design hierarchy and agree Textron should follow it.[20]

Textron, however, did not incorporate the safety design hierarchy into its conversion of the TXT golf cart into the Workhorse ST350 utility vehicle that would be used in commercial, industrial, and agricultural applications.[21] This despite Textron's preexisting knowledge that, among other things, its kick-off brake system and attendant unintended acceleration posed a danger of severe personal injury or death.[22]

Surprisingly, Textron performed absolutely no failure analysis involving unintended acceleration when designing the Workhorse ST350.[23] A member of Textron's Workhorse ST350 design team acknowledged he was familiar with design failure mode and effects analysis, or DFMEA, which attempts to put a numerical value on the likelihood and severity of something occurring.[24] That member went on to state Textron did not perform a DFMEA analysis of any kind for any purpose before the Workhorse ST350 was released.[25] At no time during the Workhorse ST350's design process did Textron consider removing the kick-off brake system.[26]

These failures and decisions were critical mistakes. As explained below, the risks presented when the design of the TXT golf cart was used on a golf cart grow significantly when

---

[19] Affidavit of Herbert C. Newbold (July 23, 2015), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 12, attached as Exhibit 8; Affidavit of William Vigilante (July 22, 2015), at ¶ 3 *and* Ex. B (Vigilante report) at 9, attached as Exhibit 9.

[20] Ex. 7 (Fisher deposition Dec. 2014), at 139:8–16; Deposition of Alan Dorris (May 6, 2015), at 234:19–235:20, attached as Exhibit 10; Deposition of David Bizzak (June 3, 2015), at 113:15–17, 113:19–25, attached as Exhibit 11.

[21] Ex. 11 (Bizzak deposition), at 114:1–115:20, 115:22; Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 12–13; Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 10–11.

[22] Ex. 6 (Textron manual warning regarding accelerator); *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

[23] Ex. 1 (Fisher deposition Sept. 2014), at 44:17–22, 44:24–45:2.

[24] Ex. 1 (Fisher deposition Sept. 2014), at 13:6–16.

[25] Ex. 1 (Fisher deposition Sept. 2014), at 26:16–27:2.

[26] Ex. 1 (Fisher deposition Sept. 2014), at 63:17–22.

the vehicle is converted into the Workhorse ST350 to be used as a farming or ranch utility vehicle.[27]

**D.    Textron ignored safer alternative designs that existed at the time the E-Z-GO Workhorse ST350 was designed and would have been apparent to Textron if it had followed the safety design hierarchy.**

Textron's failure to employ the safety design hierarchy in converting the TXT golf cart to the Workhorse ST350 utility vehicle led to Textron ignoring and/or failing to address new or increased hazards presented by the Workhorse's new applications, like farming and ranching.[28] At least four safer alternative designs to reduce these new or increased risks were economically and technologically feasible at the time the Workhorse ST350 was designed and manufactured.[29] In some cases, those alternative designs had been incorporated into the marketplace by Textron's competitors,[30] and in other cases, by Textron itself in its other vehicles.[31]

Textron incorporated its kick-off parking brake system into the Workhorse ST350, which disengages the parking brake when the accelerator is depressed.[32]  The utility of such a feature is greatly reduced or virtually nonexistent in the Workhorse ST350's new applications, like farming and ranching, where users would not enter and exit the vehicle nearly as frequently as golfers did.[33] On the other hand, the already present and identified risks posed by the kick-off brake system increased significantly: the Workhorse ST350's new applications made it more likely the vehicle

---

[27] *See* Ex. 8 (Newbold affidavit) at ¶¶ 3, 6–7 *and* Ex. B (Newbold Jan. 2015 report) at 12–13.

[28] *See* Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 6–7, 10–11.

[29] Ex. 8 (Newbold affidavit) at ¶¶ 3, 11 *and* Ex. B (Newbold Jan. 2015 report) at 17–25.

[30] Ex. 8 (Newbold affidavit) at ¶¶ 3, 11 *and* Ex. B (Newbold Jan. 2015 report) at 17–25.

[31] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 217:5–22, 239:14–240:5; Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 20.

[32] Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 17–25; Ex. 1 (Fisher deposition Sept. 2014), at 63:8–13.

[33] *See* Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 6.

would be exposed to situations where it would move unintentionally when the accelerator pedal was inadvertently depressed.[34]  More tools, supplies, and other equipment would be carried in the Workhorse ST350 than the TXT golf cart; it would be exposed to non-golf uses in farm, ranch, and other settings, including settings with cargo, animals, and children; and the Workhorse ST350 was more likely to be used on rough, uneven terrain.[35]  Thus, the risk of something or someone striking the accelerator and causing unintended acceleration greatly increased for the Workhorse ST350 utility vehicle over the old TXT golf cart.

### 1.    Removing the linkage between the accelerator pedal and the parking brake

One safer alternative design to address this issue was to remove the linkage between the accelerator pedal and the existing parking brake to disable the kick-off brake system.  This design change would eliminate the hazard posed by inadvertent depression of the accelerator pedal: when fully engaged, the Workhorse ST350's parking brake was designed to and did prevent movement of the cart even if the accelerator pedal was fully depressed.[36]  In fact, the linkage could be disabled by removing a single pin from the assembly.[37]

This alternative design (elimination of the kick-off brake system) was present in the products of Textron's competitors,[38] and, as discussed in more detail later, would be requested by a government agency in 2005 to address death and injuries caused by unintended acceleration of a Textron vehicle with a kick-off brake system.[39]  Further, this alternative design was, without

---

[34] Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B. (Vigilante report) at 6.

[35] Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B. (Vigilante report) at 6; *see also* Ex. __ (Fisher

[36] Ex. 8 (Newbold affidavit), at ¶¶ 3, 14 *and* Ex. C (Newbold June 2015 report) at 2.

[37] Ex. 2 (Moore deposition), at 107:23–108:1.

[38] Ex. 2 (Moore deposition), at 50:9–17 (stating John Deere, Honda, and Kawasaki vehicles did not contain kick-off brake systems); Ex. 5 (O'Byrne deposition), at 16:6–8, 17:16–19, 18:11–18.

[39] HSE Letter to Textron (Oct. 18, 2005) (Textron002480), at 2–3, attached as Exhibit 12.

question, economically feasible: at the time the Workhorse ST350 was designed and manufactured, removing the linkage between the accelerator pedal and the parking brake would have *saved* Textron $75 per cart.[40]  In response to that government agency request in 2005, Textron itself recognized removing the linkage was the "best protection" for consumers from risks of unintended acceleration in Textron's vehicles.[41]

### 2.    Separate parking brake

Another safer alternative design would have been to incorporate a parking brake whose engagement and release mechanism was separate from and unaffected by any use of the accelerator pedal, like a hand-operated lever brake.[42]  Textron actually used this design on other vehicles, as did its competitors.[43]

Requiring manual disengagement of such a hand brake before the cart could move would prevent inadvertent operation and/or unintended acceleration if the accelerator pedal was accidentally depressed.[44]  All of the other utility vehicles used by one of Textron's expert witnesses in his personal ranch work have separate foot- or hand-operated parking brakes,[45] and they remain very popular models.[46]

### 3.    Operator-present switch (or OPS)

A third safer alternative design would be an operator-present switch, which is an open electrical switch that requires closure before a vehicle will operate.[47]  They are specifically

---

[40] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 18–19.

[41] *See* Textron letter to HSE (Nov. 28, 2005) (Textron002353), at 1–2, attached as Exhibit 13.

[42] Ex. 8 (Newbold affidavit), at ¶¶ 3, 11 *and* Ex. B (Newbold Jan. 2015 report) at 18–21.

[43] Ex. 1 (Fisher deposition Sept. 2014), at 239:14–240:5; Ex. 5 (O'Byrne deposition), at 18:19–19:5.

[44] *See* Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 19–21.

[45] Ex. 5 (O'Byrne's deposition), at 18:25–19:5.

[46] Ex. 5 (O'Byrne's deposition), at 83:23–84:2, 84:17–19.

[47] *See* Ex. 8 (Newbold affidavit), at ¶¶ 3, 11 *and* Ex. B (Newbold Jan. 2015 report) at 23–24.

designed to reduce or eliminate operation of the vehicle when an operator is not in control of the vehicle.[48]  An example of this would be an operator-present switch incorporated into the seat of a cart: placing weight on the seat of a vehicle by sitting down would close such a switch and allow operation.[49]  Textron manufactured vehicles with seat operator-present switches.[50]

### 4.    Pedal guard

Finally, another safer alternative design that could have been incorporated into the Workhorse ST350 was a pedal guard.  Because of the Workhorse ST350's new applications, like farming and ranching, the likelihood that tools, supplies, or other equipment would inadvertently contact the accelerator pedal increased significantly.[51]  A pedal guard is exactly what it sounds like: a foot-shaped form that surrounds a cart's accelerator pedal.[52]  It reduces the likelihood the accelerator pedal would be depressed by anything other than an operator's foot.[53]  At the time the Workhorse ST350 was designed and manufactured, a pedal guard would have cost approximately $50 to incorporate, and Textron actually installed it on vehicles upon customer request.[54]

Each one of these safer alternative designs was economically and technologically feasible and would have significantly reduced or completely eliminated the increased risk of inadvertent operation and/or unintended acceleration posed by the Workhorse ST350's new commercial, industrial, and agricultural applications without significantly affecting the vehicle's utility.[55] Textron's failure to implement the safety design hierarchy meant it did not identify, evaluate, or

---

[48] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 23–24.

[49] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 23–24.

[50] *See, e.g.*, Ex. 7 (Fisher deposition Dec. 2014), at 187:15–190:5.

[51] *See, e.g.*, Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 24.

[52] *See* Ex. 8 (Newbold affidavit) at Ex. B (Newbold Jan. 2015 report) at 23–24.

[53] Ex. 8 (Newbold affidavit), at ¶ 3 and Ex. B (Newbold Jan. 2015 report) at 23–24.

[54] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 284:2–285:5.

[55] Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 17–24.

address these increased risks.[56]  Instead, it marketed and sold the Workhorse ST350 with a kick-off brake system that Textron knew put people at risk of severe personal injury or death from unintended acceleration.

**E.    Instead of designing out or guarding against the danger posed by the kick-off brake system, Textron continued to use warnings and instructions it knew were inadequate, ineffective, and not being followed.**

The safety design hierarchy mandates that, if a hazard is not designed out of a product and potential users are not guarded against the hazard, a manufacturer must adequately warn users of the danger posed by the hazard.[57]  Textron claims it provided two warnings to protect against unintended acceleration regarding the need to turn a vehicle's key to the "off" position when exiting the vehicle and the danger posed when a user fails to do so: (1) an entry in each vehicle's owner's manual and (2) in small print on a decal placed on each vehicle's dash.[58]   Textron's representatives have agreed the action sought by these warnings was "an important safety instruction."[59]

Textron insists the kick-off brake system is not unreasonably dangerous because, if the key is turned "off," the engine cannot start and the vehicle will not accelerate.[60]  Textron has repeated this mantra since the kick-off brake system design came into use more than 50 years ago, and blindly relied on this concept in the design of the Workhorse ST350, failing or refusing to consider

---

[56] Ex. 8 (Newbold affidavit) at ¶¶ 3, 6–11 *and* Ex. B (Newbold Jan. 2015 report) at 13.

[57] *See* Ex. 7 (Fisher deposition Dec. 2014), at 139:8–16; Ex. 10 (Dorris deposition), at 234:19–235:20; Ex. 11 (Bizzak deposition), at 113:15–17, 113:19–25.

[58] *See, e.g.*, Ex. 6 (Textron manual warning regarding accelerator); Ex. 1 (Fisher deposition Sept. 2014), at 213:17–218:1.

[59] Ex. 2 (Moore deposition), at 100:1–4, 100:6–10, 100:12–13.

[60] *See* Ex. 1 (Fisher deposition Sept. 2014), at 225:8–18, 226:3–6.

safeguards other than the key switch.[61]  The "turn the key off" instruction is the linchpin of the safety chain for Textron.

But there is a glaring problem with Textron's position: its instruction to turn the key "off" does not work and Textron knows it.  Textron knew of the hazard; while Textron now claims its warning and instructions are sufficient, the reality is that it gave no analysis to them at the time of the design, they didn't work then, and they don't work now.

