UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| VIRGINIA NESTER and ROBERT | § | No. 1:13-CV-920-DAE |
| SCOTT NESTER, individually and as | § | |
| next friends of C.N. and S.N., minors, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| TEXTRON, INC. d/b/a E-Z-GO, | § | |
| | § | |
| Defendant. | § | |

OMNIBUS ORDER ON PARTIES' MOTIONS TO EXCLUDE EXPERT
TESTIMONY

On September 24, 2015, the Court conducted evidentiary hearings on

motions to exclude expert testimony filed by Defendant Textron, Inc. ("Textron")

and Plaintiffs Virginia Nester and Robert Nester (collectively, "Plaintiffs")

pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) (the

"Daubert hearings").  At the hearing, Dale Markland, Esq., represented Textron,

and Sean Breen, Esq. represented Plaintiffs.  After careful consideration of the

supporting and opposing memoranda and considering the testimony given at the

Daubert hearings, the Court, for the reasons that follow, (1) **GRANTS IN PART**

**AND DENIES IN PART** Defendant's Motion to Exclude Dr. McKenzie's Report

(Dkt. # 91); (2) **GRANTS IN PART AND DENIES IN PART** Defendant's

1

Motion to Exclude the Expert Testimony of Herbert C. Newbold (Dkt. # 88);

(3) **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Exclude

the Opinions of Dr. David Bizzak (Dkt. # 80); and (4) **DENIES** Defendant's

Motion to Exclude Dr. Vigilante's Report (Dkt. # 78).

BACKGROUND

In 2005, Plaintiffs purchased an E-Z-GO Workhorse cart

("Workhorse"), a utility vehicle, for their ranch near Buda, Texas, from United

Rentals, Inc. ("United Rentals"). (Dkt. # 37 at 3–4.) The Workhorse was designed

and manufactured by Textron. (Id.)

On December 5, 2011, Virginia Nester ("Mrs. Nester"), working

alone, used the Workhorse at the ranch to assist with feeding and moving the

livestock on the property. (Id. at 4.) To feed the cattle, Mrs. Nester used a

supplemental feed consisting of "cattle cubes," which came in a fifty pound bag.

(Id.) According to Plaintiffs, because the bag of cubes was too heavy for Mrs.

Nester to lift by herself into the cargo area of the Workhorse, she placed the bag on

the passenger side floorboard of the cart. (Id.) While driving the Workhorse

across the pasture, Mrs. Nester approached a gate which led to the area of the

pasture where she intended to move and feed the cows. (Id.) Mrs. Nester stopped

the Workhorse a few feet from the gate, applied the parking brake, left the

Workhorse in the "F" or forward position, and climbed out to open the gate. (Id.)

2

Plaintiffs contend that the engine of the Workhorse had stopped when Mrs. Nester took her foot off the accelerator.  (Id.)  As Mrs. Nester opened the gate with her back to the vehicle, the bag of cattle cubes fell on the accelerator pedal, kicking off the parking brake, starting the engine, and causing the Workhorse to accelerate forward.  (Id. at 4–5.)  At that point, the Workhorse struck Mrs. Nester, knocking her to the ground and running over her.  (Id. at 5.)  According to Plaintiffs, Mrs. Nester did not see or hear the Workhorse approach.  (Id.)  Mrs. Nester was unable to move or call for help and was trapped until her husband found her and called emergency personnel approximately one hour later.  (Id.)

Mrs. Nester was transported to Brackenridge Hospital in Austin, Texas, where she was diagnosed with fractures of the C5, C6, and C7 vertebrae and dislocation and displacement between the C6 and C7 vertebrae, which resulted in the pinching and stretching of her spinal cord.  (Id.)  As a result of the accident, Mrs. Nester is now quadriplegic and requires constant medical care.  (Id.)

Plaintiffs filed suit in this Court on October 17, 2013, invoking the Court's diversity jurisdiction.  (Dkt. # 1.)  On January 16, 2015, Plaintiffs filed an Amended Complaint against Textron alleging claims for design and marketing defects, negligence, gross negligence, breach of warranty, duty to recall, and res ipsa loquitor.  (Dkt. # 37 ¶¶ 88–114.)

Currently before the Court are four motions to exclude the testimony and opinion evidence of expert witnesses. Textron has moved to exclude the testimony of Dr. William Vigilante, Ph.D. ("Dr. Vigilante") (Dkt. # 78); Herbert Newbold ("Mr. Newbold") (Dkt. # 88); and Dr. Lara McKenzie, Ph.D. ("Dr. McKenzie") (Dkt. # 91). Plaintiffs have moved to exclude the evidence of Dr. David Bizzak, Ph.D. ("Dr. Bizzak") (Dkt. # 80).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>     a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     b. the testimony is based on sufficient facts or data;
>     c. the testimony is the product of reliable principles and methods;
>     d. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule lays responsibility on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.

"Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" United States v. Cooks,

589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  Id.

To determine whether testimony is reliable, the court must assess whether the reasoning or methodology underlying the testimony is scientifically valid.  Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  Courts consider five non-exclusive factors in making this determination: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific community.  Daubert, 509 U.S. at 593–94.  In evaluating these factors, the court must focus on the expert's "principles and methodology, not on the conclusions" generated.  Id. at 594.  The party seeking admission of expert testimony must show the testimony is reliable by a preponderance of the evidence.  Moore, 151 F.3d at 276.  "This requires some objective, independent validation of the expert's methodology."  Id.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence."  Pipitone v. Biomatrix, Inc., 288 F.3d

239, 250 (5th Cir. 2002) (quoting Daubert, 509 U.S. at 596).

> "In addition to being reliable, expert testimony must 'help the trier of
fact to understand the evidence or to determine a fact in issue.'"  Roman v.
Western Mfg., Inc., 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid.
702(a)).  Under Rule 702, this means that the proffered expert testimony must be
relevant.  Id.  "Expert testimony which does not relate to any issue in the case is
not relevant, and ergo, non-helpful."  Id. (quoting Daubert, 509 U.S. at 591
(internal quotation marks and citations omitted)).

## DISCUSSION

I.   Motion to Exclude Testimony of Dr. Lara McKenzie

> Textron moves to exclude the testimony of Dr. Lara McKenzie.  (Dkt.
# 91.)  Specifically, Textron moves to exclude Dr. McKenzie's opinion that 31
actual and 1,645 estimated patients were treated in U.S. emergency rooms for golf
cart-related injuries due to unintentional acceleration because such incidents do not
"fit this case" and are not relevant.  (Id. at 1.)  Textron also moves to exclude
Dr. McKenzie's opinions relating to her National Electronic Injury Surveillance
System ("NEISS") database searches on the grounds that (1) Dr. McKenzie's

methodology is unreliable;[1] (2) the probative value of the opinions is substantially outweighed by a danger of unfair prejudice by confusing the issues, misleading the jury, and undue delay; and (3) the opinions are based on inadmissible hearsay.  (Id. at 11.)  Plaintiffs counter that the 31 NEISS database entries are admissible and reliable.  (Dkt. # 119.)

A.    "Substantially Similar" Incidents

Dr. McKenzie's expert report includes the following conclusion: "Between January 1, 1990 and December 31, 2013, a total of 31 actual patients, an estimated number of 1,645 patients were treated in US emergency departments for a golf-cart related injury that occurred as a result of an unintentional acceleration of a golf cart."  ("McKenzie Rpt.," Dkt. # 91, Ex. 1.C at 6.)  Plaintiffs offer 28 different reasons they believe Dr. McKenzie's testimony is relevant, including that it proves the existence of a design defect and that Textron had notice of the defect. (Dkt. # 119 at 6; Dkt. # 37 ¶ 125.)

---

[1] Regarding Textron's methodology argument, the Court notes that Textron has impermissibly referred the Court to additional pages of legal argument located in an "exhibit" to its Motion.  Textron used this tactic on multiple occasions in its briefing of the pending motions without seeking leave to file additional pages beyond the page limits set out in the Local Rules.  The Court will therefore not consider the additional material contained in such "exhibits."  Even if the Court were to consider Textron's methodology argument with regard to Dr. McKenzie, the Court would reject it—Textron simply quotes from portions of Dr. McKenzie's deposition in which she admits that her methodology in this case differed in some respects from her usual practice.  Textron provides no support for the implied assertion that any deviation from an expert's usual practice renders his or her methodology unreliable under the Daubert standard.

When evidence is offered to show proof of a design defect in the product, the evidence must pertain to other "substantially similar" incidents. Johnson v. Ford Motor Co., 988 F.2d 573, 579 (5th Cir. 1993). "Evidence of similar accidents occurring under substantially similar circumstances involving substantially similar components may be probative of design defect." Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1082 (5th Cir. 1986). "The question of admissibility of substantially similar accidents is necessarily determined on a case-by-case basis, with consideration to be given to any number of factors, including the product or component part in question, the plaintiff's theory of recovery, the defenses raised by the defendant, and the degree of similarity of the products and of the other accidents." Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 426 (5th Cir. 2006).

Courts generally find "substantial similarity" where the other accidents or occurrences involve the same defects, the same product models, and the same model years. See, e.g., Johnson, 988 F.2d at 579–80; Bradley v. Cooper Tire & Rubber Co., No. 4:03cv00094-DPJ-JCS, 2007 WL 4624613, at *3 (S.D. Miss. Aug. 3, 2007); Scordill v. Louisville Ladder Grp., LLC, No. 02-2565, 2004 WL 307475, at *12 (E.D. La. Feb. 17, 2004); Wallace v. Gen. Motors Corp., No. 94-2627, 1997 WL 269498, at *8 (E.D. La. May 19, 1997). Overall, however, "[t]he 'substantially similar' predicate for the proof of similar accidents is defined,

8

again, by the defect (or, as we have also termed it, the product) at issue." Jackson, 788 F.2d at 1083.