Textron knew that users of its vehicles did not follow instructions to turn the vehicle's key to "off" when exiting the vehicle.[62]  Textron's own representatives and expert witnesses have admitted exiting Textron vehicles without turning the key "off" themselves,[63] and some have even stated it is common for users to do so.[64]  The warnings were ineffective and Textron knew it—but they do show Textron was aware of the risk posed by its kick-off brake system.[65]  Despite this awareness, Textron made no efforts to identify how prevalent the practice was, or to improve the existing warning on the vehicle's dash or in the service manual.[66]

Textron was or should have been aware of the dangers of carrying cargo or tools in the passenger area of the E-Z-GO Workhorse ST350 because of the kick-off brake system and the risks of unintended acceleration,[67] but did not warn potential users.[68]  Quite the opposite: Textron

---

[61] *See* Ex. 1 (Fisher deposition Sept. 2014), at 225:8–18, 226:3–6, 227:1–18.

[62] Ex. 1 (Fisher deposition Sept. 2014), at 45:10–14, 45:16–21, 56:21–57:1, 58:7–12.

[63] Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12.

[64] Ex. 5 (O'Byrne's deposition), at 38:16–19, 38:21–22, 39:9–10.

[65] Ex. 10 (Dorris deposition), at 210:10–17, 211:18–25.

[66] Ex. 2 (Moore deposition), at 17:8–14.

[67] *See* Ex. 9 (Vigilante affidavit), at ¶ 5.

[68] Ex. 2 (Moore deposition), at 30:21–31:11; Ex. 9 (Vigilante affidavit), at ¶ 8.

specifically represented to consumers that such a use was acceptable through its marketing materials.[69]

Further, the engine-shutoff design of the Workhorse ST350 compounded users' confusion: when the cart's accelerator pedal is released, the engine stops.[70]  This result makes it even less likely users will see a need to follow Textron's instructions and turn the cart's key to "off," as the engine has already quit.  This phenomenon was known to Textron, and, as explained in more detail below, was exactly the reason Mrs. Nester saw no need to turn the key "off" when she exited her vehicle.[71]

Textron was aware the notice it included in its vehicles' owner's manuals and the warning printed in miniature type on its vehicles' dashes to turn the key to "off" before exiting the vehicle were not effective—users were constantly disregarding it.[72]  These warnings were ineffective under American National Standards Institute criteria,[73] and should have prompted additional and/or more conspicuous warnings by Textron.[74]

For example, a conspicuous and explicit warning of the dangers posed by leaving the vehicle's key in the "on" position, carrying cargo in the passenger area, and the danger of unintended acceleration from contacting the accelerator pedal even when the parking brake is engaged should have been featured more prominently on the vehicle itself.[75]  Such a warning on

---

[69] Ex. 7 (Fisher deposition Dec. 2014), at 255:13–257:4; Pictures authenticated by Mr. Fisher's deposition testimony, attached as Exhibit 14.

[70] *See, e.g.*, Ex. 11 (Bizzak deposition), at 182:8–183:4, 183:6–12, 183:14–15.

[71] *See, e.g.*, Deposition of Gini Nester (June 19, 2014), at 15:18–2.

[72] Ex. 1 (Fisher deposition Sept. 2014), at 56:21–57:1, 58:7–12; Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12.

[73] Ex. 9 (Vigilante affidavit), at ¶ 13 *and* Ex. B to that affidavit (Vigilante report) at 15–16.

[74] Ex. 9 (Vigilante affidavit), at ¶¶ 14–15 *and* Ex. B to that affidavit (Vigilante report) at 16–17.

[75] Ex. 9 (Vigilante affidavit), at ¶¶ 14–15 *and* Ex. B to that affidavit (Vigilante report) at 16–17.

the vehicle's dash would have significantly reduced the danger posed by the Workhorse ST350's kick-off brake system in its new commercial, industrial, and agricultural applications.[76]

Textron, however, failed to implement, or even examine the need for, any new or different warnings on the Workhorse ST350.

## F.    Mrs. Nester made an anticipated and foreseeable use of the E-Z-GO Workhorse ST350.

Textron alleges that Mrs. Nester's incident and injuries could have been prevented had she turned the key/light switch off before dismounting the vehicle to open the gate.  Leaving the key/light switch on when exiting the vehicle, however, is consistent with the anticipated and foreseeable use of E-Z-GO vehicles and is a practice followed by a large percentage of vehicle users, Textron employees, and Textron corporate representatives themselves.[77]    It was not unreasonable or negligent for Mrs. Nester to dismount without turning the key off.[78]  That was a foreseeable and anticipated use of the Workhorse ST350 that Textron knew or should have known at the time the vehicle was designed, marketed, and sold.

At the time it was design, Textron was aware that users of their E-Z-GO vehicles did not turn the key "off" before exiting the vehicle: many users do not,[79] Textron representatives do not (both Jim Fisher and Nick Moore testified they have exited E-Z-GO vehicles without turning the key "off"[80]), and even Textron's corporate officers do not (Textron officers enter and drive a Textron vehicle during a charity video posted on YouTube without turning the key "on": https://www.youtube.com/watch?v=xjL8Dd44dRM).  Textron's own expert witness, Dr. David

---

[76] Ex. 9 (Vigilante affidavit), at ¶¶ 14–15 *and* Ex. B to that affidavit (Vigilante report) at 16–17.

[77] *See* Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12.

[78] *See* Ex. 5 (O'Byrne deposition), at 57:15–24.

[79] Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12.

[80] Ex. 2 (Moore deposition), at 15:19–25.

Bizzak, left the subject Workhorse ST350 utility vehicle unoccupied with the key turned "on" during his inspection of the vehicle in this matter.[81]

Textron knew or should have known that exiting an E-Z-GO vehicle without turning the key "off" is a reasonable behavior by Workhorse ST350 users. Textron designed the vehicle so that the accelerator pedal starts and stops the vehicle's engine, not the key. Textron describes the key as a "key/light" switch that turns on the electrical system of the vehicle, including the lights, not a kill switch. The presence of the key is not even needed for the engine to start if the switch was turned on before the key was removed.[82] The functions of the key and accelerator pedal in the Workhorse ST350 are contrary to the experience of most users when entering and exiting a passenger vehicle, or most other vehicles, where the engine is turned on and off by the ignition key and the accelerator is used to modulate speed.[83]

Considering the severe personal injury hazard involved with the design of their kick-off brake system, Textron's continued reliance on warnings and instructions it knows do not work is a conscious disregard of the safety design hierarchy.[84] Moreover, repeatedly blaming the user for not following an instruction that Textron knows is inadequate and does not even follow itself— instead of addressing the hazard through the design of the product and its warnings and instructions—is improper, unreasonably dangerous, and an egregious disregard for its responsibility as a product manufacturer.

---

[81] Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 11.

[82] *See* Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B to that affidavit (Vigilante report) at 18.

[83] *See* Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B to that affidavit (Vigilante report) at 18.

[84] *See* Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B to that affidavit (Vigilante report) at 18.

**G.      The hazards posed by the kick-off brake system would not be contemplated by ordinary users of the vehicle and were not contemplated by Mrs. Nester.**

Textron is critical of Mrs. Nester for not perceiving that, if the key was "on," cargo in the passenger area could fall over, strike the accelerator, release the parking brake, and cause unintended acceleration. While Textron knew this could happen at the time it designed the vehicle, this risk was not contemplated by either the ordinary user or Mrs. Nester.

As shown above, while Textron knew the importance of turning the key "off," it also knew ordinary users did not. Likewise, while Textron knew the importance of not carrying cargo in the passenger area, it knew or should have known ordinary consumers did not.[85]

The E-Z-GO Workhorse is intended for carrying various types of cargo, equipment, tools, and other objects. The Workhorse is designed and sold with a flat bench-style seat and a flat floorboard.[86] The flat surfaces afford the perception and ability to stack or place objects on for temporary storage or transport during use of the vehicle. The design and operation of the accelerator pedal affords the perception that the vehicle is off when pedal is released. Given the design of the vehicle, there was no reason for a user to think that cargo should ***not*** be stored or placed in the passenger compartment, or that the vehicle would start or move on its own after the engine was off and the parking brake set. Textron's own print and video marketing material depicts cargo being carried and/or stored in the passenger compartment of their utility vehicles, including on the bench seat and on the floorboard.[87]

Other incidents involving inadvertent operation/unintended acceleration of the vehicle demonstrate the practice of placing cargo in the passenger area is a foreseeable use and that the

---

[85] *See* Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B to that affidavit (Vigilante report) at 14, 16, 20.

[86] *See* Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B to that affidavit (Vigilante report) at 20.

[87] Ex. 14 (Marketing materials pictures).

hazard of the presence of cargo placed in the passenger compartment was not contemplated by the ordinary user.[88]  These incidents also demonstrate that users do not turn the key "off" as instructed. For example, a table below contains numerous incidents from 1999 to 2012 where people have been injured or killed by a Textron vehicle due to inadvertent operation/unintended operation of the vehicle.  In many of them, cargo placed in the passenger compartment of a Textron vehicle inadvertently contacted the accelerator pedal, resulting in the vehicle moving without an operator and then striking the victim.[89]  In one or more of the incidents, a young child inadvertently hit the accelerator pedal causing the parking brake to kick-off and the vehicle to move.[90]  In some, an employee inadvertently contacted the accelerator pedal while entering the Textron vehicle causing the parking brake to kick-off and the vehicle to accelerator forward striking the victim.[91]

Mrs. Nester's lack of appreciation of the unintended-acceleration hazard associated with the kick-off brake system and carrying cargo in the passenger compartment of the vehicle is consistent with the anticipation and expectation of Textron.  Textron admitted it does not think it is easy for the average consumer to detect and know that unanticipated acceleration could occur with their kick-off system.[92]

All of these design choices by Textron creates the following environment: the vehicle's user associates the engine stopping and starting with the accelerator pedal, not the key.  The key then becomes a secondary function that is not directly related to the starting and stopping of the vehicle, and likely not thought about in the ordinary use of the vehicle.  The lack of importance

---

[88] *See, e.g.*, Hallenbeck incident files, attached as Exhibit 15; Bedell incident files, attached as Exhibit 16; Cassidy incident files, attached as Exhibit 17.

[89] *See generally* Ex. 15 (Hallenbeck).

[90] *See* Ex. 12 (HSE letter to Textron), at 1.

[91] *See generally* Miller incident files, attached as Exhibit 18.

[92] Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–22.

and need for the key in the ordinary use of an E-Z-GO vehicle is identified in the testimony of both Mr. Fisher and Mr. Moore, Textron's corporate representatives. For example, Mr. Moore testified he unconsciously leaves the key turned "on" when he exits the vehicle.[93] Mr. Fisher also testified he has inadvertently exited Textron vehicles without turning the key "off" because he did not think about it before getting out of vehicle.

**H.  Textron has repeatedly and unreasonably chosen to ignore safety problems with the kick-off brake system by burying its head in the sand.**

Textron knew the kick-off brake system could cause unintended acceleration and personal injury or death; it has known that and warned about it for more than 30 years.[94] The numerous incidents involving the dangerous unintended acceleration of Textron's vehicles validates the existence of that known danger. But instead of acting to try and mitigate it (at least in the United States, more on that later), Textron claims now that these incidents are "freak accidents" that cannot be foreseen, anticipated, or prevented. Textron is simply wrong.

First, Textron appreciated and warned of the risk for 30 years before Mrs. Nester was injured. Textron does not warn of "freak accident" danger.[95] Its policy is not to issue a warning unless merited by incidents, as is apparent from testimony in the *Lesho* case. Thus, the warning itself is an admission by Textron that the risk and danger of unintended acceleration is present and real.

Second, Textron relies on its lack of records regarding incidents or claims to contend there is no real or meaningful risk of injury due to unintended acceleration in vehicles with a kick-off brake system. But Textron cannot bury its head in the sand and then escape responsibility by

---

[93] Ex. 2 (Moore deposition), at 15:19–216:3.

[94] *See* Ex. 6 (Textron manual warning regarding accelerator); Ex. 2 (Moore deposition), at 104:2–15, 104:17.