Plaintiffs have provided the Court with a chart listing each of the 31 incidents relied upon by Dr. McKenzie and annotations indicating whether each incident involved (1) a golf cart or utility cart; (2) a kick-off brake system; (3) something striking the accelerator pedal of the cart or vehicle; (4) inadvertent operation or unintended acceleration; and (5) injury.  (Dkt. # 119-5.)  Fifteen of the 31 incidents do not provide sufficient detail to determine whether they involved an object or person striking the accelerator pedal of the cart or vehicle.  (Id.) Additionally, Plaintiffs admit that the presence of a kick-off brake system was assumed for each incident—the data itself includes no information regarding the brake systems used on the vehicles involved in the incidents.  (Dkt. # 119 at 10.) The data further includes no information regarding the makes or models of the vehicles involved in the other incidents, and the Court declines to rely on Plaintiffs' assumption that each of the carts involved had a kick-off brake system. Based on these facts, the Court finds that there is not a sufficient basis in the record for concluding that any of the 31 incidents are "substantially similar" to Mrs. Nester's accident.  The Court therefore excludes the Dr. McKenzie's testimony insofar as Plaintiffs attempt to offer it as proof of a design defect.

B.     "Reasonably Similar" Incidents

Although the Court is unable to conclude that the NEISS incidents are

sufficiently similar to Mrs. Nester's incident to be offered as evidence of a design

defect, they may still be admissible for the purpose of showing notice.  When the

proponent offers evidence of similar incidents to show notice, the standard is

relaxed but not abandoned; instead of "substantial similarity," the proponent must

establish "reasonable similarity."  Johnson, 988 F.2d at 579.  Here, Plaintiffs bring

claims for negligence based on Textron's alleged failures to (1) design a car

without a defect, (2) warn Plaintiffs about the defective and unsafe condition,

(3) recall the product, (4) correct the product through a technical bulletin, and

(5) exercise reasonable care to learn of post-sale problems with the product.[2]  (Dkt.

# 37 ¶ 101.)

Under Texas law, "[t]he determination of whether a duty to warn

exists is made as of the time the product leaves the manufacturer."  Gen. Motors

---

[2] The Court notes that Texas courts do not recognize a common law duty to
prevent risk once prior conduct is found to be dangerous.  See Blackmon v. Am.
Home Prods. Corp., 346 F. Supp. 2d 907, 914 (S.D. Tex. 2004) (citing Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 438 (Tex. 1997)).  As a result, the
incidents cannot be admitted in connection with negligence claims based on a
failure to recall, failure to correct the product through a technical bulletin, or
failure to exercise reasonable care to learn of post-sale problems with the product.
See Grinnell, 951 S.W.2d at 438 (holding that Texas law does not recognize claims
based on a duty to act to prevent risk once prior conduct is found to be dangerous
and noting that such claims "are particularly ill-suited for application to what are
essentially products liability claims because they impose liability even when the
manufacturer provides adequate warnings").

Corp. v. Saenz on Behalf of Saenz, 873 S.W.2d 353, 356 (Tex. 1993).  A duty to

warn arises when a manufacturer knew or should have known about potential harm

to a user because of the nature of the product for sale.  Id.  According to the

Nesters' Amended Complaint, Textron initially sold the Workhorse at issue in this

case in October 2000.  (Dkt. # 37 ¶ 11.)   Textron's design of the vehicle

necessarily occurred prior to its manufacture and sale.  As a result, only reasonably

similar incidents occurring before October 2000 are relevant for the purpose of

establishing notice.  See Nissan Motor Co. Ltd. v. Armstrong, 145 S.W.3d 131,

139 (Tex. 2004) ("Product design and product warnings can take into account

accidents occurring before production and sale, but not unforeseeable accidents

occurring thereafter.").

       McKenzie states in her expert report that she searched for and

analyzed data for patients treated between January 1, 1990 and December 31,

2013.  (McKenzie Rpt. at 5.)  Of the 31 incidents at issue, 13 occurred before

October of 2000.[3]  The Court finds that the remaining incidents are irrelevant for

the purpose of establishing notice.

       Textron argues that the incidents occurring before October 2000 are

also irrelevant because it did not start examining NEISS data trend information

until 2005 or 2006, long after the Nesters' cart was sold in 2000.  (Dkt. # 149.)  Dr.

---

[3] These incidents are listed in Plaintiffs' Exhibit 1.B as numbers 1, 4, 8, 11, 12, 14, 15, 17, 18, 19, 22, 28, and 29.  (Dkt. # 91, Ex. 1.B.)

Bizzak, Textron's engineering expert, stated that he began analyzing NEISS data at Textron's request in 2006 to "evaluate reported injuries and determine if there are any notable injury trends or increase in frequency of specific accident types." ("Bizzak Rpt.," Dkt. # 80-1 at 10.)   As noted above, a manufacturer has a duty to warn if it knows or should have known of potential harm to a user because of the nature of the product for sale.  Saenz, 873 S.W.2d at 356.  Given the nature of Textron's business and the products it manufactures, and in light of Textron's own efforts to monitor the NEISS database for golf cart-related injuries, there is a sufficient basis on which to argue that Textron should have known of incidents that occurred prior the period in which it began actually monitoring the NEISS injury data.  As such, Plaintiffs are not, as a matter of law, precluded from using incidents occurring before October 2000 to show notice.

Generally, courts find other incidents "reasonably similar" when they involve similar products failing in a similar manner.  See, e.g., Hendricks v. Ford Motor Co., No. 4:12CV71, 2012 WL 4478308, at *3 (E.D. Tex. Sept. 27, 2012); Knauf v. Dorel Juvenile Grp., No. SA:08-CV-336-XR, 2010 WL 114014, at *3 (W.D. Tex. Jan. 6, 2010).  Upon review of the incidents in the NEISS database occurring before 2000, the Court finds that only one, incident 8, is admissible to show notice.  Incident 8 involves an accident victim falling on the accelerator pedal while entering a golf or utility cart.  Like Mrs. Nester's incident, it involves a

golf or utility cart in the "on" position with the parking brake engaged.  Also like

Mrs. Nester's incident, the parking break disengaged due to weight accidentally

applied to the gas pedal, resulting in injury.  The Court finds that this incident thus

involves a similar product (a golf or utility cart) failing in a similar manner

(accelerating after the accelerator pedal was accidentally struck with the parking

brake engaged), and is therefore admissible for the purpose of demonstrating

notice to Textron.  "Any differences in the circumstances surrounding these

occurrences go merely to the weight to be given the evidence." <u>Jackson</u>, 778 F.2d

at 1083.  The data entries describing the remainder of the incidents contain

insufficient information to establish that the incidents were reasonably similar to

the one at issue here.

    C.    <u>Unfair Prejudice</u>

       Textron also argues that the probative value of Dr. McKenzie's

testimony is substantially outweighed by the danger of unfair prejudice by

confusing the issues, misleading the jury, and causing undue delay under Federal

Rule of Evidence 403.  (Dkt. # 91 at 11.)  Textron offers no explanation in support

of its position.  Should Textron formulate a more specific objection, the Court will

address it at the appropriate time.

D.    Basis in Hearsay

Lastly, Textron argues that Dr. McKenzie's opinions regarding the 31 other incidents are inadmissible because they are based on hearsay.  (Dkt. # 91 at 12.)  Specifically, Textron contends that the narratives in the NEISS database amount to summaries stated by unknown persons, some of whom have no personal knowledge of the incident, and that no exception to the hearsay rule applies.  (Id.) Plaintiffs respond that the public records exception to the rule against hearsay applies to the NEISS database.  (Dkt. # 119 at 11–12.)

The Court agrees with Plaintiffs.  Rule 803(8) of the Federal Rules of Evidence provides, in relevant part, that a public record is not excluded by the rule against hearsay if the record is "[a] record or statement of a public office [that] sets out . . . factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  The party challenging an official report bears the burden of showing that it is untrustworthy.  Fed. R. Evid. 803(8)(B).

Textron argues that information in the NEISS database is untrustworthy because by the time information is entered into the database, it may have been transmitted multiple times from the patient or a family member to a doctor, nurse, police officer, or emergency responder.  (Dkt. # 149 at 21.)  The Fifth Circuit has explained that the trustworthiness requirement "means that the

14

trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon." Moss v. Ole S. Real Estate, Inc., 933 F.2d 1300, 1307 (5th Cir. 1991). The reliability inquiry thus focuses on the methodology employed behind making a report, and courts should presume that public officials may be trusted to perform their legal duties. Id. at 1307–08. The Advisory Committee set out a nonexclusive list of factors helpful in determining the trustworthiness of a report: "(1) the timeliness of the investigation; (2) the special skill or expertise of the official; (3) whether a hearing was held and at what level; and (4) possible motivational problems." Id. at 1306 (citing Fed. R. Evid. 803 advisory committee's notes on proposed rules).