[95] *See* Ex. 7 (Fisher deposition Dec. 2014), at 118:7–22.

claiming lack of notice.  By design or neglect, Textron has no meaningful or effective process to monitor the safety of its products through reports of accidents or injuries.[96]

Textron had and has a duty to exercise reasonable care to learn of post-sale problems with their products.  The failure of Textron to set up a system to gather post-sale information—and then claim a lack of knowledge—is unreasonable, especially when one could be set up with little effort and expense.  Textron should have put into place an appropriate post-sale monitoring system and established appropriate committees or trained personnel who can analyze the gathered information to determine whether post-sale actions might be appropriate.

Textron originally claimed in this matter it is only aware of three or four incidents of unintended acceleration, including Mrs. Nester's injuries.[97]  In fact, there are many more similar incidents of which Textron knew or should have known.  Some of those are as follows:

| Victim | Date | Location | Circumstances |
|---|---|---|---|
| Robert Hallenbeck | April 25, 1999 | California | Employee at a golf course dropped a tent bag into an E-Z-GO golf cart, which depressed the accelerator, kicked off the parking brake, and allowed the golf cart to take off without an operator.  The cart struck Mr. Lesho, who was standing nearby, and pinned him to a wall.[98] |
| Daniel Lesho | August 11, 2001 | Michigan | A ladder fell onto an E-Z-GO Workhorse vehicle at a Pontiac plant in Michigan, which depressed the accelerator pedal, kicked off the parking brake, and allowed the vehicle to take off without an operator.  The vehicle struck Mr. Lesho and injured his right knee and leg.[99] |
| Melissa Roberts | January 31, 2004 | Kentucky | Ms. Roberts drove a vehicle with a kick-off brake system to her horse barn to clean out stalls.  A |

---

[96] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 72:19–74:15.

[97] Ex. 1 (Fisher deposition Sept. 2014), at 79:7–80:12.

[98] *See* Ex. 15 (Hallenbeck).

[99] *See* Lesho incident files, attached as Exhibit 19.

| Victim | Date | Location | Circumstances |
|--------|------|----------|---------------|
| | | | bale of hay likely fell onto the accelerator pedal of the vehicle, kicked off the parking brake, and allowed the vehicle to take off without an operator present.  The vehicle struck Ms. Roberts and trapped her.  She was found dead several hours later.[100] |
| Name unknown | July 2005 | Devon Cliffs Holiday Park, Devon, United Kingdom | A child climbed onto an E-Z-GO vehicle with a kick-off brake system and depressed the accelerator pedal, which kicked off the vehicle's parking brake.  The vehicle rolled down a hill and into a crowd of people, killing one person and injuring several people.[101] |
| Zaida Bedell | April 20, 2006 | California | Ms. Bedell was struck by an E-Z-GO golf cart with a kick-off brake system at a charity event when boxes were being stacked on the cart's front seat fell onto the accelerator pedal, kicked off the parking brake, and the cart took off without an operator in the cart.[102] |
| Linda Cassidy | April 15, 2009 | Florida | An E-Z-GO golf cart with a kick-off brake system struck and killed Ms. Cassidy, who was feeding horses on a farm.  The police concluded feed buckets fell and depressed the cart's accelerator pedal, kicked off the parking brake, and allowed the cart to take off without an operator present.[103] |
| Willie Amendola | December 17, 2011 | Texas | Mr. Amendola was struck and injured by a runaway E-Z-GO cart with a kick-off brake system after a high school state football championship game at Cowboys Stadium, when a pylon was thrown into the cart, depressed the accelerator pedal, kicked off the parking brake, and the cart took off without an operator present.[104]  (The videos attached as summary |

---

[100] *See* Roberts incident files, attached as Exhibit 20.

[101] *See, e.g.*, Ex. 12 (HSE letter to Textron).

[102] *See* Ex. 16 (Bedell).

[103] *See* Ex. 17 (Cassidy).

[104] *See* Amendola (Cowboys Stadium) incident files, attached as Exhibit 21.

| Victim | Date | Location | Circumstances |
|--------|------|----------|---------------|
| | | | judgment evidence depict the incredible risk if injury posed by the kick-off brake system.[105]) |
| Terry Miller | May 12, 2012 | Pennsylvania | A fellow employee inadvertently depressed the accelerator pedal of an E-Z-GO cart while entering the vehicle, which caused the parking brake to kick off and the cart to cart to accelerate forward unintentionally.  The cart struck and injured Miller from behind before the co-worker could get the vehicle under control.[106] |

In addition to the incidents listed above, even more have been identified by reviewing the National Electronic Injury Surveillance System (NEISS), a database maintained by the federal Consumer Products Safety Commission.[107]  Counting only emergency-room visits at participating hospitals in the United States and its territories, there were at least 31 other reported incidents of injuries caused by a golf cart's unintended acceleration from 1990 to 2013.[108]  Under NEISS statistical weighting practices, 31 reported incidents equals an estimated 1,645 incidents over that time period.[109]  Neither of those figures includes events of inadvertent operation or unintended acceleration: (i) that, luckily, did not result in injuries and does not include fatalities; or (ii) where treatment was provided by anyone other than an emergency-care physician, like a primary-care doctor.[110]  Therefore, if anything, NEISS *underestimates* the number of injuries that occur.[111]

---

[105] Video #1 of Cowboys Stadium incident, attached as Exhibit 22; Video #2 of Cowboys Stadium incident, attached as Exhibit 23.

[106] *See* Ex. 18 (Miller).

[107] *See* Affidavit of Lara McKenzie (July 23, 2015), at ¶ 3 *and* Ex. B (McKenzie report) at 1–3, attached as Exhibit 24.

[108] Ex. 24 (McKenzie affidavit), at ¶¶ 3, 8 *and* Ex. B (McKenzie report), at 6.

[109] Ex. 24 (McKenzie affidavit), at ¶¶ 3, 8 *and* Ex. B (McKenzie report), at 6.

[110] Ex. 24 (McKenzie affidavit), at ¶ 3 *and* Ex. B (McKenzie report), at 3.

[111] Ex. 24 (McKenzie affidavit), at ¶ 3 *and* Ex. B (McKenzie report), at 3.

All of these similar incidents are important to the Nesters' claims. Under the law of this circuit, similar incidents "may be probative of any number of factors," like notice, foreseeability, and the existence of a defect.[112]

**I.    Textron knew of a safer alternative design fix for the dangers of the kick-off brake system before Mrs. Nester was paralyzed, said it would implement it, but then put profits over safety and left the design in place.**

After the Devon Cliffs death in 2005, the United Kingdom's Health and Safety Executive specifically asked Textron to implement one of the safer alternative designs identified by the Nesters in this lawsuit—removal of the linkage between the accelerator pedal and the parking brake to disable Textron's kick-off brake system.[113] At the time, a Textron employee even stated that the inadvertent release of the kick-off brake system that gave rise to the Devon Cliffs fatality was foreseeable,[114] and agreed that Textron recognized the issue should be addressed by removing the linkage—calling it the "best protection" for users of the vehicle.[115]

After initially agreeing to remove the linkage for vehicles sold in the United Kingdom, Textron decided against the change and did not implement it after the HSE ceased to follow up. In the United States, Textron issued a Field Service Bulletin regarding maintenance of the kick-off brake system within days of responding to the HSE's 2005 request, but did ***not*** advise owners or dealers of the danger Textron knew was posed by continued use of the kick-off brake system, or that Textron had determined the "best protection" was to remove the linkage.[116]

---

[112] *See Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 426 (5th Cir. 2006).

[113] Ex. 12 (HSE letter to Textron), at 2–3; (Ex. 2 (Moore deposition), at 37:1–5.

[114] E-mail from Mr. Lansdell to Mr. Fisher (Nov. 4, 2005) (Textron002387), attached as Exhibit 25.

[115] Ex. 13 (Textron letter to HSE), at 1.

[116] *See* Field service bulletin, attached as Exhibit 26; Ex. 13 (Textron letter to HSE), at 1.

Textron has taken the position it was unaware of the vast majority of these incidents.[117] This is unsurprising; Textron has taken affirmative steps to maintain an appearance of ignorance in the face of the many injuries caused by its kick-off brake system:

- Textron asserts it has no records of any incidents, complaints, and lawsuits that occurred before 2005.[118]  According to Textron, those records, maintained by Textron's then-manager of reliability engineering, Wally Powell, were all destroyed and no copies were made;[119]

- Textron's current manager of reliability engineering, Jim Fisher, testified Textron kept no record of customer complaints or phone calls regarding product issues until recently;[120]

- In contrast to its lax policies concerning records-tracking, Textron maintains a very strict document-retention policy that destroys files after two years.[121]  For lawsuits, Textron keeps files another three years.[122]

The efficacy of Textron's system has been exposed in this lawsuit.  Initially, Textron claimed only four incidents had ever occurred where unintended acceleration of a Textron vehicle caused injuries: Ms. Bedell, Mr. Lesho, the incident at Cowboys Stadium, and this case, Mrs. Nester.[123]  As shown in the table above, that was not the case.  Relying on Textron's incomplete collection of recorded incidents to determine if its products are unreasonably dangerous or it had notice of earlier incidents is neither reliable nor reasonable.

In short, there have been many incidents of injury or death caused by Textron's kick-off brake system, and it has gone to great lengths to make sure it appears not to be aware of them. When asked how many injury incidents it would take before the design in question would be

---

[117] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 79:7–80:12.

[118] *See* Ex. 1 (Fisher deposition Sept. 2014), at 72:19–74:15.

[119] *See* Ex. 1 (Fisher deposition Sept. 2014), at 72:19–74:15.

[120] *See, e.g.*, Ex. 1 (Fisher deposition Sept. 2014), at 75:3–76:25, 292:11–19.

[121] Ex. 7 (Fisher deposition Dec. 2014), at 213:5–19.

[122] Ex. 7 (Fisher deposition Dec. 2014), at 215:14–19.

[123] Ex. 1 (Fisher deposition Sept. 2014), at 79:7–80:12.

evaluated by Textron, a member of the Workhorse ST350 design team indicated he did not know how many it would take, but it would have to be more.[124]

**J.      Gini Nester is struck and paralyzed by the unreasonably dangerous runaway Utility Vehicle.**

All of these choices by Textron led to the tragic beginning of this case.  On December 5, 2011, Gini Nester drove with one of her daughters to the family's ranch in Buda, Texas.[125]  As she commonly did, Mrs. Nester loaded a 50-pound bag of cattle cubes onto the passenger-side floorboard of the family's 2001 E-Z-GO Workhorse ST350 utility vehicle, serial number 1369608 (the Utility Vehicle), both of which were stored in a barn on the property.[126]  She then drove the Utility Vehicle from the barn out into the ranch to feed the cattle and move them from one field to another.[127]

Mrs. Nester called the cattle using the Utility Vehicle's horn, and some had drawn close to the Utility Vehicle by the time Mrs. Nester stopped to open a gate separating two fields.[128]  She stopped the Utility Vehicle a few feet from the gate, took her foot off the accelerator (which stopped the Utility Vehicle's engine, by design), applied the parking brake, left the gear selector in the "F" position (forward), and exited the Utility Vehicle to walk the gate open.[129]  While Mrs. Nester was walking the gate open, the bag of cattle cubes fell onto the Utility Vehicle's accelerator

---

[124] Ex. 1 (Fisher deposition Sept. 2014), at 153:17–154:1, 154:4–8.

[125] Deposition of Virginia Nester (June 19, 2015), at 6:7–10, attached as Exhibit 27; Deposition of Scott Nester (June 19, 2014), at 5:7–13, attached as Exhibit 28.

[126] *See* Ex. 27 (Gini Nester deposition June 19), at 42:11–43:12.

[127] *See* Ex. 27 (Gini Nester deposition June 19), at 49:14–50:5.

[128] Ex. 27 (Gini Nester deposition June 19), at 38:12–21, 63:13–21, 67:20–68:24.