The Consumer Product Safety Commission ("CPSC") is required to "collect, investigate, analyze, and disseminate injury data, and information, relating to . . . injury . . . associated with consumer products." 15 U.S.C. § 2054(a)(1). CPSC complies with this requirement by maintaining such information in the NEISS. Southland Mower Co. v. Consumer Prod. Safety Comm'n, 619 F.2d 499, 510 n.24 (5th Cir. 1980). The NEISS database therefore is a public record within the meaning of Rule 803(8)." See Jenks v. N.H. Motor Speedway, No. 09-cv-205-JD, 2012 WL 274348, at *2 (D.N.H. Jan. 31, 2012). The NEISS "was designed to develop statistically valid, representative product-related injury data," Southland, 619 F.2d at 510 n.24, and consists of a sample of

approximately 100 hospitals selected to be representative of the entire country, (Tr. 11:8–15.)  NEISS coders at those hospitals review every injury treated in the hospitals' emergency departments and record variables such as age, sex, the body part injured, the diagnosis, and the disposition.  (Tr. 11:15–24.)  Textron has submitted no authority supporting the proposition that the CPSC's methodology is in unreliable, and the Court finds that the NEISS data falls within the public records exception to the hearsay rule.

Even if the NEISS data did not fall under the public records exception to the hearsay rule, it would still be admissible because Plaintiffs intend to use the incidents contained therein only for the purpose of showing notice.  The data is not being offered for the truth of the matter asserted, but rather is offered to show that Textron had notice of similar incidents.  It therefore does not violate the rule against hearsay.  Fed. R. Evid. 801; United States v. Cent. Gulf Lines, Inc., 747 F.2d 315, 319 (5th Cir. 1984) (holding that evidence introduced to prove that notice was given is not offered to prove the truth of the matter asserted and therefore is not hearsay); Wielgus v. Ryobi Techs., Inc., No. 08 CV 1597, 2012 WL 3614642, at *6 (N.D. Ill. Aug. 21, 2012) (holding that NEISS data is admissible for the non-hearsay purpose of showing notice).

16

E.      Conclusion

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Textron's Motion to Exclude the Testimony of Dr. Lara Dr. McKenzie (Dkt. # 91).  The Court finds that testimony regarding incident 8, described in Exhibit 5 to Plaintiffs' Response to Textron's Motion to Exclude (Dkt. # 119), is admissible for the purpose of showing notice.  Textron's Motion is granted in all other respects.

II.     Motion to Exclude Testimony of Herbert Newbold

Textron moves to exclude the opinion testimony of Plaintiffs' expert Herbert C. Newbold.  (Dkt. # 88.)  Textron argues that Mr. Newbold is not qualified to express opinions regarding the design of the utility cart, his opinion is based on inaccurate legal standards, and his methodology was unreliable.  (Id. at 2–8.)  Textron further argues that Mr. Newbold's opinions regarding the reasonableness of Mrs. Nester's operation of the utility cart immediately prior to the accident should be excluded.  (Id. at 11.)  Plaintiffs argue that Mr. Newbold, while not a utility cart specialist, is nonetheless qualified to opine on utility cart design; his opinions are based on accepted Texas legal standards; and his methodology was reliable.  (Dkt. # 112.)

17

A.   Mr. Newbold's Qualifications

Textron first argues that Mr. Newbold is not qualified to express opinions on utility cart design because he lacks experience in the design of "golf carts or golf cart platform utility vehicles." (Dkt. # 88 at 2.) Textron further argues that Mr. Newbold is not qualified to express an opinion on whether the risk of injury due to the alleged defect was reasonably foreseeable because he has no training or experience in the utility cart industry. (Id. at 8.) Finally, Textron argues that Mr. Newbold is not qualified to express opinions on the proper standard of care for users of the vehicle. (Id. at 11.)

A witness may be qualified as an expert if he possesses specialized knowledge, skill, experience, training, or education. Fed. R. Evid. 702. The inquiry is whether the witness's qualifications allow him to form a reliable opinion on a relevant issue. See Huss v. Gayden, 571 F.3d 442, 455 (5th Cir. 2009). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." Id. at 452; see also Peteet v. Dow Chemical Co., 868 F.2d 1428, 1431 (5th Cir. 1989) (allowing a doctor certified as a toxicologist to testify as an expert regarding whether chemical exposure was a contributing cause of cancer even though he was not a specialist in any other field).

Mr. Newbold received his bachelor's degree in mechanical engineering in 1983 from the University of Colorado. ("Newbold Rpt.," Dkt. # 88,

Ex. 1.A at 1; "Hr'g Tr.," Dkt. # 144 at 169:9–10.)  He is a registered Professional

Engineer in the State of Colorado, and is a member of the American Society of

Mechanical Engineers and the Society of Automotive Engineers.  (Dkt. # 112-1,

Ex. A; Hr'g Tr. 171:2–5.)  Mr. Newbold has worked in accident reconstruction,

failure analysis, and mechanical design and testing for over 30 years, and has been

certified in traffic accident reconstruction since 1996.  (Dkt. # 112-1, Ex. A; Hr'g

Tr. 171:6–8.)  This work has included analysis, design, and testing of recreational

off-road vehicles including motorcycles, all-terrain vehicles ("ATVs"), go-carts,

golf carts, and utility vehicles, among others.  (Newbold Rpt. at 1; Hr'g Tr. 171:9–

175:22.)  Mr. Newbold has conducted analysis and testing on "hundreds" of cases

or studies involving utility vehicles and has experience designing and fabricating

mechanical components for such vehicles.  ("Newbold Aff.," Dkt. #112-1 ¶¶ 9–

10.)  He is a member of the American National Standards Institute's ("ANSI")

Standards Committee for Four Wheel ATVs, has been retained as a consultant

regarding the design and safety of ATVs by the U.S. Consumer Products Safety

Commission ("CPSC") and the National Association of Attorneys General

("NAAG"), and has testified before Congress on ATV safety.  (Id. at 1–2; Hr'g Tr.

177:23–178:21.)

       Mr. Newbold's education and experience in accident reconstruction,

failure analysis, and mechanical testing and design of recreational motor vehicles

qualifies him to express his opinion as to whether the utility vehicle at issue in this case was defectively designed. While Textron argues that Mr. Newbold "has no experience whatsoever in the design of golf carts or golf cart platform utility vehicles," his lack of specialization in golf cart design goes to the weight of Mr. Newbold's testimony, not its admissibility. See Huss, 571 F.3d at 455. Mr. Newbold's education in mechanical engineering and experience analyzing the design and failure of recreational motor vehicles, in addition to his experience on "dozens" of cases involving golf carts, (Hr'g Tr. 182:8–12), is sufficient to allow him to reach reliable opinions concerning the safety and design of analogous vehicles like the one at issue in this case.

Mr. Newbold is also qualified to give his opinion on whether the risk of injury from the alleged defect was reasonably foreseeable. Mr. Newbold's 30 years of experience analyzing "thousands" of motor vehicle accidents, similarly lengthy experience designing, evaluating, and testing utility vehicles, and work on behalf of ANSI, the CPSC, and the NAAG related to the design and safety of ATVs qualify him to give his opinion on whether the risk of injury created by a design defect in a utility vehicle was reasonably foreseeable. Here, as before, any lack of specialized experience with golf carts in particular goes to the weight of his testimony. The Court therefore finds that Mr. Newbold is sufficiently qualified to

serve as an expert witness on utility vehicle design and the risk of injury created by a design defect.

Mr. Newbold is not, however, qualified to give his opinion on the proper standard of care for users of the vehicle. His expertise in mechanical engineering, accident reconstruction, and recreational vehicle design and testing does not give him technical or otherwise specialized knowledge of how a person of ordinary prudence would operate a vehicle similar to the one at issue here. Lacking expertise of the type possessed by Dr. Vigilante, or some significant level of experience driving and observing others drive this or similar vehicles, Mr. Newbold's background does not qualify him to serve as an expert on the standard of care ordinarily used by operators of such vehicles. The Court will therefore exclude his opinions concerning whether Mrs. Nester's operation of the vehicle was negligent.

B. <u>Relevancy</u>

Textron further argues that Mr. Newbold's opinions are not based on correct legal standards under Texas law, which amounts to an argument that his opinions on mixed questions of law and fact will not help the trier of fact and are thus not relevant. Specifically, Textron takes issue with the definition of "unreasonably dangerous" and the definition of "reasonably foreseeable" relied upon by Mr. Newbold in forming his opinions. (Dkt. # 88 at 5, 8.)

21

1.   <u>Unreasonably Dangerous</u>

The definition of "unreasonably dangerous" to which Textron objects comes directly from the Texas Supreme Court's explanation of design defect claims in <u>Timpte Indus., Inc. v. Gish</u>, 286 S.W.3d 306, 311–312 (Tex. 2009).  In determining whether a product is unreasonably dangerous, Texas courts apply a risk-utility analysis that considers:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

<u>Id.</u> at 311.  These factors were included in the definition used by Mr. Newbold, as were the Texas Supreme Court's statements regarding how the concept of "open and obvious risk" applies in the context of the risk-utility analysis.  <u>Id.</u> at 312; (Dkt. # 88, Ex. 1C.)  Given that the definition of "unreasonably dangerous" relied upon by Mr. Newbold was taken directly from Texas Supreme Court precedent, Textron's objection to the definition is groundless.