[129] Ex. 27 (Gini Nester deposition June 19), at 70:10–71:19.

pedal (likely nudged by a cow), which "kicked off" the Utility Vehicle's parking brake and caused the vehicle to accelerate forward unintentionally and without an operator present.[130]

By the time Mrs. Nester had walked the gate open approximately 20 to 30 feet from where the Utility Vehicle was stopped and had turned to walk back to the vehicle, it was upon her.[131] The Utility Vehicle struck Mrs. Nester and ran her over, fracturing her C5, C6, and C7 vertebrae.[132] The impact paralyzed her and rendered her unable to call for help; she laid on the ground for more than an hour, cold and alone, until her husband found her.[133]

Mrs. Nester, a former sign-language teacher at Texas School for the Deaf, is now a quadriplegic and requires round-the-clock care from others.[134] Her life and her relationships with her family and friends have been drastically and permanently altered as a result of Textron's choices.[135]

### III.    SUMMARY JUDGMENT EVIDENCE

In support of their response to Textron's motion for summary judgment, the Nesters rely on and incorporate the exhibits listed in their appendix, submitted in conjunction with this response, and the citations throughout this response to those documents and any other filings or evidence on file with this Court.

---

[130] See Ex. 28 (Scott Nester deposition), at 58:1–21.

[131] Ex. 27 (Gini Nester deposition June 19), at 74:12–75:21.

[132] See Ex. 27 (Gini Nester deposition June 19), at 110:7–15.

[133] Deposition of Virginia Nester (June 20, 2015), at 221:14–222:23, attached as Exhibit 29.

[134] Ex. 29 (Gini Nester deposition June 20), at 172:1–173:1, 234:8–24.

[135] Ex. 29 (Gini Nester deposition June 20), at 234:8–235:17.

## IV.     ARGUMENTS AND AUTHORITIES

### A.     Legal standards

Summary judgment under Rule 56 is only appropriate when the movant has shown there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[136]  All of the evidence presented must be viewed in the light most favorable to the nonmovant, and all reasonable inferences from that evidence must be drawn in the nonmovant's favor.[137]

As to its arguments where it is affirmatively moving for judgment as a matter of law on claims on which it will not bear the burden of proof at trial, Textron must present evidence to conclusively negate at least one essential element of the claim it is challenging.[138]

For its arguments where it claims no evidence or insufficient evidence exists, Textron bears the burden to "point out the absence of evidence supporting the nonmoving party's case,"[139] or, in other words, to identify an essential element of a claim for which the nonmoving party has not or cannot produce some evidence.[140]  Only after Textron satisfies its initial burden is any obligation imposed on the Nesters to demonstrate that summary judgment is not appropriate.[141]

A district court's decision to deny a motion for summary judgment is reviewed *de novo*.[142]

---

[136] *See* FED. R. CIV. P. 56(a); *Angus Chem. Co. v. Glendora Plantation, Inc.*, 782 F.3d 175, 179 (5th Cir. 2015).

[137] *Glendora Plantation*, 782 F.3d at 179.

[138] *See* Fed. R. Civ. P. 56(a); *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832-RF, 2005 U.S. Dist. LEXIS 32213, at *19–20 (W.D. Tex. Nov. 1, 2005)

[139] *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912 (5th Cir. 1992).

[140] *Garcia v. Penske Logistics, LLC*, No. 5:13-CV-85, 2014 U.S. Dist. LEXIS 174533, at *11 (S.D. Tex. Dec. 18, 2014).

[141] *Willis v. Roche Biomedical Labs., Inc.*, 21 F.3d 1368, 1371 (5th Cir. 1994).

[142] *Kitchen v. Dallas County*, 759 F.3d 468, 476 (5th Cir. 2014)

**B.      Organization of the Nesters' responses**

Textron advances 15 arguments in its motion, many of which are directed at the same causes of action.[143]  The length of Textron's motion belies its simplicity.  The large majority of its arguments are comprised of two sections: (i) the Nesters' claims fail as a matter of law because Textron's experts say so;[144] and (ii) the Nesters cannot present evidence of essential elements of their claims because the opinions that will likely be offered by two of the Nesters' expert witnesses (Herb Newbold and Bill Vigilante) are allegedly conclusory—and Textron will explain why they are conclusory in separate motions to be filed later.[145]  These paired arguments are similar to a procedure under the Texas Rules of Civil Procedure: traditional summary judgment under Rule 166a(c) and no-evidence summary judgment under Rule 166a(i).

To allow for a more orderly analysis, the Nesters' responses will be organized by the claims Textron challenges.  A disposition table below correlates each of Textron's arguments with the claim it presumably addresses.  Textron's arguments are numbered by the headings in its motion.

| Textron Argument | | Nesters' Claim | Nesters' Response |
|---|---|---|---|
| A-1 A-2 | The cart was not defectively designed. | Design Defect | MSJ denied; fact question |
| B-1 B-2 | The safer alternative designs proposed by the Nesters are insufficient under Texas law. | | MSJ denied; fact question |
| C-1 C-2 | The cart was not negligently designed. | Negligence in design | MSJ denied; fact question |
| D-1 D-2 | Textron did not breach any warranties for the cart. | Breach of Warranty | MSJ denied; fact question |

---

[143] Textron's motion for summary judgment (Doc. No. 70), at 4–5.

[144] *See* Textron's motion for summary judgment (Doc. No. 70), at 7, 10, 11, 14–15, 16, 18.

[145] *See* Textron's motion for summary judgment (Doc. No. 70), at 7, 9, 11, 15, 17, 18.

| Textron Argument | | Nesters' Claim | Nesters' Response |
|---|---|---|---|
| F-1<br>F-2 | The cart's lack of additional warnings did not render it unreasonably dangerous. | Marketing Defect | MSJ denied;<br>fact question |
| E-1<br>E-2<br>E-3 | Textron had no duty to warn Mrs. Nester because (a) she was aware of the hazard and (b) the hazard was not foreseeable to Textron. | Negligence in marketing | MSJ denied;<br>fact question |
| G-1<br>G-2 | Textron was not negligent with respect to the warnings it provided. | | MSJ denied;<br>fact question |

Below, the Nesters identify evidence of each essential element of all challenged causes of action. This has the dual effect of both: (i) rebutting Textron's claims that the Nesters' claims are barred as a matter of law; and (ii) providing evidence to defeat Textron's no-evidence and insufficient-evidence points.

## C.    Design defect

### 1.    Matter-of-law arguments

**Argument A-1:** Textron asserts its "cart is not defectively designed as a matter of law," and references the risk and utility of the cart.[146] Though Textron does not explicitly say so, it appears to be asserting the 2001 E-Z-GO Workhorse ST350 is not unreasonably dangerous, based upon Texas's risk-utility test.

In support of this argument, Textron has cited one paragraph of an affidavit submitted by one of its expert witnesses, Dr. David Bizzak, and the exhibits attached to his affidavit (read: Dr. Bizzak's expert report).[147] The Fifth Circuit held in *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.* that "unsupported affidavits setting forth ultimate or conclusory facts and

---

[146] Textron's motion for summary judgment (Doc. No. 70), at 7.

[147] Textron's motion for summary judgment (Doc. No. 70), at 7.

conclusions of law are insufficient to either support or defeat a motion for summary judgment."[148] In paragraph 3 of Dr. Bizzak's affidavit, he gives absolutely no explanation for his opinion that the 2001 E-Z-G Workhorse ST350 utility vehicle is not defectively designed, other than to reference "the reasons set forth in my expert report"; Dr. Bizzak did not even identify where to find these supporting reasons in his report.[149] With only this evidence, Textron has failed to negate an essential element of the Nesters' design-defect claim (that the product is unreasonably dangerous) through the submission of conclusive evidence establishing the opposite, because Dr. Bizzak's nonspecific affidavit and a lack of citation to any portion of his report constitutes no evidence.[150]

To the extent this Court permits Textron to rely on Dr. Bizzak's conclusory affidavit, the Nesters have submitted at least some evidence for each essential element of a design-defect claim. (See the Nesters' response to Textron's no-evidence arguments in Section IV(C)(2) below.) Because Textron has failed to conclusively prove the E-Z-GO Workhorse ST350 was *not* defectively designed, Argument A-1 should be denied.[151]

**Argument B-1:** Textron asserts the Nesters have failed as a matter of law to identify an appropriate safer alternative design.[152]

In support of this argument, Textron relies on (i) the conclusory opinion of Dr. Bizzak and (ii) a citation to an alleged lack of statistical evidence by one of the Nester's designated expert witnesses, Herbert Newbold.[153] The Nesters have submitted at least some evidence of four safer

---

[148] 922 F.2d 220, 225 (5th Cir. 1991).

[149] *See* Affidavit of Dr. Bizzak (Doc. No. 70-1), at 5 (¶ 3).

[150] *See Wang Labs.*, 922 F.2d at 225.

[151] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[152] Textron's motion for summary judgment (Doc. No. 70), at 8–9.

[153] Textron's motion for summary judgment (Doc. No. 70), at 8.

alternative designs, covering all aspects of reduced risk, utility, and economic and technological feasibility. (See the Nesters' response to Textron's no-evidence arguments in Section IV(C)(2) below.) Because Textron has failed to conclusively prove that the Nesters' proposed safer alternative designs are deficient under Texas law,[154] Argument B-1 should be denied.

### 2.    No-evidence arguments

To prove a strict products liability claim based on a design defect, a plaintiff must prove: "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." [155] Under Texas law, a trial court decides if a product is "unreasonably dangerous" through the following risk-utility test:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.[156]

The unreasonably-dangerous factors are to be considered holistically and no single factor needs to be proven on its own, so long as all factors working together point to a finding of unreasonable dangerousness.[157] The risk-utility analysis is "fluid" for a reason: to "encourage manufacturers to reach an optimum level of safety in designing their products."[158]

---

[154] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[155] *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).

[156] *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997).

[157] *See Scott v. Dorel Juvenile Grp., Inc.*, 456 F. App'x 450, 453 (5th Cir. 2012).

[158] *Genie Indus., Inc. v. Matak*, 58 Tex. Sup. Ct. J. 832, 2015 Tex. LEXIS 437, at *39–40 (Tex. May 8, 2015).

A "safer alternative design" is one that "in reasonable probability: (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge."[159]  A "producing cause" is one that (1) is a substantial cause of the event in issue and (2) is a but-for cause, that is, one without which the event would not have occurred.[160]

As to the first factor of a design-defect clam, the Nesters have presented evidence the design of Textron's Workhorse ST350 is unreasonably dangerous.  Mr. Newbold, one of the Nesters' designated expert witnesses, has specifically opined the Workhorse ST350 is and was unreasonably dangerous in general because it does not prevent unintended acceleration in the reasonable and foreseeable event of an object contacting the vehicle's accelerator pedal.[161]

Mr. Newbold's opinion—which, by itself, constitutes at least some evidence the Workhorse ST350 is unreasonably dangerous—is also supported by an application of Texas's risk-utility test to the facts the Nesters have marshaled.[162]

| Risk-Utility Test for Design Defect | | |
|---|---|---|
| | **Element** | **Proof** |
| 1 | The utility of the product to the user and to the public as a whole weighed against the | Textron has specifically admitted through its own warnings that the gravity and likelihood of injury created by the Workhorse ST350's kick-off brake system is severe personal injury or death.[163]  The utility of the kick-off brake system to |

---

[159] Tex. Civ. Prac. & Rem. Code § 82.005(b).

[160] *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 41–42 (Tex. 2007).

[161] *See, e.g.*, Ex. 8 (Newbold affidavit) at ¶¶ 3, 12 *and* Ex. B (Newbold Jan. 2015 report) at 12–13, 17.

[162] *Grinnell*, 951 S.W.2d at 432.