Textron's objection that Mr. Newbold impermissibly took additional factors into account in determining whether the cart design was "unreasonably

dangerous" is similarly without basis.  Mr. Newbold's deposition testimony that he considered "proximate cause" in forming his opinion on whether the vehicle design was unreasonably dangerous appears to be the product of confusing questioning (and objecting) that moved back and forth between the legal standards for negligence, contained in Attachment 1 of Mr. Newbold's Report, and the standard for unreasonable dangerousness, an element of the design defect standards contained in Attachment 2.  ("Newbold Dep.," Dkt. # 88, Ex. 1A at 75:6–81:6.)  Even a torts professor would have had difficulty with the course of questioning, and nearly constant attorney argument, posed in Mr. Newbold's deposition.  Nothing in the section of Newbold's Report dealing with the vehicle's design suggests that any consideration of "proximate cause" was a factor in his design defect analysis, and Mr. Newbold's hearing testimony indicated that he only used proximate cause in forming his opinions as to whether Mrs. Nester was contributorily negligent.  (Hr'g Tr. 229:23–230:5.)  With regard to Mr. Newbold's testimony regarding the "engineering hierarchy," an approach to addressing risk in design, the concept is relevant to Plaintiffs' cause of action for negligence and the duty of care owed by Textron in designing the vehicle.

Finally, Textron argues that Mr. Newbold failed to consider the vehicle's utility and "failed to balance risk and utility" in his analysis.  (Dkt. # 88 at 4.)  This argument mischaracterizes Mr. Newbold's report.  In considering

alternatives to the "kick-off" parking brake system, in which the accelerator is mechanically linked to the brake such that depressing the accelerator also releases the parking brake, Mr. Newbold stated that the purpose of the kick-off feature appeared to be mainly for convenience and was not integral to the function or utility of the vehicle.  (Newbold Rpt. at 18.)  Mr. Newbold noted the existence of other comparable vehicles with uses similar to that of the vehicle at issue here that incorporate different parking brake mechanisms.  (Id. at 20.)  Finally, Mr. Newbold discussed the utility of the kick-off system itself—particularly, that it prevents damage to the parking brake caused by driving the vehicle with the parking brake on.  (Id. at 21–22.)  The Court therefore finds that Mr. Newbold's opinions regarding whether the vehicle design was unreasonably dangerous were based on and considered the applicable Texas legal standards such that they will assist the trier of fact.

      2.    <u>Reasonably Foreseeable</u>

Textron argues that the definition of reasonable foreseeability relied upon by Mr. Newbold impermissibly broadened the category of relevant risks, contending that "the full conglomeration of Mrs. Nester's negligent acts and/or omissions which led to her injury must have been reasonably foreseeable."  (Dkt. # 88 at 9.)  The "acts/omissions" to which Textron refers, and which Textron argues should have been considered, include placing a feedbag on the floorboard of

24

the vehicle, honking the vehicle's horn to attract cattle, exiting the vehicle with the ignition key in the "on" position, walking in front of the vehicle, and not watching the vehicle as she was opening the gate.  (Dkt. # 88-5 ¶ 7.)  This argument is without merit.

Under Texas law, "foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." Mellon Mortg. Co. v. Holder, 5 S.W.3d 654, 655 (Tex. 1999) (quoting Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996)).  More particularly,

> [i]t is not required that the particular accident complained of should have been foreseen.  All that is required is (1) that the injury be of such a general character as might reasonably have been anticipated; and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.

Id.  Nothing in Mr. Newbold's deposition or hearing testimony suggests that his understanding or application of the concept of reasonable foreseeability is inconsistent with Texas law.  Textron's position that the exact circumstances of Mrs. Nester's injury must have been foreseeable, on the other hand, is a misstatement of the law.  The Court is satisfied that Mr. Newbold understood and considered the correct standard of reasonable foreseeability in developing his opinion regarding whether the risk of harm from the alleged defect was reasonably foreseeable such that his opinion will assist the trier of fact.

C.    Reliability

Textron further argues that Mr. Newbold's opinions regarding the vehicle's design and available design alternatives are unreliable.  Textron specifically challenges Mr. Newbold's opinions with respect to whether the vehicle's accelerator and braking systems were defectively designed on the basis that he does not conduct a statistical analysis of the vehicle's injury rate; that "proven experts in the industry reject his methodology;" and that his opinions regarding design alternatives are "conclusory and speculative."  (Dkt. # 88 at 4–5, 7–8.)  As noted above, the reliability analysis asks whether the reasoning or methodology underlying the expert testimony is scientifically valid.  Moore, 151 F.3d at 276.

1.    Mr. Newbold's Opinion Regarding Likelihood of Injury

Textron's objection to Mr. Newbold's failure to conduct a statistical analysis of the vehicle's injury rate attacks his findings regarding the likelihood of injury from the vehicle's use.  These findings are part of the risk-utility analysis used to determine whether a product is unreasonably dangerous.  See Gish, 286 S.W.3d at 311.  In the parts of his analysis relevant to the likelihood of injury, Mr. Newbold conducted testing to determine how much force is required to release the parking brake, finding that 65 pounds of force were required to release the parking brake by pressing down on the service brake pedal while only 10 pounds of force

26

were required to release the parking brake by pushing the accelerator.  (Newbold

Rpt. at 6.)  Mr. Newbold also conducted testing to determine whether a feedbag

could depress the accelerator pedal, finding that a 50-pound feedbag on the

floorboard of the vehicle, when knocked over onto the accelerator, was sufficient

to depress the accelerator and release the parking break in 45 out of 50 trials.[4]  (Id.

at 8.)

   Additionally, Mr. Newbold researched public reports of injuries

caused by similar incidents involving unintended acceleration of Textron vehicles

and reviewed the expert report of Lara McKenzie prepared for this litigation,

which discusses injuries due to unintended acceleration by golf carts found in the

National Electronic Injury Surveillance System ("NEISS") database.  (Id. at 16.)

As noted in the Court's discussion of the McKenzie report, evidence of other

incidents offered to show proof of a design defect in the product must be

substantially similar to the incident in question, which generally requires that the

accidents involved the same product model, model year, and defect.  Johnson, 988

F.2d at 579.  Because the NEISS database includes no information regarding the

model or brake systems of the golf carts involved in those injuries, they cannot

serve as evidence of substantially similar incidents.  Additionally, while the

incidents listed in Mr. Newbold's report involved Textron vehicles that use the

---

[4] Textron does not contend that this testing was inaccurate or otherwise unreliable.

kick-off brake system, the descriptions include no information as to the model and model year of the vehicles involved and thus are also insufficient to support their use as substantially similar incidents.  As a result, neither McKenzie's report nor Mr. Newbold's own research into similar incidents may be used as evidence regarding the likelihood of injury associated with the alleged defect.[5]

Mr. Newbold's opinion regarding the likelihood of injury associated with the vehicle's kick-off brake system thus must be based solely on his testing. Mr. Newbold has not attempted to quantify the risk of injury associated with the kick-off brake system, and his opinion is expressly based on his findings on "the ease of unintended acceleration" using that system.  (Newbold Rpt. at 26.)  Textron cites no authority for the proposition that an expert's opinion on the likelihood of injury from an alleged product defect must be based on statistical analysis of reported injuries in order to be reliable.  While such analysis may add (significant) weight to an expert's testimony regarding the likelihood of injury, the Court finds that its absence does not render the testimony inadmissible where, as here, the expert's opinion is based on his own testing of the allegedly defective product. Mr. Newbold may therefore give his opinion that the ease of causing unintended acceleration of the vehicle due to the alleged defect creates a risk of injury.

---

[5] Because the incidents listed by Newbold do appear to be reasonably similar, however, they may serve as evidence that Textron had notice of the defect.  See Johnson, 988 F.2d at 579.

2.    Mr. Newbold's Opinion on the Availability of Substitutes

Textron next argues that Mr. Newbold has no basis for his opinion regarding the safety of his proposed alternative designs because he has not compared the relative injury rates of the vehicle with the injury rates of similar vehicles that incorporate the alternative design elements.  (Dkt. # 88 at 7 & Ex. 1.D ¶ 9.)  In the risk-utility analysis, the relevant consideration with regard to substitutes is "the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive."  Gish, 286 S.W.3d at 311.  In evaluating the reliability of an expert's opinions on product design alternatives, the Fifth Circuit has looked to whether the expert produced drawings, performed calculations, or tested the alternative designs.  Watkins v. Telsmith, Inc., 121 F.3d 984, 992 (5th Cir. 1997).  Because "the proper methodology for proposing alternative designs includes more than just conceptualizing possibilities," courts have also considered whether the expert presented a specific design or a complete "end product."  Guy v. Crown Equip. Corp., 394 F.3d 320, 327 (5th Cir. 2004) (quoting Watkins, 121 F.3d at 992).

Mr. Newbold's January 15 report states that he examined possible alternative design modifications that would have reduced the risk of unintended acceleration, and described four: (1) a parking brake operated by a separate foot pedal or hand lever; (2) increased force required to depress the accelerator pedal;

29

(3) a key-operated ignition system; and (4) elimination of the kick-off feature

linking the accelerator to the parking brake.  (Newbold Rpt. at 17–18.)  Mr.

Newbold identified similar utility vehicles made by other manufacturers that use

parking brake systems "that incorporate unlinked accelerator and parking brake

pedals, redundant parking brake systems or more complex parking brake release

mechanisms."  (Id. at 19–20.)  Mr. Newbold also identified a specific vehicle built

by Textron that uses a hand-operated mechanical parking brake.  (Id. at 20.)  Mr.

Newbold characterized these parking brake systems as "safer" and opines that they

"would have probably prevented or significantly reduced the risk of unintended

acceleration" without sacrificing the vehicle's utility.  (Id.)