[163] Ex. 6 (Textron manual warning regarding accelerator pedal); *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

| Risk-Utility Test for Design Defect | |
|---|---|
| **Element** | **Proof** |
| gravity and likelihood of injury from its use. | users of the Workhorse ST350, as opposed to the users of golf carts for which the kick-off brake system was originally designed, is minimal: users in the farming-and-ranching application for which the Workhorse ST350 was intended enter and exit their vehicles far less than golfers, reducing the utility of a design that allows the user to take off from a standstill very quickly.[164] |
| 2  The availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive. | There are many substitute vehicles in the farming-and-ranching market that meet users' needs, are not unsafe, and are not unreasonably expensive: one of Textron's expert witnesses identified at least five other manufacturers that provide similar products without a kick-off brake system.[165] |
| 3  The manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs. | The only alteration needed to disable the Workhorse ST350's kick-off brake system would be to remove the linkage between the vehicle's accelerator pedal and its parking brake.[166]  This can be as simple as removing one single pin in the linkage.[167]  Removing the entire linkage would save Textron approximately $75 per vehicle,[168] and the only impingement of usefulness as a result of this change identified by Textron are unsupported claims of increased brake wear.[169] |
| 4  The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the | A member of Textron's design team for the Workhorse ST350 admitted "it's not easy" for the average consumer to detect that unintended acceleration is a danger of the kick-off brake system.[170]  Further, the warnings Textron provided did not adequately associate the kick-off brake system with the |

---

[164] *See* Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 6.

[165] Ex. 5 (O'Byrne deposition), at 16:6–8, 17:16–19, 18:11–18.

[166] *See, e.g.*, Ex. 13 (Textron letter to HSE), at 1 (identifying removal of the linkage as the "best protection" for users of the vehicle from unintended acceleration).

[167] Ex. 2 (Moore deposition), at 107:23–108:1; Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 22.

[168] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 18–19.

[169] Ex. 2 (Moore deposition), at 49:21–25 (overall utility), 71:23–72:5 (no evidence of excessive wear on parking brakes on vehicles without a kick-off brake system).

[170] Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–25.

| Risk-Utility Test for Design Defect | |
|---|---|
| **Element** | **Proof** |
| obvious condition of the product, or of the existence of suitable warnings or instructions. | danger of unintended acceleration from an unattended vehicle.[171] |
| 5  The expectations of the ordinary consumer. | As noted above, Textron knew the average consumer would not be aware that unintended acceleration was a danger of the kick-off brake system.[172] |

In addition to Mr. Newbold's opinion, the facts listed above provide at least some evidence that the Workhorse ST350 was unreasonably dangerous.

As to the second factor of a design-defect claim, the Nesters have provided four safer alternative designs of the Workhorse ST350:

| Safer-Alternative-Design Test for Design Defect | | |
|---|---|---|
| **Alternative Design** | **Reduced risk without substantially impairing utility?** | **Technologically and Economically Feasible?** |
| 1  Remove the linkage between the accelerator pedal and the parking brake | Yes.  Without the linkage, the parking brake would not be disengaged if the accelerator pedal is depressed, meaning there would be no danger of unintended acceleration.[173]<br><br>Other than bald assertions, Textron has no data to suggest excessive brake wear would result.[174]  Further, Textron has no data to suggest its kick-off brake system is | Yes.  Textron specifically acknowledged its ability to do this in a letter to the HSE in 2005.[178]  Such a design would actually *save* Textron approximately $75 per vehicle.[179] |

---

[171] *See* Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–22 (acknowledging it wouldn't be easy to detect that type of danger); Ex. 27 (Gini Nester deposition June 19), at 20:13–23:2 (Mrs. Nester didn't appreciate the danger).

[172] Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–25.

[173] *See* Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 22–23.

[174] Ex. 2 (Moore deposition), at 71:23–72:5.

[178] Ex. 13 (Textron letter to HSE), at 1, 2.

[179] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 18–19.

| Safer-Alternative-Design Test for Design Defect | | |
|---|---|---|
| **Alternative Design** | **Reduced risk without substantially impairing utility?** | **Technologically and Economically Feasible?** |
| | important to its customers,[175] and its corporate representative testified he is not aware of any customer who has stated a Textron vehicles was purchased due to the kick-off brake system.[176] Textron also has no data that suggests the utility of the Workhorse ST350 would have been reduced if kick-off brake system was removed.[177] | |
| 2 | Provide a separate foot- or hand-operated parking brake that is not disengaged by the vehicle's accelerator pedal. | Yes. A separate parking brake that is not disengaged by depression of the accelerator pedal will certainly reduce, if not eliminate, the danger of unintended acceleration.[180] <br><br> Because the farming-and-ranching application does not involve nearly as much entering and exiting of the vehicle as the golf application for which the kick-off brake system was designed,[181] there should be little to no drop-off in utility for users. | Yes. There are numerous examples in the marketplace of Workhorse competitors with this design.[182] Textron itself has manufactured vehicles with this design.[183] |
| 3 | Include an operator-present switch under the vehicle's seat. | Yes. Such switches are specifically designed to reduce or eliminate operation of a vehicle when an operator is not in control of the vehicle.[184] | Yes. Textron itself has manufactured vehicles with this design.[186] |

---

175 Ex. 2 (Moore deposition), at 42:1–10.

176 Ex. 2 (Moore deposition), at 46:11–17.

177 Ex. 2 (Moore deposition), at 49:21–25 (overall utility), 71:23–72:5 (no evidence of excessive wear on parking brakes on vehicles without a kick-off brake system).

180 Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 19–22.

181 Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 6.

182 *See* Ex. 5 (O'Byrne deposition), at 18:19–19:5.

183 Ex. 1 (Fisher deposition Sept. 2014), at 239:14–240:5.

184 Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 23–24.

186 See, e.g., Ex. 7 (Fisher deposition Dec. 2014), at 187:15–190:5.

| Safer-Alternative-Design Test for Design Defect | | |
| --- | --- | --- |
| **Alternative Design** | **Reduced risk without substantially impairing utility?** | **Technologically and Economically Feasible?** |
| | | In response to this proposed design, Textron has only identified potential operational problems covering rough ground and the differing weights of people.[185] | |
| 4 | Provide a pedal guard. | Yes. A pedal guard reduces the likelihood a vehicle's accelerator pedal would be depressed by an object other than the operator's foot.[187] That, in turn, reduces the likelihood of unintended acceleration if a vehicle's parking brake is disengaged. <br><br> Textron actually installs pedal guards upon customer request.[188] A Textron corporate representative is not aware of any complaints concerning reduced utility from pedal guards.[189] | Yes. Pedal guards cost approximately $50, and Textron currently installs them on its vehicles upon customer request.[190] |

As to the third factor, the Nesters have produced at least some evidence that the Workhorse ST350's defective design was a producing cause of their injuries. Mr. Newbold has specifically opined that the Workhorse ST350's defective design was a producing cause of the Nesters' injuries.[191] That, by itself, is sufficient to meet the Nesters' burden to produce some evidence of causation. Even if Mr. Newbold's opinions are not considered—which they should be—there has

---

[185] *See* Ex. 7 (Fisher deposition Dec. 2014), at 184:13–185:19.

[187] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 23–24.

[188] *See* Ex. 1 (Fisher deposition Sept. 2014), at 284:2–285:5.

[189] Ex. 2 (Moore deposition), at 89:23–90:12.

[190] See, e.g., Ex. 1 (Fisher deposition Sept. 2014), at 284:2–285:5.

[191] Ex. 8 (Newbold affidavit), at ¶¶ 3, 13 *and* Ex. B (Newbold Jan. 2015 report) at 25–26.

been testimony from Textron witnesses that without Textron's kick-off brake system, the unintended acceleration that caused Mrs. Nester's injuries would not have occurred.[192]

Based on the above, the Nesters have provided at least some evidence of each essential element of their design-defect claims, and Textron's motion for summary judgment based on no evidence or insufficient evidence should be denied.

**Argument A-2:** Textron asserts the Nesters have produced no evidence or insufficient evidence that the 2001 E-Z-GO Workhorse ST350 was defectively designed.[193]  Specifically, Textron argues the Nesters have not shown: (i) their proposed safer alternative designs would provide overall safety benefits compared to Textron's existing design; and (ii) their safer alternative designs would not introduce other dangers of equal or greater magnitude.[194]

The safer-alternative-design table above rebuts both of these arguments.  First, Textron's existing design (the kick-off brake system) provides no discernible safety benefits whatsoever—in fact, it contains a warning that says it presents a danger of severe personal injury or death.[195] On the other hand, the Nesters have presented testimony that the likelihood of the situation creating Mrs. Nester's injuries would have been significantly reduced or eliminated if any of the Nesters' four proposed safer alternative designs had been implemented.[196]

Second, there is absolutely no evidence in this case the Nesters' proposed safer alternative designs would introduce dangers of equal or greater magnitude when compared to Textron's existing design (the kick-off brake system).  To the contrary, Mr. Newbold has specifically opined

---

[192] *See* Ex. 5 (O'Byrne deposition), at 5:19–6:5.

[193] Textron's motion for summary judgment (Doc. No. 70), at 7.

[194] Textron's motion for summary judgment (Doc. No. 70), at 7.

[195] Ex. 6 (Textron manual warning regarding accelerator pedal); *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

[196] *See, e.g.*, Ex. 8 (Newbold affidavit), at ¶¶ 3, 13 *and* Ex. B (Newbold Jan. 2015 report) at 25–26.

as follows: "E-Z-GO had at their disposal numerous economically and technologically feasible design alternatives that, by the application of then existing or reasonably achievable scientific knowledge, would have prevented, eliminated or significantly reduced the risks associated with unintended vehicle acceleration."[197]

Because the Nesters have presented at least some evidence of each essential element of their design-defect claims, including safer alternative designs, Textron's Argument A-2 should be denied.

**Argument B-2:** This argument is a verbatim recitation of Argument A-1: Textron asserts the Nesters have not shown their proposed safer alternative designs (i) would provide overall safety benefits compared to Textron's existing design; and (ii) their safer alternative designs would not introduce other dangers of equal or greater magnitude.[198]

For the same reasons as Argument A-2, Argument B-2 should be denied.

## D. Marketing defect

### 1. Matter-of-law arguments

**Argument E-1:** Textron argues it had no duty to warn Mrs. Nester because it claims Mrs. Nester had "actual knowledge of how the kick-off brake worked."[199]  Textron is correct when it states a duty to warn is imposed under Texas law only to hazards of which the user is unaware.[200]  But Textron's identification of the hazard posed by the E-Z-GO Workhorse ST350 utility vehicle is incomplete.  The hazard is not simply that the parking brake releases when the operator depresses

---

[197] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 25.

[198] Textron's motion for summary judgment (Doc. No. 70), at 9.

[199] Textron's motion for summary judgment (Doc. No. 70), at 13–15.

[200] *See Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995).

the accelerator pedal,[201] but that the parking brake could be released and the vehicle can start and move if the accelerator pedal is depressed *even when the operator is not in the vehicle*.

Further, Textron's misleading citations to Mrs. Nester's deposition do not accurately portray her testimony. When specifically asked at her deposition whether she was aware that an object depressing the accelerator pedal, other than the operator's foot, would release the parking brake and cause unintended acceleration, this is how Mrs. Nester responded:

> Q:    ...[I]f you had thought about it, you would have known if you did the same thing with an object as opposed to your foot and pressed on the accelerator pedal with an object or put an object on the accelerator pedal, that the cart would also go forward also; correct?
>
> A:    I have no idea that would have ever occurred to me.
>
> Q:    Well, if you know pressing your foot on the accelerator will make the cart go forward, if you had thought about it, you would also know that putting an object on the accelerator pedal would have caused the cart to move forward; wouldn't you?
>
> A:    I didn't think about it. I don't think it's reasonable to think about it.
>
> Q:    Not reasonable to think about dropping an object on an accelerator pedal and it going forward?
>
> A:    Um-hum.
>
> Q:    Okay. Well, how about if another person? If you got off the cart and another person got on the cart and pressed on the accelerator pedal, under those circumstances, with the directional control in forward and with the key in the on position, if another person got on the cart after you got off the cart and pushed on the accelerator pedal, you would know it would go forward; wouldn't you?
>
> A:    Yes.
>
> Q:    And if you'd really stopped to think about it, any time you got off the cart with the positional control in forward and with the key in the on position, if you had stopped to think about it and somebody had said: I'm going to go over and throw a bag of feed on the accelerator pedal, you would know that that would cause the cart to go forward; wouldn't you?

---

[201] *See* Textron's motion for summary judgment (Doc. No. 70), at 12–13.

A:      I have no idea.

Q:      Well, if your foot pushed on the accelerator pedal would cause the cart to go forward, then any other object pushing on the accelerator pedal would cause the cart to go forward, too, wouldn't it?

A:      I don't know. I don't think that it -- somebody would think of that. I certainly wouldn't have.