        Mr. Newbold's January 15 report does not explain how he reached the

conclusion that the design alternatives he identified would be safer without

sacrificing the vehicle's utility.  The proposed alternatives in the January 15 report

are merely conceptualized possibilities that consist of a general description of the

concept with no presentation of a specific design or end product.  The

identification of utility vehicles made by other manufacturers does not indicate

how those vehicles were determined to be comparable in utility to the vehicle in

question, whether they are similar in cost, or the design of the specific parking

brake system used by each.  Additionally, Mr. Newbold did not submit drawings or

calculations indicating that his opinions regarding the utility and safety of the

proposed alternatives are "supported by valid engineering principles." See
Watkins, 121 F.3d at 992.

  The testing described in Mr. Newbold's supplemental June 22 report,
however, in addition to the relevant analysis in the January 15 report, renders Mr.
Newbold's methodology sufficiently reliable to opine on the availability of one
design alternative: unlinking the parking brake from the accelerator.  In connection
with the June 22 report, Mr. Newbold obtained an "exemplar" vehicle of the same
make and model as the one that injured Nestor, inspected the vehicle, and ensured
the service adjustments were to the manufacturer's specifications.  (Dkt. # 112-1 at
2.)  He removed the linkage between the parking brake and accelerator and
depressed the accelerator to determine whether the parking brake, with the linkage
removed, would prevent the vehicle from moving when the accelerator pedal is
depressed.  (Id.)  Textron does not challenge the methodology of the test itself,
although its own expert has opined that the test vehicle did not, in fact, meet the
manufacturer's specifications.  (Dkt. # 125-4.)  With regard to feasibility, Mr.
Newbold estimated the cost and technical requirements of removing the linkage
between the accelerator and parking brake, and the test vehicle itself represents a
prototype "end product."  (Newbold Rpt. at 16, 22.)

  In light of Mr. Newbold's analysis and testing of the alternative
design in which the linkage between the parking brake and the accelerator is

removed, the Court finds that Mr. Newbold's opinion regarding the availability of this specific substitute to be reliable.  He may not, however, give his opinion on the relative safety or feasibility of other possible design alternatives, which he has neither tested nor analyzed in a way sufficient to show that his opinions have empirical support.  See Watkins at 992.

D.    Conclusion

In summary, the Court **GRANTS IN PART AND DENIES IN PART** Textron's Motion to Exclude the Testimony of Herbert Newbold (Dkt. # 88).  Specifically, Mr. Newbold may not give his opinion as to whether Mrs. Nester's conduct in operating the vehicle was negligent, and he may not give his opinion on the safety or feasibility of design alternatives other than removing the linkage between the accelerator and the parking brake.  Textron's motion is denied in all other respects.

III.    Motion to Exclude Testimony of Dr. David Bizzak

Plaintiffs have moved to exclude the opinions of defense expert Dr. Bizzak on the basis that Textron has not disclosed all of the information on which he relied in formulating his opinions.  (Dkt. # 80 at 3.)  Plaintiffs also seek to exclude certain of Dr. Bizzak's opinions on the basis that they are unreliable and will not be helpful to the trier of fact.  (Id. at 5–11.)  The Court will address these arguments in turn.

A.   <u>Disclosure of Information Relied Upon by Dr. Bizzak</u>

Under Rule 26, disclosure of an expert witness must "be accompanied by a written report prepared and signed by the witness."  Fed. R. Civ. P. 26(a)(2)(B).  The report must contain a complete statement of all opinions the witness will express, the basis and reasons for the witness's opinions, and the facts or data that the witness considered in forming them.  Fed. R. Civ. P. 26(a)(2)(B)(i), (ii).  A party may not use information or a witness that it failed to disclose as required under Rule 26(a) or (e) unless the failure is justified or is harmless.  Fed. R. Civ. P. 37(c)(1).

Plaintiffs contend that Dr. Bizzak's report failed to include the database of golf cart-related injuries, created and maintained by Dr. Bizzak, that he relied upon in forming his opinions.  Dr. Bizzak attests, and testified at the hearing, that his database consists of cases involving golf carts reported in the public NEISS database.  (Dkt. # 102-2 ¶ 3; Tr. 66:6–14.)  For those golf cart cases coded in the NEISS database as involving serious injuries, Dr. Bizzak adds additional coding to further describe the nature of the case in order to track "general trends in golf car related accidents," and provides the results to Textron.  (Dkt. #102-3 ¶ 4; Tr. 66:18–67:10.)  The data does not include information regarding the manufacturer of the vehicles involved in the accidents.  (Dkt. # 102-3 ¶ 5.)  Dr. Bizzak considers his database to be proprietary work product.  (<u>Id.</u> ¶ 6; Tr. 67:11–23.)

33

In his report, Dr. Bizzak's discussion of his database is made in the context of his broader discussion of the limitations of the NEISS database. (Bizzak Rpt. at 8–9.) The relevant section is reproduced in full below:

> Despite the limitations of the NEISS database, I have developed and maintained a database of NEISS reported injuries that have been coded to have been accidents in which a golf cart was involved. As data has been added to the database, I have evaluated reported injuries to determine if there are any notable injury trends or increase in frequency of specific accident types. My analysis, similar to an analysis performed by Dr. McKenzie [Reference 1], has shown that falls from the vehicle are the primary cause of injuries associated with golf car use. Of all the injuries reported, 90% historically have involved relatively minor injuries in which the patient is treated in the emergency room and released.

(Id. at 9.) The final two sentences of this passage reflect analysis based on the use of his database. To the extent that Dr. Bizzak used the conclusions expressed—the most prevalent cause of golf cart-related injuries and the rate of severe injury due to golf cart use—to inform his analysis of the risk of injury from the alleged design defect, the underlying data would have to be disclosed. It is not clear, however, that this analysis informed any of Dr. Bizzak's opinions in this case. Dr. Bizzak testified that he did not rely on his own database in forming his opinions regarding this case,[6] (Dkt. # 102-2 ¶ 10; Tr. 68:10–69:2), and his risk analysis of the alleged

---

[6] Dr. Bizzak testified in his deposition that his experience in assembling his database, which involves working with the NEISS database, informed his evaluation of Dr. McKenzie's expert report, which is also based on data drawn from the NEISS database. (Dkt. # 80-2 at 70:11–23.) His experience using the database is distinct from the use of his database to draw conclusions in this case.

design defect is based on NEISS data identified by Dr. McKenzie, (Bizzak Rpt. at 9–10).

The Court therefore finds that Dr. Bizzak was not required to disclose his database as "data used by the witness in forming" his opinion on the risk of injury from the alleged design defect under Rule 26(a)(2)(B)(ii).  However, because his opinions regarding the primary cause of injuries (falling) and the rate of severe injuries associated with golf cart use (approximately 10%) are based on his analysis of data compiled in his database, these opinions, to the extent Textron intended to present them, will be excluded absent disclosure of the underlying data.

B.   Opinion Regarding Whether Alternative Design Would Have Prevented Injury

Plaintiffs also move to exclude Dr. Bizzak's opinion that removing the link between the parking brake and the accelerator would not have prevented Mrs. Nester's injury.  (Dkt. # 80 at 5.)  Dr. Bizzak's report includes the results of testing using two "exemplar" vehicles, one made by Textron and one manufactured by Cushman, to determine whether the respective engines had sufficient torque power to propel the vehicles forward when the parking brakes are applied.  (Bizzak Rpt. at 15.)  Dr. Bizzak found that the engaged parking brakes did not prevent

_____

Dr. Bizzak's familiarity with the NEISS database was gained in part through creating and maintaining his own database using NEISS data.  Because he did not use his own database in forming his conclusions in this case, Textron was not required to produce it under Rule 26.

powered movement, and concluded that eliminating the link between the parking

brake and accelerator on the Workhorse would not have prevented the accident.

(Id.)  Plaintiffs argue that because Dr. Bizzak's conclusion was based on tests

conducted on different vehicle models, manufactured at different times, than the

one at issue in this case, his opinion will not be helpful to the factfinder and is

therefore not relevant.  (Dkt. # 80 at 6.)

       Plaintiffs' argument is not truly one of relevance.  If the models used

in Dr. Bizzak's tests are comparable to the vehicle at issue here, his findings

regarding the test vehicles' performance would tend to make it more probable that

Mrs. Nester's vehicle would have performed the same way, suggesting that alleged

defect—the link between the accelerator and parking brake through which

depressing the accelerator releases the parking brake—was a producing cause of

the injury.  This satisfies the standard for relevance under the Federal Rules of

Evidence.  See Fed. R. Evid. 401.  Plaintiffs' argument instead goes to the

reliability Dr. Bizzak's opinion—whether Dr. Bizzak's methods, and particularly

his use of the exemplar vehicles in his testing, were reliable.

       It is unclear from Dr. Bizzak's two reports and affidavit what vehicles

were used for which tests.  Dr. Bizzak's report states that he "conducted tests with

exemplar Workhorse utility cars and a Cushman utility car (hydraulic service

brakes and a mechanical parking brake).  Video of these tests clearly demonstrate

36

the engine has sufficient torque and power to 'drive through' the parking brake."
(Bizzak Rpt. at 15.)  He concluded that "elimination of the kick-off brake feature
would not prevent powered movement of the vehicle."  (Id.)  At the hearing, Dr.
Bizzak testified that one of the vehicles used for these tests was a 2005 MPT 1200,
which has "the same chassis, frame, drivetrain, [and] brake system as the
Workhorse."  (Tr. 73:23–74:5.)  He further testified that a technician inspected the
exemplar vehicle to make sure it was operating based on factory specifications, and
that it was a proper exemplar for the purpose of determining whether the drivetrain
had sufficient power to drive through an engaged parking brake.  (Id. 74:14–25.)