Q:      If you'd stopped to think about it, any object that's heavy enough to push the accelerator pedal down will cause the cart to go forward under those circumstances, with the key in forward -- with the key in the on position and with the directional control in forward; correct?

A:      I would -- I would have thought that the parking brake would have actually been a parking brake and wouldn't have let it go forward. I wouldn't have thought that there would be enough pressure of something falling on the accelerator that it would have moved. [202]

Contrary to Textron's representations, Mrs. Nester testified she was NOT aware of the hazard that caused her injury—that the Utility Vehicle would accelerate unintentionally when the accelerator pedal is depressed, even if the Utility Vehicle's parking brake was on and the cart was unattended. This is supported by the testimony of a member of the Workhorse design team, who testified the danger of unintended acceleration posed by the Workhorse's kick-off brake system was not easy for the average user to detect.[203]   And the testimony of one of Textron's expert witnesses, Tim O'Byrne, who testified it was not foreseeable to Mrs. Nester that her bag of cattle cubes could be tipped over onto the Utility Vehicle's accelerator pedal, the parking brake would be released, and the vehicle would operate without an operator in the seat.[204]

---

[202] Ex. 27 (Gini Nester deposition June 19), at 20:13–23:2 (objections omitted).

[203] *See* Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–22.

[204] Ex. 5 (O'Byrne deposition), at 8:15–9:9.

Textron has not presented conclusive evidence that Mrs. Nester had actual knowledge of the hazard in question,[205] and therefore its Argument E-1 should be denied.

**Argument E-2:** Textron argues the hazard in question was not reasonably foreseeable to it at the time the Utility Vehicle was marketed.[206]

To support its "unforeseeable" argument, Textron has repeatedly taken the unreasonable—and legally unsound—position that it was required to foresee a host of situation-specific details before a duty to warn is imposed, including the presence of cattle cubes, the honking of the Utility Vehicle's horn to call cattle, and Mrs. Nester taking her eyes off of the Utility Vehicle when she opened a gate.[207]

Textron's position is ridiculous; it is both legally and factually incorrect.  In *Mellon Mortgage Co. v. Holder*, the Texas Supreme Court has held there is but one test for foreseeability in Texas,[208] and it is this: "[F]oreseeability requires only that the ***general danger***, not the exact sequence of events that produced the harm, be foreseeable."[209]  In even more plain language, the *Holder* court explained:

> It is not required that the ***particular accident complained of*** should have been foreseen.  All that is required is (1) that the injury be of such a general character as might reasonably have been anticipated; and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.[210]

---

[205] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[206] Textron's motion for summary judgment (Doc. No. 70), at 13–15.

[207] Textron's motion for summary judgment (Doc. No. 70), at 13.

[208] *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 659 (Tex. 1999).

[209] *Holder*, 5 S.W.3d at 655 (emphasis added).

[210] *Holder*, 5 S.W.3d at 655 (emphasis added).

Texas courts have applied this definition of "foreseeability" in general negligence cases,[211] premises liability cases,[212] and medical malpractice cases.[213]

Mrs. Nester's injuries after she was struck by a vehicle moving due to unintended acceleration clearly meet *Holder*'s definition of "foreseeability": they were of such a general character as might reasonably have been anticipated by Textron (she suffered severe personal injury when she was struck by the Utility Vehicle) and she was a reasonably foreseeable user of the Utility Vehicle (she was one of its owners). In fact, as described above, Textron included a notice in its manual concerning the ***exact*** situation encountered by Mrs. Nester: the Utility Vehicle moved when the accelerator pedal was depressed and the parking brake was released, and severe personal injury to Mrs. Nester resulted.[214] Textron's own materials by themselves are at least some evidence the hazard creating Mrs. Nester's injuries was reasonably foreseeable to Textron.

Further, the factual assertions cited by Textron in the affidavit of Jim Fisher, one of Textron's corporate representatives, are preposterous: "Mrs. Nester's actions were so attenuated from the customary operation of the vehicle that they could not be foreseen as a hazard affecting the safe use of the product."[215] In one of his depositions,[216] Mr. Fisher authenticated Textron marketing materials that depict a farmer or rancher driving an E-Z-GO Workhorse utility vehicle in a field, next to livestock, near a gate, and with what appears to be feed buckets on the cart's seat or on the ground nearby:[217]

---

[211] *See, e.g.*, *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 138–39 (Tex. 2012).

[212] *See, e.g.*, *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 10–11 (Tex. 2008).

[213] *See, e.g.*, *Bowser v. Craig Ranch Emergency Hosp., L.L.C.*, No. 05-14-00501-CV, 2015 Tex. App. LEXIS 6631, at *18–19 (Tex. App.—Dallas June 29, 2015, no pet. h.).

[214] *See* Ex. 6 (Textron manual warning regarding accelerator pedal).

[215] Textron's motion for summary judgment (Doc. No. 70), at 14 (citing Fisher affidavit (Doc. No. 70-2), at 3).

[216] Ex. 7 (Fisher deposition Dec. 2014), at 255:11–259:13.

[217] Ex. 14 (Marketing materials pictures).

- 41 -

 

Textron was selling utility vehicles like the Workhorse ST350 to be used in exact scenario in which Mrs. Nester was injured.

Further, Mr. O'Byrne, one of Textron's expert witnesses, testified that an object falling onto a vehicle's accelerator pedal and causing the vehicle to move is a foreseeable risk of a vehicle with a kick-off brake system.[218]  So did Alan Dorris, another of Textron's expert witnesses.[219]  Dr. Dorris testified that the presence of warnings in Textron's manuals and on decals placed on the Workhorse ST350 indicate Textron was aware of the danger posed by the kick-off brake system, based on accident history or some other form of analysis.[220]  Mr. Fisher himself agreed the warnings Textron provided indicated Textron believed there was a "threshold of likelihood" of severe personal injury or death resulting from unintended acceleration.[221]

In sum, there is no question Textron foresaw the "general danger" of Mrs. Nester's injuries: Textron was specifically selling its E-Z-GO Workhorse utility vehicles to be used to tend to livestock on a farm or ranch.  Combined with its knowledge that the risks of the kick-off brake

---

[218] Ex. 5 (O'Byrne deposition), at 21:9–14, 21:16.

[219] Ex. 10 (Dorris deposition), at 92:1–9, 92:21–24, 93:1.

[220] Ex. 10 (Dorris deposition), at 210:10–17, 211:18–25.

[221] Ex. 7 (Fisher deposition Dec. 2014), at 118:7–22.

system could cause severe personal injury or death, it was foreseeable to Textron that Mrs. Nester could be injured by the kick-off brake system while tending livestock when an object feel on the accelerator.

Because Textron has not conclusively established that the hazard in question was not foreseeable to it,[222] Textron's Argument E-2 should be denied.

**Argument F-1:** Textron argues the Utility Vehicle did not require additional warnings when the TXT golf cart was converted into the Workhorse ST350 utility vehicle, and cites two paragraphs of Mr. O'Byrne's affidavit.[223]  Mr. O'Byrne's affidavit, by itself, is insufficient to support a motion for summary judgment as a matter of law,[224] and therefore Argument F-1 must be denied.

To the extent this Court permits Textron to rely on Mr. O'Byrne's conclusory affidavit, the Nesters have submitted at least some evidence of a marketing defect.  (See the Nesters' response to Textron's no-evidence arguments in Section IV(D)(2) below.)  Because Textron has failed to conclusively prove the E-Z-GO Workhorse ST350 was not defectively marketed,[225] its Argument F-1 should be denied.

### 2.        No-evidence arguments

A marketing defect requires proof that: (1) a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning and/or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the

---

[222] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[223] Textron's motion for summary judgment (Doc. No. 70), at 15–17.

[224] *See Wang Laboratories*, 922 F.2d at 225.

[225] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

product; and (5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.[226]

The Nesters have presented the testimony and opinions of Dr. Vigilante, one of their designated expert witnesses, on each of these elements.[227]  His opinions alone are at least some evidence for each essential element of the Nesters' marketing-defect claims.

In addition to the opinions and testimony of Dr. Vigilante, the Nesters offer other evidence for each essential element of a marketing-defect claim:

| Evidence of Marketing Defect | |
| --- | --- |
| **Element** | **Proof** |
| 1 | A risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product. | Textron has admitted there is a risk of harm inherent in the Workhorse ST350 from reasonably anticipated use—it has been warning of the danger of severe personal injury or death as a result of depressing the accelerator pedal and disengaging the vehicle's parking brake for 40 years.[228]  Textron corporate representatives have also admitted Textron "do[es] not warn about remote hazards that are unlikely to occur."[229] |
| 2 | The product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed. | As mentioned above, Textron was aware of the risk of harm for decades before the Workhorse ST350 was marketed and sold.[230] |
| 3 | The product contains a marketing defect. | Dr. Vigilante has explained the Workhorse ST350 contained a marketing defect because there are inherent dangers of using the product of which Textron is aware, and Textron knows the warnings it has been providing |

---

[226] *Sims v. Washex Mach. Corp.*, 932 S.W.2d 559, 562 (Tex. App.—Houston [1st Dist.] 1995, no writ).

[227] *See* Ex. 9 (Vigilante affidavit) at ¶¶ 4–20 *and* Ex. B (Vigilante report) at 1–24.

[228] Ex. 6 (Textron manual warning regarding accelerator pedal); *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

[229] Ex. 7 (Fisher deposition Dec. 2014), at 118:7–22.

[230] Ex. 6 (Textron manual warning regarding accelerator pedal); *see also* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8; Ex. 7 (Fisher deposition Dec. 2014), at 118:7–22.

| Evidence of Marketing Defect | |
|---|---|
| **Element** | **Proof** |
| | are inadequate and have not altered the behavior of the average user of the product.[231] <br><br> Further, Textron's own witnesses have confirmed Textron is aware its current warnings are commonly ignored by average users, including Textron's own employees and representatives.[232] |
| 4   The absence of a warning and/or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product. | Dr. Vigilante has opined the inadequacy of the instructions and warnings provided by Textron, and the absence of effective warnings, rendered the Workhorse ST350 unreasonably dangerous because of the magnitude of the harm presented and Textron's awareness of the ineffectiveness of the warnings it had provided.[233] <br><br> Further, there is testimony from Mrs. Nester that she did not appreciate that danger of unintended acceleration,[234] and testimony from a member of the Workhorse design team that it would not be easy for the average user to detect that unintended acceleration was a danger of the kick-off brake system.[235] |
| 5   The failure to warn and/or instruct must constitute a causative nexus in the product user's injury. | Dr. Vigilante has provided testimony that Textron's failure to provide adequate warnings of the dangers posed by the Workhorse ST350 was a producing cause of Mrs. Nester's injuries.[236] <br><br> Further, the ineffectiveness of Textron's warnings and instructions were evident: Mrs. Nester was unaware of the danger unintended acceleration posed by the kick-off brake system, and that's how she was injured.[237] |

---

[231] *See, e.g.*, Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 18; Ex. 1 (Fisher deposition Sept. 2014), at 45:10–14, 45:16–21, 56:21–57:1, 58:7–12 (Textron was aware warnings were not being followed).

[232] Ex. 1 (Fisher deposition Sept. 2014), at 45:10–14, 45:16–21, 56:21–57:1, 58:7–12; Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12, 38:16–19, 38:21–22, 39:9–10.

[233] *See* Ex. 9 (Vigilante affidavit) at ¶¶ 3, 10–11 *and* Ex. B (Vigilante report) at 14–15, 18.

[234] *See* Ex. 27 (Gini Nester deposition June 19), at 20:13–23:2.

[235] Ex. 1 (Fisher deposition Sept. 2014), at 93:14–18, 93:21–22

[236] *See* Ex. 9 (Vigilante affidavit) at ¶¶ 3, 10–11 *and* Ex. B (Vigilante report) at 14, 15, 23, 24, 26.

[237] *See* Ex. 27 (Gini Nester deposition June 19), at 20:13–23:2.

Based on the above, the Nesters have provided at least some evidence of each essential element of their marketing-defect claims, and Textron's motion for summary judgment based on no evidence or insufficient evidence must be denied.