Dr. Bizzak's original report also describes tests "using an exemplar
Workhorse utility vehicle" in which Dr. Bizzak "adjusted the brakes to provide the
average deceleration during braking observed during my testing of the Nester
utility car.  With the brakes adjusted to provide this same level of braking
capability, I removed the linkage between the brake and accelerator pedal such that
application of the accelerator pedal did not release the parking brake."  (Id.)  Dr.
Bizzak tested the speed of this vehicle from a standing start with the parking brake
disengaged, with the parking brake adjusted to replicate the brake adjustment on
the Nester vehicle, and with the parking brake "properly adjusted."  (Id.)  He
concluded that the Nester vehicle "will accelerate from a stopped position at
roughly the same rate whether or not the parking brake is applied."  (Id.)

Dr. Bizzak's supplemental report, dated May 18, 2015, states that his tests used "an exemplar utility car equipped with a Fuji engine (a proper exemplar vehicle), as well as a more recent model utility car equipped with a more powerful Kawasaki engine. In both of these tests, the mechanical drum brakes on the vehicle were properly adjusted to achieve rear brake lock-up when the service brakes were applied, and the kickoff brake linkage was removed to prevent disengagement of the parking brake when the accelerator pedal was depressed." (Dkt. # 107-8 at 2.) In the following section, titled "Utility Car Comparison," Dr. Bizzak states that he performed video tests of a Cushman utility car equipped with 4-wheel hydraulic brakes and a mechanical hand brake, and a John Deere Gator 850D utility car with a hand brake. (Id. at 3.) Both vehicles moved forward with the parking brake engaged upon application of the accelerator. (Id.)

Dr. Bizzak also testified that he subsequently performed tests on a model year 2001 Workhorse cart adjusted to factory specifications in September 2015. (Tr. 78:14–19.) Dr. Bizzak testified that he tested whether, with a parking brake engagement force of 75 pounds, the vehicle would move forward with the parking brake engaged when the accelerator was depressed. (Id. 78:20–80:16.) He found that in each of the tests, the vehicle moved forward upon application of the accelerator. (Id. 80:8–21.)

38

Textron's argument in support of the reliability of Dr. Bizzak's opinion regarding whether the alleged defect was a producing cause of Mrs. Nester's injury does not mention Dr. Bizzak's tests on the Cushman and John Deere vehicles.  Textron appears to recognize that tests conducted on vehicles made by different manufacturers and containing different parking brake systems than Mrs. Nester's vehicle cannot predict whether Nester's vehicle would have performed similarly.  Textron instead relies on Dr. Bizzak's tests conducted using an "exemplar Workhorse utility vehicle," which the Court believes refers to the "proper exemplar model" described in Dr. Bizzak's testimony and supplemental report and the 2001 model year vehicle used in later testing.  (See Tr. 73:23–74:25, 78:14–80:21; Dkt. # 80-2 at 88:5–18; Dkt. # 107-8 at 2.)

Dr. Bizzak testified that the first exemplar vehicle he tested had the same relevant components as Mrs. Nester's vehicle, "including the same operational system, the same engine which would supply the same power, and the same drive train," and that it was "for all testing purposes substantially similar" to the vehicle that injured Mrs. Nester.  (Dkt. # 102-2 ¶ 17; Tr. 63:23–64:5, 74:20–25.)  The test vehicle used the same parking brake system that Plaintiffs allege to be defective.  (Bizzak Rpt. at 15.)  While the test vehicle has a different model name and model year, Plaintiffs have not identified any differences in the vehicle tested that would undermine Dr. Bizzak's testimony that the test vehicle accurately

39

replicates the performance of Mrs. Nester's vehicle with regard to the engine's

ability to propel the vehicle when the parking brake is engaged.[7]  Additionally, the

2001 model year Workhorse tested in September 2015 also appears to be

substantially equivalent to Mrs. Nester's 2001 Workhorse.  (Tr. 78:14–79:10.)

Plaintiffs do not challenge any other aspect of the test methodology beyond the use

of a different vehicle than the one involved in the accident.  The Court therefore

finds that the methodology used to test the capacity of the vehicle's parking brake

to prevent powered movement was reliable, and will not exclude Dr. Bizzak's

opinion on whether the linkage between the accelerator and parking brake was a

producing cause of Mrs. Nester's injury.

C.    Opinion Concerning the Risk of Using a Utility Cart

Plaintiffs also seek to exclude Dr. Bizzak's opinion concerning the

risk of injury created by the alleged defect.  In his original report, Dr. Bizzak

identified two accidents in the NEISS database that could be viewed as

substantially similar to the accident involving Mrs. Nester.  (Bizzak Rpt. at 9–10.)

---

[7] The Court notes that Dr. Bizzak's own inspection of the vehicle that caused Mrs. Nester's injury indicated that it was "significantly underpowered" and due to the "long term deterioration" of the igniter and ignition coil.  (Dkt. # 102-2 ¶ 19; Dkt. # 107-8 at 5–6.)  Because of the time lags between the vehicle's purchase in 2005, the accident in December 2011, and the testing and inspection of the vehicle in the spring of 2015, it is not clear exactly where the vehicle's engine was on the spectrum from "fully functioning" to "significantly underpowered" at the time of the accident.  This imprecision, and its effect on the strength of Dr. Bizzak's opinion, can be appropriately addressed through cross-examination and the presentation of contrary evidence.  See Daubert, 509 U.S. at 596.

Dr. Bizzak's definition of substantially similar incidents required that (1) the golf cart was unattended, with no one in the compartment; (2) the vehicle movement was caused by an inanimate object depressing the accelerator pedal; and (3) the movement of the object was caused by an external force other than gravity.  (Id. at 10.)  Using the statistical weighting provided by the database and an estimate of the number of golf carts in use,[8] Dr. Bizzak calculated that there would only be 0.21 accidents caused by the alleged defect for every 100,000 car-years of use. (Id.)

Plaintiffs first argue that Dr. Bizzak's definition of substantially similar incidents is too narrow, and that similar incidents include accidents caused by "inadvertent operation or unintended acceleration as a result of Textron's kick-off brake system."  (Dkt. # 80 at 10.)   Textron responds that using two incidents was "generous" given that "there is absolutely no evidence that even the two incidents selected involved the same type of cart with the same type of operating system as the Nester cart."  (Dkt. # 102 at 10.)  Textron is correct in its assessment of the evidence, but its argument does not support its position.  As noted in the Court's above discussion of the McKenzie report, the NEISS data does not include the makes or models of the golf carts involved in the other incidents, and critically,

---

[8] Dr. Bizzak estimated the number of golf carts in use by combining an estimate of the service life of a golf or utility cart and an estimate of EZGO's market share. (Bizzak Rpt. at 9–10.)

does not indicate whether the carts used a kick-off parking brake system.  Because other accidents or occurrences must have been substantially similar to those at issue when offered as evidence for any purpose other than to show notice, <u>Johnson v. Ford Motor Co.</u>, 988 F.2d 573, 579 (5th Cir. 1993), the NEISS data cannot provide a basis on which to calculate the risk of injury from the kick-off parking brake system.[9]

Additionally, Dr. Bizzak's report provided no basis for his estimates of the average service life of similar vehicles or E-Z-GO's market share.  Dr. Bizzak's affidavit notes that because golf carts are not registered and licensed, "there is no source of information by which one can independently establish the average service life of a golf car."  (Dkt. # 102-2 ¶ 26.)  It further states that "there is no means to establish a manufacturer's share of the overall market."  (<u>Id.</u> ¶ 27.)  While Dr. Bizzak may have done his best with the available data, the lack of information regarding the number of similar vehicles in service over the relevant time period left the temporal side of his risk calculation entirely without empirical basis.  The underlying data is simply insufficient to provide a reliable quantitative estimate of the risk of injury due to the alleged defect, and as a result, Dr. Bizzak's

---

[9] The Court further notes that the CPSC recommends a minimum sample size of 20 in order to produce reliable national estimates of injury rates from incidents in the NEISS database.  (Tr. 23:19–24:9.)  Dr. Bizzak used only two incidents in producing his estimated national injury rate, and the Court therefore finds that his opinion on the frequency of injuries caused by the alleged defect is unreliable.

methodology in calculating this estimate was unreliable.  The Court therefore excludes Dr. Bizzak's opinions regarding the risk of injury associated with the kick-off brake system.[10]

D.   Conclusion

In sum, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Exclude the Opinions of Dr. David Bizzak (Dkt. # 80). Specifically, the Court will exclude Bizzak's opinion regarding the risk of injury associated with the kick-off brake system, and denies Plaintiffs' motion in all other respects.

IV.   Expert Testimony of Dr. William Vigilante

Textron moves to exclude the opinion testimony of Plaintiffs' expert Dr. William Vigilante.  (Dkt. # 78 at 1.)  Specifically, Textron argues that Dr. Vigilante's opinions were not timely disclosed, that he is not qualified, that his opinions are based upon improper criteria and an inaccurate statement of Texas law, and that the methodology he used renders his testimony unreliable.  (Id.) Plaintiffs counter that Textron's arguments are about admissibility, that Dr. Vigilante's opinions were timely disclosed, and the methodology is consistent with Texas law.  (Dkt. # 96 at 1–2.)

---

[10] This includes Bizzak's comparison of his risk figure with the risks of other activities, which would have been excluded as irrelevant even if Bizzak's risk analysis methodology had been reliable.