**Argument E-3:** Textron generally argues Mr. Newbold's and Dr. Vigilante's opinions concerning whether the "hazard created by Mrs. Nester's actions while using the cart was reasonably foreseeable to Textron" should be excluded, but does not identify why their opinions should be excluded.[238]

The table above rebuts this argument. It establishes both that: (i) there is at least some evidence, aside from Dr. Vigilante's opinion, that the risk of harm presented by the Workhorse ST350 was reasonably foreseeable to Textron; and (ii) Dr. Vigilante's opinion that the risk of harm was reasonably foreseeable to Textron is reliable, and not conclusory, because it is based on sufficient facts and data. Textron's Argument E-3 should be denied.

**Argument F-2:** Textron asserts the opinions and testimony of Mr. Newbold and Dr. Vigilante should be excluded, does not explain why, and states there is no evidence that Textron's lack of additional warnings rendered the Utility Vehicle unreasonably dangerous.[239]

Again, the table above rebuts this argument. It establishes both that: (i) there is at least some evidence, aside from Dr. Vigilante's opinion, that the lack of additional warnings rendered the Workhorse ST350 unreasonably dangerous; and (ii) Dr. Vigilante's opinion that the lack of additional warnings rendered the ST350 unreasonably dangerous is reliable, and not conclusory, because it is based on sufficient facts and data. Textron's Argument F-2 should be denied.

---

[238] Textron's motion for summary judgment (Doc. No. 70), at 15.

[239] Textron's motion for summary judgment (Doc. No. 70), at 17.

### E.     Negligence

#### 1.     Design

##### a.     Matter-of-law arguments

**Argument C-1:** Textron states in a conclusory fashion that "that cart was not negligently designed, but rather, was appropriately designed," citing only a single paragraph in Dr. Bizzak's affidavit.[240] Dr. Bizzak's affidavit, by itself, is insufficient to support a motion for summary judgment as a matter of law,[241] and therefore Argument C-1 must be denied.

To the extent this Court permits Textron to rely on Dr. Bizzak's conclusory affidavit, the Nesters have submitted at least some evidence of a negligent-design claim.  (See the Nesters' response to Textron's no-evidence arguments in Section IV(E)(1)(b) below.)  Because Textron has failed to conclusively prove E-Z-GO Workhorse ST350 was not negligently designed as a matter of law,[242] Argument C-1 must be denied.

##### b.     No-evidence arguments

A claim asserting negligence in the design of a product requires proof that: (i) the defendant owed a legal duty to reasonably design the product at issue; (ii) the defendant breached that duty; and (iii) that breached proximately caused the plaintiff's injuries.[243]

Textron has not disputed, and cannot dispute, that it had a duty to design the Workhorse ST350 in a reasonable manner.[244]  The Nesters have presented evidence from both their own designated expert witnesses and from representatives of Textron that the safety design hierarchy

---

[240] Textron's motion for summary judgment (Doc. No. 70), at 10.

[241] *See Wang Laboratories*, 922 F.2d at 225.

[242] *See Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[243] *See Shears*, 911 S.W.2d at 384 (contrasting strict liability design-defect claims with negligent design claims); *Sico N. Am., Inc. v. Willis*, No. 14-08-00158-CV, 2009 Tex. App. LEXIS 7239, *24–25 (Tex. App.—Houston [14th Dist.] Sept. 10, 2009, no pet.) (same).

[244] *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871–72 (Tex. 1978).

is a fundamental design and manufacturing process,[245] and that Textron failed to employ that hierarchy when the Workhorse ST350 was designed and marketed.[246] Further, the Nesters have presented evidence Textron did not perform any failure analysis involving unintended acceleration while designing the Workhorse ST350.[247] Finally, the Nesters have presented evidence Textron should have performed a thorough hazard and risk analysis while designing the Workhorse ST350,[248] which should have addressed the danger of unintended acceleration, the cause of the Nesters' injuries.[249]

Based on the above, the Nesters have provided at least some evidence of each essential element of their negligent-design claims, and Textron's motion for summary judgment based on no evidence or insufficient evidence must be denied.

**Argument C-2:** Textron does not identify any essential element for which evidence is lacking for the Nesters' negligent-design claim, but merely states that opinions and testimony from Mr. Newbold and Dr. Vigilante should be excluded.[250] First, Textron has failed to meet its burden to identify the essential element(s) of the Nesters' negligent-design claims for which there is no evidence.[251] On this basis alone, Argument C-2 should be denied.

Second, aside from opinions from Mr. Newbold and Dr. Vigilante, the Nesters have presented at least some evidence of their negligent-design claims from the testimony of Textron's

---

[245] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 12; Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B (Vigilante report) at 9; Ex. 7 (Fisher deposition Dec. 2014), at 139:8–16; Ex. 10 (Dorris deposition), at 234:19–235:20; Ex. 11 (Bizzak deposition), at 113:15–17, 113:19–25.

[246] Ex. 11 (Bizzak deposition), at 114:1–115:20, 115:22; Ex. 8 (Newbold affidavit) at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 12–13; Ex. 9 (Vigilante affidavit) at ¶ 3 *and* Ex. B (Vigilante report) at 10–11.

[247] Ex. 1 (Fisher deposition Sept. 2014), at 44:17–22, 44:24–45:2.

[248] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 14.

[249] Ex. 8 (Newbold affidavit), at ¶ 3 *and* Ex. B (Newbold Jan. 2015 report) at 25.

[250] Textron's motion for summary judgment (Doc. No. 70), at 10–11.

[251] *Skotak*, 953 F.2d at 912; *Garcia*, 2014 U.S. Dist. LEXIS 174533, at *11.

own witnesses. Mr. Fisher (Textron corporate representative) and Dr. Bizzak and Dr. Dorris (Textron expert witnesses) testified that Textron was aware of the safety design hierarchy, acknowledged its importance, but failed to apply it when the Workhorse ST350 was designed.[252] This occurred despite the fact that Mr. Fisher acknowledged that protecting a user from unintended acceleration should "always be a design consideration."[253] Further, there is undisputed evidence Mrs. Nester was injured by the Utility Vehicle's unintended acceleration.[254] From this evidence— without considering any opinions from Mr. Newbold or Dr. Vigilante—a reasonable fact-finder could infer Textron negligently designed the Workhorse ST350.[255]

For either of these reasons, Textron's Argument C-2 regarding the Nesters' negligent-design claims should be denied.

In Argument C-2, Textron also purports to challenge the Nesters' gross-negligence claims, simply stating the claims cannot stand without proof of ordinary negligence.[256] Textron makes no further efforts to attack any other aspect of the Nesters' gross-negligence claims.[257]

Because the Nesters have established there is at least some evidence of their negligent-design claims and Textron has failed to challenge any aspect of the Nesters' gross-negligence claims other than to assert no underlying negligence exists, the portion of Textron's Argument C-2 regarding the Nesters' gross-negligence claims should be denied.

---

[252] See Ex. 7 (Fisher deposition Dec. 2014), at 139:8–16; Ex. 10 (Dorris deposition), at 234:19–235:20; Ex. 11 (Bizzak deposition), at 113:15–17, 113:19–25.

[253] Ex. 1 (Fisher deposition Sept. 2014), at 38:16–39:9.

[254] Ex. 28 (Scott Nester deposition June 19), at 58:1–21.

[255] See Glendora Plantation, 782 F.3d at 179.

[256] Textron's motion for summary judgment (Doc. No. 70), at 11.

[257] See Textron's motion for summary judgment (Doc. No. 70), at 11.

2.    **Marketing**

a.  **Matter-of-law arguments**

**Arguments E-1 and E-2:** Both of these arguments implicate the Nesters' negligent-marketing claims because they challenge Textron's duty to warn, but they have been considered and disposed of above.  The Nesters have demonstrated both that: (i) Mrs. Nester did not have actual knowledge of the hazard in question (unintended acceleration as a result of the kick-off brake system when the vehicle is unattended), meaning Textron's duty to warn of that hazard was not removed;[258] and (ii) the hazard in question was reasonably foreseeable to Textron, meaning Textron did in fact have a duty to warn of that hazard.[259]

For these reasons, Textron's Arguments E-1 and E-2 should be denied.

**Argument G-1:** Textron states, baldly, that it "was not negligent relative to the warnings it provided with the 2001 ST-350 Workhorse utility cart."[260]  The only evidence Textron cites in support of this argument is a single paragraph in the affidavit of Dr. Alan Dorris, one of Textron's expert witnesses.[261]  Dr. Dorris's affidavit, by itself, is insufficient to support a motion for summary judgment as a matter of law,[262] and therefore Argument G-1 must be denied.

To the extent this Court permits Textron to rely on Dr. Dorris's conclusory affidavit, the Nesters have submitted at least some evidence of a negligent-marketing claim.  (See the Nesters' response to Textron's no-evidence arguments in Section IV(E)(2)(b) below.)  Because Textron has

---

[258] *See* Section IV(D)(1), *supra*.

[259] *See* Section IV(D)(1), *supra*.

[260] Textron's motion for summary judgment (Doc. No. 70), at 18.

[261] Textron's motion for summary judgment (Doc. No. 70), at 18.

[262] *See Wang Laboratories*, 922 F.2d at 225.

failed to conclusively prove the E-Z-GO Workhorse ST350 was not negligently marketed,[263] Argument G-1 must be denied.

### b.     No-evidence arguments

A claim asserting negligence in the design of a product requires proof that: (i) the defendant owed a legal duty to reasonably market the product at issue; (ii) the defendant breached that duty; and (iii) that breach proximately caused the plaintiff's injuries.[264]

As to the first factor, like the Nesters' negligent-design claim, Textron has not disputed, and cannot dispute, that it had a duty to warn of hazards associated with the use of its products.[265] As to the second factor, Textron breached that duty. By way of example, it is undisputed that Textron did not provide a warning regarding the placement of objects in the passenger area of the Workhorse ST350,[266] despite Textron's awareness of (i) the kick-off brake system and its potential for unintended acceleration[267] and (ii) users' common disregard of Textron's instruction to turn the vehicle's key "off" when exiting the vehicle.[268] Further, the Nesters have presented evidence it was reasonable for Mrs. Nester to carry cargo in the passenger area of the Utility Vehicle,[269] and that such a use was foreseeable to Textron, as depicted in certain marketing materials for Workhorse vehicles.[270] Also, the Nesters have presented evidence Textron purported to warn the Workhorse ST350 users to turn the vehicle's key to "off" when exiting the vehicle, but Textron

---

[263] *Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[264] *See Allen v. W. A. Virnau & Sons, Inc.*, 28 S.W.3d 226, 233 (Tex. App.—Beaumont 2000, pet. denied).

[265] *See Seifried v. Hygenic Corp.*, 410 S.W.3d 427, 431–32 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

[266] Ex. 2 (Moore deposition), at 31:5–11.

[267] Ex. 6 (Textron manual warning regarding accelerator); *see* Ex. 2 (Moore deposition), at 102:10–11, 102:14–103:4, 103:7–8.

[268] Ex. 1 (Fisher deposition Sept. 2014), at 45:10–14, 45:16–21, 56:21–57:1, 58:7–12; Ex. 2 (Moore deposition), at 15:19–25; Ex. 5 (O'Byrne's deposition), at 36:14–21, 37:2–12, 38:16–19, 38:21–22, 39:9–10.

[269] Ex. 5 (O'Byrne deposition), at 60:20–25.

[270] *See* Ex. 14 (Marketing materials pictures).

was aware average users were commonly disregarding that warning.[271]  There is evidence Textron did not revise, or even evaluate, their existing warnings to address this issue.[272]

Finally, the Nesters have presented evidence the Utility Vehicle unintentionally accelerated and ran Mrs. Nester over after a bag of cattle cubes she had been carrying on the vehicle's floorboard was nudged over by a cow, disengaged the vehicle's parking brake, and started the vehicle moving without an operator.[273]

The Nesters have presented at least some evidence of each essential element of their negligent-marketing claims by showing Textron was aware of a potential use, it was aware of a danger posed by that potential use, it failed to warn or failed to adequately warn of the potential use, and the potential use caused injury.  Therefore, Textron's motion for summary judgment for no evidence or insufficient evidence of the Nesters' negligent-marketing claim should be denied.