A.    <u>Timely Disclosure</u>

Textron argues that Dr. Vigilante's opinions regarding alleged design

defects in the Workhorse should be excluded because the opinions were not timely

disclosed in Dr. Vigilante's expert report or Plaintiffs' expert disclosure.  (Dkt.

# 78 at 6.)  Textron further argues that the design opinions were expressed for the

first time in his deposition.  (<u>Id.</u>)  The Court first notes that Dr. Vigilante has

offered no opinion on whether the Workhorse contains design defects, and his

opinion regarding the product's design is limited to how ordinary users are likely

to interact with the product in light of its design features.  (Tr. 162:25–163:8.)

In their expert witness disclosures, Plaintiffs indicated that

Dr. Vigilante's testimony would relate to, among other topics:

> Textron['s] awareness of the hazard potential associated with the
> inadvertent operation/unintended acceleration of their E-Z-GO
> Workhorse utility vehicle created by the design of their kick-off brake
> system; responsibility of Textron to identify and mitigate the
> inadvertent operation unintended acceleration hazard associated with
> the kick-off brake system of their E-Z-GO Workhorse utility vehicle;
> responsibility of Textron to identify and mitigate the increased risk of
> inadvertent operation/unintended acceleration created by carrying
> cargo in the passenger compartment of their E-Z-GO Workhorse
> utility vehicle . . . ."

(Dkt. # 31 at 4.)  Additionally, Dr. Vigilante listed the following findings in his

expert report:

1.    Textron was aware of the hazard potential associated with the
inadvertent operation/unintended acceleration of their E-Z-GO

Workhorse utility vehicle created by the design of their kick-off brake system.

2. Textron should have been aware of the increased risk of inadvertent operation/unintended acceleration of the E-Z-GO Workhorse when storing or carrying cargo in the passenger area of the vehicle.

3. Textron had a responsibility to identify and mitigate the inadvertent operation/unintended acceleration hazard associated with the kick-off brake system of their E-Z-GO Workhorse utility vehicle.

4. Textron also had a responsibility to identify and mitigate the increased risk of inadvertent operation/unintended acceleration created by carrying cargo in the passenger compartment of their E-Z-GO Workhorse utility vehicle.

5. Even though they failed to eliminate the hazard through design, Textron failed to provide users with adequate warning and instruction regarding the inadvertent operation/unintended acceleration hazard associated with their kick-off brake system and carrying cargo in the passenger compartment of the E-Z-GO Workhorse utility vehicle.

("Vigilante Rpt.," Dkt. # 78-3 at 24.)  In light of these disclosures, Plaintiffs argue that Textron had sufficient notice of Dr. Vigilante's opinions and was on notice that Dr. Vigilante would offer opinions related to the design of the Workhorse. (Dkt. # 96 at 9.)

Federal Rule of Civil Procedure 26 requires that any party seeking to introduce expert testimony must disclose the identity of that witness together with a report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  "[T]he purpose of the report is to avoid the disclosure of 'sketchy and vague' expert information."  Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546,

571 (5th Cir. 1996).  Therefore, "[t]he test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced."  Klein v. Fed. Ins. Co., No. 7:03-CV-102-D, 2014 WL 6885973, at *2 (N.D. Tex. Dec. 8, 2014) (citations omitted).

Here, Dr. Vigilante's expert report states that he would testify as to Textron's awareness of certain hazards associated with the Workhorse's design. The Court therefore finds that Dr. Vigilante's testimony related to the Workhorse's design was properly disclosed under Rule 26(a)(2)(B)(i).

### B.    Qualifications

Textron argues that Dr. Vigilante's testimony on four subjects should be excluded because he is not qualified to offer opinions on those subjects.  (Dkt. # 109 at 1.)  Specifically, Textron seeks to exclude Dr. Vigilante's opinions on the following issues:

1.    Whether the Workhorse was defectively designed—that is, whether it was unreasonably dangerous considering risk and utility, and opinions regarding design alternatives;

2.    Whether the hazardous situation that led to Mrs. Nester's injuries was "reasonably foreseeable" to Textron;

3.    Whether the lack of warnings rendered the product unreasonably dangerous as marketed, i.e. dangerous to the extent beyond that which would be contemplated by the ordinary user of such products; and

      4.     Whether Mrs. Nester used the same care that a reasonably prudent rancher would have used under the same or similar circumstances.

(Id.)

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).  However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009).

      1.     Defective Design

Textron argues that Dr. Vigilante is not qualified to offer testimony regarding design defects because he is not an engineer and has never been involved in the design or manufacture of a golf cart.  (Dkt. # 78 at 4–6.)  As noted above, Dr. Vigilante's testimony is limited to whether the Workhorse contained a marketing defect, and that he has offered no opinion with regard to the existence of a design defect.  (Tr. 162:25–163:8.)  The stated purpose of Dr. Vigilante's investigation into this case was to "objectively review the materials presented in conjunction with my background, education, training, and experience and to deliver objective, reliable opinions regarding the human factors and marketing (i.e.

47

<u>warnings and instructions) issues</u> relevant to the incident." (Dkt. # 78-3 at 3 (emphasis added).) While Dr. Vigilante's analysis includes an assessment of the product's design as it relates to how the product's users are likely to interact with the product, (Tr. 128:1–21), he has offered no opinion with regard to whether the Workhorse at issue is defectively designed. The Court therefore declines to exclude his testimony on this basis.[11]

2.   <u>Foreseeability of Hazardous Situation</u>

Textron next argues that Dr. Vigilante is not qualified to offer an opinion as to whether the "hazardous situation" leading to Mrs. Nester's injuries was "reasonably foreseeable" to Textron. (Dkt. # 109 at 1.) Neither party provides any argument on this issue apart from the arguments presented regarding Dr. Vigilante's qualifications to opine about design defects. Upon review, the Court finds that Dr. Vigilante is qualified to testify regarding what Textron should or should not have foreseen given the design of the cart. Dr. Vigilante is an expert

---

[11] The Court notes, however, that if Dr. Vigilante were to offer an opinion regarding design defects, it would be excluded. Dr. Vigilante testified that he is not an engineer, (Tr. 156:8–11; "Vigilante Dep.," Dkt. # 78-1, Ex. 1 at 216:25–217:5), that he has never designed a golf cart, (Tr. 156:20–22; Vigilante Dep. 71:25–72:1), and that he has never participated in the manufacturing of a golf cart (Tr. 157:1–3; Vigilante Dep. at 185:11–12). He is therefore not qualified to give an opinion regarding mechanical design defects potentially present in the Workhorse, including opinions regarding design alternatives. <u>See also</u> <u>Hernandez v. Crown Equip. Corp.</u>, — F. Supp. 3d. —, No. 7:13-CV-91(HL), 2015 WL 1064557, at *13 (M.D. Ga. Mar. 11, 2015) (finding that human factors expert was not qualified to offer design defect opinion because the expert had no training, education, or experience in designing forklifts or other similar products).

in "human factors"—in other words, the way cognition and perception relate to human behavior.  (Dkt. # 78-3 at 34.)  Based on his "knowledge, skill, experience, training, and education," Fed. R. Civ. P. 702, Dr. Vigilante is thus qualified to testify as to how an average user would operate Textron's product, which relates directly to whether Mrs. Nester's use of the cart was "reasonably foreseeable."

        3.    <u>Lack of Warnings</u>

Textron next argues that Dr. Vigilante is not qualified to offer an opinion as to whether the lack of warnings rendered the product unreasonably dangerous as marketed—in other words, whether it was "dangerous to the extent beyond that which would be contemplated by the ordinary user of such products." (Dkt. # 109 at 1.)  Textron contends that Dr. Vigilante has no qualifications to render any expert opinion regarding ranchers' expectations regarding utility carts because he is not a rancher and may have never even operated a utility cart.  (Dkt. # 78 at 8.)

Expert witnesses are not strictly confined to their specific areas of practice, but may testify concerning related applications.  <u>Trenando v. Cooper Tire & Rubber Co.</u>, No. 4:08-cv-249, 2009 WL 5061775, at *2 (S.D. Tex. Dec. 15, 2009) (citing <u>Lavespere v. Niagara Mach. & Tool Works, Inc.</u>, 910 F.2d 167, 176–77 (5th Cir. 1990), <u>abrogated on other grounds by</u> <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069 (5th Cir. 1994)).  Again, Dr. Vigilante is an expert in the way in which

cognition and perception relate to human behavior, and his curriculum vitae states that he has experience in the "[a]ffects of warnings and situational factors, and their effect on compliance and risk taking behavior." (Vigilante Rpt. at 34.)

An opinion as to whether a product was more dangerous than an ordinary user would assume in the ordinary course of operating such a product is directly related to Dr. Vigilante's field of expertise. His expert report states that he examined whether the ordinary user would anticipate certain operations of the Workhorse, and whether those operations were readily apparent to the ordinary user given the warnings provided on the product. (Id. at 3.) Dr. Vigilante also testified at the hearing that he looked at the reasonableness of Mrs. Nester's actions based on what would be expected of an ordinary user of the product. (Tr. 120: 3–15.) In other words, he applied his human factor expertise to Mrs. Nester's operation of the Workhorse. The fact that Dr. Vigilante personally is not a rancher has no bearing on the analysis, and the Court finds that he is qualified to offer such an opinion.