**Argument G-2:** Like many others discussed earlier, Textron does not identify the essential elements of a negligent-marketing claim for which Textron alleges the Nesters have no evidence; instead, again, it generally argues opinions from Mr. Newbold and Dr. Vigilante should be excluded.[274]

For the reasons described above, the Nesters have presented at least some evidence of each essential element of their negligent-marketing claims, none of which comes from Mr. Newbold or Dr. Vigilante.  Textron's Argument G-2 should be denied.

---

[271] Ex. 1 (Fisher deposition Sept. 2014), at 45:10–14, 45:16–21, 56:21–57:1, 58:7–12.

[272] Ex. 9 (Vigilante affidavit), at ¶ 3 *and* Ex. B (Vigilante report) at 14.

[273] *See* Ex. 28 (Scott Nester deposition June 19), at 58:1–21.

[274] Textron's motion for summary judgment (Doc. No. 70), at 18.

### F.    Breach of warranty

#### 1.    Matter-of-law arguments

**Argument D-1:** Textron cites no law in its challenge to the Nesters' claim for breach of the implied warranty of merchantability.[275]  It simply states: "[A]t the time Textron manufactured and sold the cart at issue in this case the cart was not defective and was merchantable and fit for its intended purpose," citing three paragraphs in Dave Bizzak's affidavit.[276]  Dr. Bizzak's affidavit, by itself, is insufficient to support a motion for summary judgment as a matter of law,[277] and therefore Argument D-1 must be denied.

To the extent this Court permits Textron to rely on Dr. Bizzak's conclusory affidavit, the Nesters have submitted at least some evidence of a breach-of-the-implied-warranty-of-merchantability claim.  (See the Nesters' response to Textron's no-evidence arguments in Section IV(F)(2) below.)  Because Textron has failed to conclusively prove the E-Z-GO Workhorse ST350 was merchantable and fit for its intended purposes,[278] Argument D-1 must be denied.

#### 2.    No-evidence arguments

A claim for breach of the implied warranty of merchantability requires proof that: (i) the defendant, a merchant, sold or leased goods to the plaintiff; (ii) the goods were unmerchantable; (iii) the plaintiff notified the defendant of the breach; and (iv) the plaintiff suffered injury.[279]  To be merchantable, a good must meet all of the following six requirements:

- pass without objection in the trade under the contract description;
- in the case of fungible goods, are of fair average quality within the description;

---

[275] Textron's motion for summary judgment (Doc. No. 70), at 11.

[276] Textron's motion for summary judgment (Doc. No. 70), at 11.

[277] *See Wang Laboratories*, 922 F.2d at 225.

[278] *Kinetic Concepts*, 2005 U.S. Dist. LEXIS 32213, at *19–20.

[279] *See* Tex. Bus. & Comm. Code § 2.314 cmt. 13; *see also Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.).

- are fit for the ordinary purposes for which such goods are used;
- run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;
- are adequately contained, packaged, and labeled as the agreement may require;  and
- conform to the promises or affirmations of fact made on the container or label if any.[280]

A good is not fit for its ordinary purposes, the third factor listed above, if it lacks something necessary for adequacy.[281]  For example, a good lacks something necessary for adequacy when it is not constructed in a manner that allows it to accomplish its purpose safely.[282]

As to the first factor, Textron sold the Utility Vehicle to Rental Service Corporation USA in or around October 2000.[283]  Rental Service Corporation USA, or its successor or assignee, sold the Utility Vehicle to the Nesters on or about January 20, 2005.[284]  Mr. Nester has testified he purchased the Utility Vehicle from United Rentals,[285] the name later used by Rental Services Corporation USA,[286] and United Rentals has stated it sold the Utility Vehicle to the Nesters.[287]

As to the second factor, the Nesters have presented evidence that the Workhorse ST350 is not constructed in a manner that allows it to accomplish its purpose safely.  As depicted in Textron's marketing materials, the Workhorse ST350 is marketed and sold to consumers as appropriate to perform farming and ranching work, including the carrying of cargo within the

---

[280] Tex. Bus. & Comm. Code § 2.314(b).

[281] *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989).

[282] *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999).

[283] E-Z-GO invoice (Oct. 20, 2000), attached as Exhibit 30.

[284] RSC computer record (Jan. 20. 2005), attached as Exhibit 31.

[285] *See, e.g.*, Deposition of Scott Nester (June 20, 2014), at 175:4–9, attached as Exhibit 32; Ex. (Scott Nester deposition June 19), at 63:20–64:7, 117:9–19, 128:11–22.

[286] United Rentals' objections and answers to Scott Nester's first set of interrogatories (April 23, 2014), at 4, attached as Exhibit 33.

[287] Ex. 33 (United Rentals' answers to Scott Nester's interrogatories), at 4–5.

passenger area of the vehicle.[288]  When Mrs. Nester made this reasonable[289] and foreseeable use of the Workhorse ST350, she was struck and run over by the vehicle.

As to the third factor, the Nesters were not required to provide Textron notice of their claims because Textron is a remote manufacturer and did not sell the Utility Vehicle directly to the Nesters.[290]

As to the fourth factor, there is no question the Nesters have suffered injuries.  Mrs. Nester is now a quadriplegic as a result of being struck and run over by the Utility Vehicle after a bag of cattle cubes fell over, depressed the accelerator pedal, disengaged the parking brake, and the vehicle took off without an operator in control.[291]  The cause of Mrs. Nester's injuries was the reasonable and foreseeable use for which Textron sold the Utility Vehicle.

Based on the above, the Nesters have provided at least some evidence of each essential element of their claims for breach of the implied warranty of merchantability, and Textron's motion for summary judgment based on no evidence or insufficient evidence must be denied.

**Argument D-2:** Textron asserts the opinions of Mr. Newbold and Dr. Vigilante are conclusory and are therefore the Nesters are without admissible evidence to prove Textron breached any implied warranty of merchantability or that such a breach was a cause of the Nesters' harm.[292]

First, Mr. Newbold's and Dr. Vigilante's opinions are not conclusory, and they are additional evidence that the Utility Vehicle was not fit for its ordinary purpose and that such a

---

[288] Ex. 14 (Marketing materials pictures).

[289] Ex. 5 (O'Byrne deposition), at 60:20–25.

[290] *See Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 888–89 (Tex. Civ. App.—El Paso 1979, no writ).

[291] *See* Ex. 29 (Gini Nester deposition June 20), at 172:1–173:1, 234:8–24; Ex. 28 (Scott Nester deposition June 19), at 58:1–21.

[292] Textron's motion for summary judgment (Doc. No. 70), at 12.

breach of warranty caused the Nesters harm.[293]  Second, even if Mr. Newbold's and Dr. Vigilante's opinions are not considered in support of the Nesters' breach-of-warranty claims—which they should be—none of the evidence identified for each of the four essential elements above comes from Mr. Newbold or Dr. Vigilante.  In other words, the Nesters have produced at least some evidence of their breach-of-warranty claims, with or without their experts' opinions.

For either of these reasons, Textron's Argument D-2 should be denied.

## V.    CONCLUSION

The Nesters have presented at least some evidence of each essential element for all of the claims challenged by Textron and none of their claims is barred as a matter of law.  Therefore, the Nesters respectfully request an order denying Textron's motion for summary judgment in its entirety, and for such other and further relief to which the Nesters may be justly entitled.

---

[293] *See, e.g.*, Ex. 9 (Vigilante affidavit) at ¶ 3 and Ex. B (Vigilante report) at 6 (use of the Workhorse ST350 in its new applications was significantly different than the old TXT golf cart, and the design features and warnings were even less appropriate, leading to Mrs. Nester's injuries); Ex. 8 (Newbold affidavit) at ¶ 3 and Ex. B (Newbold Jan. 2015 report) at 20 (at least four safer alternative designs existed that would have prevented, or significantly reduced the chances of, Mrs. Nester's injuries).

Dated: July 24, 2015                    Respectfully submitted,

                                        HOWRY BREEN & HERMAN, L.L.P.

                                        _____
                                        Sean E. Breen
                                        sbreen@howrybreen.com
                                        State Bar No. 00783715
                                        1900 Pearl Street
                                        Austin, Texas 78705-5408
                                        Tel. (512) 474-7300
                                        Fax (512) 474-8557

                                        Craig A. Nevelow
                                        cneleow@w-g.com
                                        State Bar No. 14933580
                                        WRIGHT & GREENHILL, P.C.
                                        221 West 6th Street, Suite 1800
                                        Austin, Texas 78701
                                        Tel. (512) 476-4600
                                        Fax (512) 476-5382

                                        *Attorneys for Plaintiffs Virginia Nester and Robert*
                                        *Scott Nester, Individually and as Next Friend of C.N.*
                                        *and S.N., minors*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on July 24, 2015, in accordance with Rule 5(b)(2) of the Federal Rules of Civil Procedure, to the parties listed and in the manner indicated below:

Dale Gene Markland                          ☐ In person
dmarkland@marklandhanley.com                ☐ Left at office or dwelling
Tara E. Hanley                              ☐ Registered or certified mail or delivery service
thanley@marklandhanley.com                  ☐ Left with court clerk
Delwin Eugene Hervey                        ✓ Electronic means
dhervey@marklandhanley.com                  ☐ Other: _____
MARKLAND HANLEY LLP
2200 Ross Avenue Suite 4100W
Dallas, TX 75201
Tel. (469) 341-3633
Fax (469) 341-3640

Brittan L. Buchanan
bbuchanan@vbllp.com
VAN OSSELAER & BUCHANAN, LLP
9600 Great Hills Trail, Suite 300 West
Austin, TX 78759
Tel. (512) 225-2822
Fax (512) 225-2801

*Attorneys for Defendant Textron, Inc.,*
*d/b/a E-Z-GO*

_____
Sean E. Breen

- 58 -

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| VIRGINIA NESTER and ROBERT SCOTT NESTER, Individually and as Next Friend of C.N. and S.N., minors, | § § § § | |
|---|---|---|
| *Plaintiffs*, | § § | Cause No. 1:13-CV-00920-DAE |
| vs. | § § § | JURY DEMANDED |
| TEXTRON, INC., d/b/a E-Z-GO | § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO TEXTRON'S MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description |
|:---:|---|
| 1 | Deposition of Jim Fisher deposition (Sept. 11, 2014) |
| 2 | Deposition of Nick Moore (Dec. 17, 2014) |
| 3 | Picture of vehicle pedals from manual (Textron000344) |
| 4 | Picture of parking brake pedal assembly (Textron 000278) |
| 5 | Deposition of Tim O'Byrne (May 27, 2015) |
| 6 | Accelerator-pedal warning from Representative Manual (Textron003078) |
| 7 | Deposition of Jim Fisher (Dec. 12, 2014) |
| 8 | Affidavit of Herbert C. Newbold |
| 9 | Affidavit of William Vigilante Jr. |
| 10 | Deposition of Alan Dorris (May 6, 2015) |
| 11 | Deposition of David Bizzak (June 3, 2015) |

| Exhibit | Description |
|---------|-------------|
| 12 | HSE letter to Textron (Textron 002480) |
| 13 | Textron letter to HSE (Textron002353) |
| 14 | Pictures from Workhorse marketing materials |
| 15 | Hallenbeck incident files |
| 16 | Bedell incident files |
| 17 | Cassidy incident files |
| 18 | Miller incident files |
| 19 | Lesho incident files |
| 20 | Roberts incident files |
| 21 | Amendola (Cowboys Stadium) incident files |
| 22 | Video #1 of Cowboys Stadium incident |
| 23 | Video #2 of Cowboys Stadium incident |
| 24 | Affidavit of Lara McKenzie |
| 25 | Lansdell e-mail to Fisher (Textron002387) |
| 26 | Textron field service bulletin |
| 27 | Deposition of Virginia Nester (June 19, 2014) |
| 28 | Deposition Scott Nester (June 19, 2014) |
| 29 | Deposition of Virginia Nester (June 20, 2014) |
| 30 | E-Z-GO invoice (Textron 001291) |
| 31 | RSC computer record (United Rentals 000001) |
| 32 | Deposition of Scott Nester (June 20, 2014) |
| 33 | United Rentals interrogatory responses |