### 4. "Reasonably Prudent Rancher"

Textron lastly argues that Dr. Vigilante is not qualified to offer an opinion as to whether Mrs. Nester used the same care that a reasonably prudent rancher would have used under the same or similar circumstances. (Dkt. # 109 at 1.) Again, Textron points to the fact that Dr. Vigilante is not a rancher and does

not operate utility carts.  (Dkt. # 78 at 9.)  The relevant standard in assessing

whether Mrs. Nester was negligent in her operation of the vehicle is the degree of

care that would be used by a reasonably prudent person under the same or similar

circumstances.  See Omega Contracting, Inc. v. Torres, 13 S.W.3d 828, 839 (Tex.

App. 2006).  Dr. Vigilante need not have any experience or background in

ranching to offer an opinion on the degree of care that would be used by a

reasonably prudent person.  Such experience may instead go to the weight of his

opinion concerning what a reasonably prudent person would do under the "same or

similar circumstances."  For the reasons explained above, the Court finds that

Dr. Vigilante is qualified to testify as to how an ordinary user would operate a

Workhorse cart, and how the ordinary user would respond to warnings regarding

the cart's operation.

C.    Improper Criteria; Contrary to Texas Law

Textron next objects to Dr. Vigilante's testimony that the hazardous

situation leading to Mrs. Nester's injuries was "reasonably foreseeable" to Textron

on the grounds that he based his opinion upon improper criteria and an

inappropriate definition of "reasonably foreseeable" that is contrary to Texas law.

(Dkt. # 78 at 7.)  Textron points to the portion of Dr. Vigilante's deposition in

which he testified as follows:

A:    The first step in hazard analysis is to identify all those hazards
      that you can.

51

Q:     And that would be those that are possible as well as those that are probable?

A.     All of them.

Q:     Okay.

A:     Probable, possible, improbable.

Q:     And when you say—sorry.

A:     You know, you identify all the potential hazards associated with the product.  If you find things that you're coming up with that are improbable or impossible, of course you can write those off, but again, it's a—it's a formal process that ensures that you're looking at this product from a design standpoint from all relevant angles and identifying everything that's foreseeable—reasonably foreseeable.  And then once you identify them, you can determine how you're going to deal with them.

Q:     Well, but—

A:     Sometimes you don't have to deal with them because they are improbable.

Q:     I understand that.  What you seem to be saying, without answering my question, is that reasonably foreseeable hazards include possible as well as probable hazards?

A:     They can.

. . .

Q:     My question is: Do you consider all hazards that one can think of or speculate about or conjecture to be reasonably foreseeable hazards?

A:     I guess the problem I'm having is that your question is conflicting.  If you can think about it, or if you can imagine it, it's reasonably foreseeable.

(Vigilante Dep. 123:21–124:21; 126:7–14.)

An expert's opinion on a question of mixed law and fact is not inadmissible merely because it embraces an ultimate issue to be decided by the factfinder.  Fed. R. Evid. 704; United States v. Milton, 555 F.2d 1198, 1202 (5th

Cir. 1977).  However, such testimony may be inadmissible if the expert lacks

understanding of the relevant underlying legal standard.  See Fed. R. Evid. 702.

Here, the deposition excerpt cited by Textron does not establish that Dr. Vigilante

believes an event is "reasonably foreseeable" in the legal sense "if you can think

about it or if you can imagine it."  In this portion of the deposition, Dr. Vigilante

was being questioned about the process of hazard analysis, not his understanding

of the legal definition of "reasonably foreseeable."  There is no evidence

suggesting that this is the standard Dr. Vigilante relied upon when formulating his

conclusions in this case.[12]  Dr. Vigilante has served as an expert witness in

upwards of 300 cases (Vigilante Dep. 218:4), and presumably is aware that legal

terms have legal meanings and that he cannot decide for himself how to define

such terms without direction from the counsel who retained him.  The Court will

not exclude Dr. Vigilante's testimony on these grounds.

---

[12] Even if Vigilante's opinions were based on such a standard, the standard does
not directly conflict with Texas law.  Under Texas law, "[a]n event is reasonably
foreseeable if a person of ordinary intelligence should have anticipated dangers
that his negligent act created for others.  To establish foreseeability, it is not
necessary that the exact nature of the injury or the precise manner of its infliction
should be foreseen, but the actor need only foresee injury of the same general
character as the actual injury."  Baylor Med. Plaza Servs. Corp. v. Kidd, 834
S.W.2d 69, 74 (Tex. App. 1992).  In the products liability context, a manufacturer
of a specialized product is "charged with the foreseeability of persons who possess
the special knowledge and ability of those involved in this field of endeavor."  Id.
at 74–75.  Contrary to Textron's assertion, Vigilante's testimony was not at odds
with this definition.

D.     <u>Reliable Methodology</u>

Textron objects to Dr. Vigilante's conclusions that the warnings provided rendered the Workhorse unreasonably dangerous as marketed and that Mrs. Nester used reasonable care in her cube spreading process on the grounds that he did not use reliable methodology in forming his opinions.  (Dkt. # 78 at 8.)  As explained above, the reliability analysis asks whether the reasoning or methodology underlying the expert testimony is scientifically valid.  <u>Moore</u>,151 F.3d at 276.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Pipitone</u>, 288 F.3d at 250.

1.     <u>Lack of Additional Warnings</u>

Textron first argues to exclude Dr. Vigilante's opinion that the alleged lack of additional warnings rendered the Workhorse unreasonably dangerous as marketed because he did not use a reliable methodology for determining the expectations of ranchers or utility cart users.  (Dkt. # 78 at 8.)  Specifically, Textron claims that Dr. Vigilante has not spoken with any ranchers or cart users about their expectations regarding hazards associated with the Workhorse or its operational system.  (<u>Id.</u>, citing Vigilante Dep. 150:5–151:6.)

Dr. Vigilante's expert report states that:

[T]he purpose of my investigation was to objectively review the materials presented in conjunction with my background, education,

54

> training and experience and deliver objective, reliable opinions about
> human factors, warnings and instruction issues involved in the matter.
> As part of that analysis, I was provided with the materials and
> instructions, attached here as Appendix A, and asked to utilize those
> questions and instructions in my analysis and I have done so.

(Vigilante Rpt. at 8.)  In reaching his conclusion that the Workhorse was

unreasonably dangerous as marketed in the absence of further warnings,

Dr. Vigilante relied on a number of sources, including publications by the National

Safety Council and other human factors experts, deposition testimony from

Textron representatives, and the American National Standard for Product Safety

Signs and Labels.  (Tr. 123:1–14; Dkt. # 78-3 at 13–15, 27.)  He also determined

that Textron failed to meet the ANSI guidelines for product safety signs and labels.

(Id. at 17.)  These are the types of publications and sources that a human factors

expert would be expected to rely upon.  In fact, in another case involving both

Textron and Dr. Vigilante, a district court found that:

> In reaching his opinion that the golf car's warnings were inadequate,
> Vigilante considered established standards and guidelines for product
> warnings, as well as warnings and human factors literature and his
> own extensive experience and training in human factors analysis.
> Specifically, Vigilante determined that Textron's warnings did not
> meet the American National Standards Institute ("ANSI") guidelines
> for "product safety signs and labels" and was inconsistent with criteria
> set forth in various articles and literature on adequate product
> warnings.  Such opinions go beyond the mere "ipse dixit of the
> expert," and are sufficiently reliable to survive a Daubert challenge.

<u>Jenks v. N.H. Motor Speedway</u>, No. 09-cv-205-JD, 2012 WL 405479, at *3

(D.N.H. Feb. 8, 2012).  The Court finds the reasoning in <u>Jenks</u> persuasive, and

likewise finds that Dr. Vigilante's methodology in determining whether the

absence of additional warnings rendered the Workhorse unreasonably dangerous is

sufficiently reliable.

   2. <u>Cube Spreading Process</u>

   Textron also argues that Dr. Vigilante's opinion regarding whether

Mrs. Nester used reasonable care in her "cube spreading process" should also be

excluded on the grounds that he did not use reliable methodology in arriving at his

conclusion.  (Dkt. # 78 at 8.)  The Court first notes that the relevant question with

regard to whether Mrs. Nester was contributorily negligent in the accident that

caused her injuries is whether her actions were consistent with what "a person of

ordinary prudence would have done under the same or similar circumstances."

<u>20801, Inc. v. Parker</u>, 249 S.W.3d 392, 398 (Tex. 2008).  The question is thus not

whether Mrs. Nester "used reasonable care in her cube spreading process," but

whether she used reasonable care in her operation of the vehicle, which may be

informed by how she was feeding the cattle while operating the vehicle.  More

importantly, Dr. Vigilante's report renders no opinion with regard to the process

Mrs. Nester used to feed her cattle, and Dr. Vigilante testified that he has "no

opinion on the cattle cube spreading." (Tr. 140:25–141:12.) The Court therefore declines to exclude his testimony on this basis.

    E.    <u>Conclusion</u>

        In summary, the Court **DENIES** Textron's Motion to Exclude the Testimony of William Vigilante (Dkt. # 78).

<u>CONCLUSION</u>

        For the foregoing reasons, the Court (1) **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Exclude Dr. McKenzie's Report (Dkt. # 91); (2) **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Exclude the Expert Testimony of Herbert C. Newbold (Dkt. # 88); (3) **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Exclude the Opinions of Dr. David Bizzak (Dkt. # 80); and (4) **DENIES** Defendant's Motion to Exclude Dr. Vigilante's Report (Dkt. # 78).

        **IT IS SO ORDERED.**

        **DATED:** Austin, Texas, November 17, 2015.

_____

David Alan Ezra
Senior United States Distict Judge